Appeal Nos. 12-2208 and 12-2209

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 12-2208

WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO,
Plaintiff, Appellant,
v.
ADM ASSOCIATES, LLC,
Defendant, Appellee,

JOSEPH CARAMADRE, ET AL.,
Defendants.

No. 12-2209

WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO,
Plaintiff, Appellant,
v.
DK LLC, ET AL.,
Defendant, Appellee,

JOSEPH CARAMADRE, ET AL.,
Defendants.

On Appeal from the United States District Court, District of Rhode Island

**BRIEF OF APPELLANT**

Catherine R. Connors
Brooks R. Magratten
Michael J. Daly
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100
Attorneys for Appellants

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure

Plaintiff/Appellant submits the following corporate disclosure statement:

Western Reserve Life Assurance Co. of Ohio is owned by
AEGON USA, LLC., which is owned by AEGON U.S. Holding
Corporation, owned by Transamerica Corporation, owned by
The AEGON Trust, owned by AEGON International B.V., owned by
AEGON N.V.

Dated: March 8, 2013

/s/ Catherine R. Connors
Catherine R. Connors
First Circuit Bar No. 7451
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..............................................................................v

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS ........................................................................5

    I.    The fraudulent scheme:  Defendants obtained policies based on the lives of terminally ill strangers. ........................................................5

        A.    The DK transaction:  Defendants find terminally ill Jason Veveiros, with whom they have no relationship, and, unbeknownst to him, have him sign a Policy application. .........7

        B.    The ADM transaction:  Defendants find terminally ill Charles Buckman, with whom they have no relationship, and have him sign a Policy application. .....................................8

    II.    The suits:  Western Reserve took action to declare the Policies void as soon as it discovered the scheme. .............................................9

    III.    The appealed rulings:  the District Court dismissed all claims against DK and ADM, concluding that Rhode Island does not require an insurable interest for annuities with death benefits and that the Policies' incontestability clauses precluded any relief....................................................................................................10

SUMMARY OF THE ARGUMENT .....................................................12

ARGUMENT ...........................................................................................15

    I.    Standard of review:  the Court reviews the allegations de novo, with no deference to the District Court's interpretation of Rhode Island law. ...............................................................................15

II.   The Policies are void *ab initio* for lack of an insurable interest. ........15

A.   Rhode Island law requires an insurable interest in contracts with benefits dependent upon the death of another. ...................................................................15

1.   Under Rhode Island common law, in the absence of an insurance interest, a contract with benefits dependent upon the death of another is void a policy wagering against continued life. ..........................15

2.   Rhode Island statutory law also requires an insurable interest for any insurance contract upon the life of another. ...........................................19

B.   Both the Section 27-4-27 and the common law require DK and ADM to have an insurable interest in the Policies. ..................................................................21

1.   Section 27-4-27 applies to the Policies. .........................21

a.   The Policies, with their death benefits, are "insurance contracts" within the meaning of Section 27-4-27. ..................................................21

b.   The death benefits cannot be carved out of the Policies in determining the applicability of Section 27-4-27. ..............................................23

c.   The insurable interest requirement of Section 27-4-27(a) is not limited to "Life Insurance" contracts as that term is defined in Section 27-4-0.1; in any event, the Policies meet this statutory definition, too. ..........25

d.   Rhode Island's Life Settlements Act does not suggest that STATs are countenanced. ..........31

2.   The Policies violate Rhode Island's common law insurable interest requirement, rendering them void *ab initio*. .........................................................33

Page

III.    The incontestability clauses do not bar Western Reserve's claims................................................................................34

    A.    Incontestability clauses do not apply when the contracts are void *ab initio* because they lack insurable interests............35

    B.    The Policies' incontestability clauses are additionally unenforceable because they make the Policies incontestable at their inception. ................................................40

    C.    The incontestability clauses do not bar claims that do not challenge the validity of the Policies. .......................................43

CONCLUSION ......................................................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................45

CERTIFICATE OF SERVICE .............................................................46

# TABLE OF AUTHORITIES

Page

## CASES

*American Deposit Corp. v. Schacht*,
84 F.3d 834 (7th Cir. 1996) ...........................................................28

*Amex Life Assur. Co. v. Superior Court*,
930 P.2d 1264 (Cal. 1997)...........................................................36

*Atty. Gen. v. C. E. Osgood Co.*,
144 N. E. 371 (Mass. 1924)...........................................................22

*Beard v. Am. Agency Life Ins. Co.*,
550 A.2d 677 (Md. 1988) ..................................................... 36, 37

*Birkett v. Chatterton*,
13 R.I. 299 (1889)...........................................................39

*Bogacki v. Great-West Life Assur. Co.*,
234 N.W. 865 (Mich. 1931) ...........................................................37

*Brennan v. Kirby*,
529 A.2d 633 (R.I. 1987)...........................................................24

*Carter v. Continental Life Ins. Co.*,
115 F.2d 947 (D.C. Cir. 1940)...........................................................36

*Clark v. Allen*,
11 R.I. 439 (1877)..................................................... 16, 17, 30

*Commonwealth Life Ins. Co. v. George*,
28 So. 2d 910 (Ala. 1947)...........................................................39

*Connecticut Mutual Life Ins. Co. v. Schaefer*,
94 U.S. 457 (1876)...........................................................16

*Cronin v. Vermont Life Ins. Co.*,
40 A. 497 (R.I. 1898)............................................. 12, 13, 17, 18, 19, 30, 34

*Delk v. Markel American Ins. Co.*,
81 P.3d 629 (Okla. 2003)...........................................................29

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*,
　　215 F.3d 182 (1st Cir. 2000)............................................................15

*Evora v. Henry*,
　　559 A.2d 1038 (R.I. 1989)...............................................................38

*Feliciano-Hernandez v. Pereira-Castillo*,
　　663 F.3d 527 (1st Cir. 2011)............................................................15

*Fishel v. Union Central Life Ins. Co.*,
　　270 N.Y.S. 734 (City Ct. 1933)........................................................41

*Flanigan v. Federal Life Ins. Co.*,
　　83 N.E. 178 (Ill. 1907)....................................................................41

*Gorman v. Gorman*,
　　883 A.2d 732 (R.I. 2005)................................................................25

*Grisby v. Russell*,
　　222 U.S. 149 (1911)........................................................................17

*Guarantee Trust Life Ins. Co. v. Wood*,
　　631 F. Supp. 15 (N.D. Ga. 1984)............................................. 36, 43

*Henderson v. Life Ins. Co. of Virginia*,
　　179 S.E. 680 (S.C. 1935).................................................................37

*Home Life Ins. Co. of N.Y. v. Masterson*,
　　21 S.W.2d 414 (Ark. 1929) ............................................................39

*Kemper v. Equitable Life Ins. Co. of Iowa*,
　　171 N.E. 2d 536 (Ohio Ct. App. 1960) ...........................................37

*Knowles v. Ponton*,
　　190 A.2d 4 (R.I. 1963)....................................................................20

*Lawson v. FMR, LLC*,
　　670 F.3d 61 (1st Cir. 2012).............................................................25

*Lerner v. Lerner*,
　　508 N.Y.S.2d 191 (N.Y. App. Div. 1986).......................................23

*Lichoulas v. City of Lowell*,
    555 F.3d 10 (1st Cir. 2009)..............................................................5

*Love v. Prudential Ins. Co. of America*,
    176 S.E. 333 (S.C. 1934) ................................................................43

*Massachusetts Benefit Life Ass'n v. Robinson*,
    30 S.E. 918 (Ga. 1898) ...................................................................42

*Mohr v. Prudential Ins. Co. of America*,
    78 A. 554 (R.I. 1911)................................................... 14, 17, 18, 40

*Mowry v. Home Ins. Co.*,
    9 R.I. 346 (1869)................................................................... 16, 17

*Murray v. State Mut. Life Ins. Co.*,
    48 A. 800 (R.I. 1901)................................................ 14, 35, 38, 42

*Mutual Dev't Corp. v. Ward Fisher & Co.*,
    47 A.3d 319 (R.I. 2012)..................................................................22

*Nationsbank of N.C., N.A. v. Variable Annuity life Ins. Co.*,
    513 U.S. 251 (1995)........................................................................28

*New England Mut. Life Ins. Co. v. Caruso*,
    535 N.E.2d 270 (N.Y. 1989) ..........................................................37

*Nyonteh v. Peoples Sec. Life Ins. Co.*,
    958 F.2d 42 (4th Cir. 1992) ............................................................38

*Obartuch v. Sec. Mut. Life Ins. Co.*,
    114 F.2d 873 (7th Cir. 1940) ..........................................................35

*Paul Revere Life Ins. Co. v. Fima*,
    105 F.3d 490 (9th Cir. 1997) .................................................. 13, 36

*Pelletier v. Phoenix Mut. Life Ins. Co.*,
    141 A. 79 (R.I. 1928)......................................................................38

*PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*,
    28 A.3d 1059 (Del. 2011) ....................................................... 13, 35

*Prudential Ins. Co. v. Tanenbaum*,
    167 A. 147 (1933)......................................................................38

*Reagan v. Union Mutual Life Ins. Co.*,
    76 N.E. 217 (Mass. 1905).................................................. 14, 41

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991)..................................................................15

*SEC v. Variable Annuity Life Ins. Co.*,
    359 U.S. 65 (1979).............................................................. 28, 29

*Sisson v. Prata Undertaking Co*,
    141 A. 76 (R.I. 1928).......................................................... 22, 23

*State v. Huxford*,
    87 A. 171 (R.I. 1913).................................................................33

*State v. Rhode Island Alliance of Social Services Employees,*
*Local 580, SEIU*,
    747 A.2d 465 (R.I. 2000)...........................................................39

*Stratton v. Service Life Ins. Co. of Lincoln*,
    222 N.W. 332 (Neb. 1928) ........................................................41

*Tulipano v. U.S. Life Ins. Co. in the City of New York*,
    154 A.2d 645 (N.J. Super. 1959)................................................36

*Warnock v. Davis*,
    104 U.S. 775 (1881)...................................................... 12, 15, 18

*Welch v. Union Central Life Ins. Co.*,
    78 N.W. 853 (Iowa 1899) .........................................................42

*Western Reserve Life Assurance Co. of Ohio v. Conreal LLC*,
    715 F. Supp. 270 (D.R.I. 2010) .......................................... *passim*

*Western Reserve Life Assurance Co. of Ohio v. Conreal LLC*,
    847 F. Supp. 329 (D.R.I. 2010) .................................................11

*Wood v. New York Life Ins. Co.*,
    336 S.E. 2d 806 (Ga. 1985) ......................................................36

## STATUTES, RULES AND REGULATIONS

Fed. R. App. P. 42(b) ...................................................................1

Fed. R. App. P. 54(b) ...................................................................1

Fed. R. Civ. P. 12(b)(6) ........................................................... 4, 15

R.I. Gen. Laws § 5-20.6-1(b) ......................................................20

R.I. Gen. Laws § 9-1-2 ................................................................10

R.I. Gen. Laws § 11-41-29 ...................................................... 4, 10

R.I. Gen. Laws § 27-4 ..................................................................21

R.I. Gen. Laws § 27-4-0.1 ......................................... 25, 26, 27, 28

R.I. Gen. Laws § 27-4-6.2(a) .......................................................40

R.I. Gen. Laws § 27-4-27 ....................................................... *passim*

R.I. Gen. Laws § 27-72 ................................................... 31, 32, 33

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1332 ...........................................................................1

## OTHER AUTHORITIES

44 Am. Jur. 2d Insurance § 767 (2003) .....................................37

Black's Law Dictionary (5th ed. 1979)......................................21

44 C.J.S. Insurance § 352 (2007).................................................37

Couch on Insurance 3D § 240:7 (2000)........................................40

Edwin W. Patterson, *Insurable Interest in Life*,
    18 Colum. L. Rev. 381 (1918)...............................................30

*Restatement (Second) of Contracts* § 7 (1981) ..........................39

*Stranger-Initiated Annuity Transactions and the Case for Insurable Interest*,
      19 Conn. Ins. L.J 113 (Fall 2012)..................................................... 12, 24, 32

16 Williston on Contracts § 49-95 (4th ed. 2000) ...................................................40

## JURISDICTIONAL STATEMENT

These are appeals from judgments dated August 2, 2012 entered in favor of (1) Defendant DK LLC (DK), in District Court Civil Docket CV-00473-S-PAS, Appeal No. 12-2209; and (2) ADM Associates, LLC (ADM), in District Court Civil Docket CV-00472-S-PAS, Appeal No. 12-2208.  (Addendum or Add. 42-43.)[1]

The District Court had jurisdiction over these matters pursuant to 28 U.S.C. § 1332.  (*See* Appendix or App. 36, ¶ 8; 183, ¶ 9.)  The notices of appeal were filed on August 30, 2012.  (App. 144, 265.)

The August 2, 2012 judgments were entered pursuant to Federal Rule of Civil Procedure 54(b).  (Add. 41-42.)  On November 16, 2012, this Court entered an Order retaining jurisdiction, but remanding for a statement of reasons supporting the entry of the judgments.  The District Court issued its Statement of Reasons, filed with this Court, on November 27, 2012, noting, *inter alia*, that it had had determined that there was no just reason to delay the judgment as to DK and ADM until after an anticipated lengthy trial of the remaining claims against other Defendants on issues unrelated to those remaining for trial.  Jurisdiction over these appeals is proper under 28 U.S.C. § 1291.

---

[1] A third appeal of a third judgment appealed in Docket 12-2207 was settled, with a dismissal agreement pursuant to Federal Rule of Appellate Procedure 42(b) filed with this Court on March 5, 2013 and judgment entered the next day.

**STATEMENT OF THE ISSUES**

1.  Did the District Court err as a matter of law in dismissing the claims against Defendant-Appellees DK and ADM on the basis that under Rhode Island law, DK and ADM need not have insurable interests in the annuities with death benefits that DK and ADM purchased from Plaintiff-Appellant Western Reserve Life Assurance Co. of Ohio ("Western Reserve")?

2.  Did the District Court err as a matter of law in dismissing the claims against DK and ADM on the basis that under Rhode Island law the claims were barred by the incontestability clause in the annuities with death benefits that DK and ADM purchased from Western Reserve?

Western Reserve respectfully submits that the answer to both questions is yes. "Stranger-Originated Annuity Transactions" (STATs) with death benefits are against public policy and void under Rhode Island law.

## STATEMENT OF THE CASE

Western Reserve has sued various Defendants based on their participation in a broad-based fraudulent scheme.  In this scheme, the Defendants preyed upon terminally ill individuals to serve as the measuring lives for Western Reserve annuities with death benefits.  (*See* App. 37, 184; Add. 1-40.)  The mastermind of this scheme, Defendant Joseph A. Caramadre, was indicted on 66 counts of wire fraud, mail fraud, conspiracy to commit offenses against the United States, identity theft, aggravated identity theft, money laundering, and witness tampering; pled guilty to one count of wire fraud and one count of conspiracy to commit offenses against the United States; and has recently attempted to rescind his guilty plea.  *See U.S. v. Caramadre*, 1:11-cr-00186/S (D.R.I.).

Defendant-Appellees DK and ADM – of which Caramadre is an officer, agent, employee or controlling member (App. 36, ¶¶ 11-12; 183, ¶¶ 12-13; 187, ¶ 31) – are the owner-beneficiaries of the instruments upon which these actions are based (hereinafter "the Policies").  (App. 40 ¶ 29; 187, ¶ 30.)[2]

The operative complaints[3] seek rescission or a declaratory judgment to declare the Policies void, and assert claims for damages for common law fraud,

---

[2] The instruments refer to themselves as policies throughout.  (*E.g.*, App. 81.)
[3] These are the Third Amended Complaint for DK (App. 182) and the Second Amended Complaint for ADM (App. 35).

civil liability for crimes and offenses pursuant to R.I. Gen. Laws § 11-41-29, and civil conspiracy.  (App. 41-44, 47-48, 189-193, 196-197.)

The District Court of Rhode Island (Smith, J.) granted dismissal of the claims against DK and ADM pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 2, 2010.  (Add 1.)  Other claims, against other Defendants, remained.  (*See* Add. 18-19.)  After further amendment to the complaints and motions to dismiss and to reconsider relating to other parties, the District Court issued a second decision affirming the dismissal of the claims previously dismissed and dismissing and retaining other claims against other Defendants.  (*See* Add. 20.)  Thereafter, the District Court entered a final judgment as to DK and ADM as well as one other annuity owner-beneficiary.  (Add. 42-43.)

These appeals ensued.  After this Court consolidated the appeals and extended the briefing schedule based on ongoing settlement discussions (*see* Order of Court dated January 3, 2013), the claims relating to the other appeal were settled, leaving the claims against DK and ADM for disposition.  (*See supra* n. 2.)

## STATEMENT OF FACTS

I.    **The fraudulent scheme: Defendants obtained policies based on the lives of terminally ill strangers.**

The factual allegations describing Defendants' scheme (App. 36-41, 183-188) are assumed to be true for the purposes of this appeal. *Lichoulas v. City of Lowell*, 555 F.3d 10, 12 (1st Cir. 2009).

Caramadre and his associates looked for individuals who were seriously ill and needed money. Through advertisements, flyers and/or a network of hospice workers, they sought out strangers meeting these criteria and lured them with cash offers to sign applications for policies or investment accounts. (App. 38, ¶ 18; 39, ¶ 24; 54; 184, ¶ 16; 185, ¶ 19; 203.)

Caramadre would typically orchestrate a relatively low initial premium with an application, invested conservatively, so as not to generate questions or raise suspicions by the insurer. Later, after the policy was issued, Caramadre's investors would supplement the investment with a substantially higher premium and transfer funds into higher-yielding and riskier investments. (App. 39, ¶ 21; 186, ¶ 23.)

Caramadre's investors would elect, for an additional premium, a "Double Enhanced Death Benefit." (App. 40, ¶¶ 27, 29; 73; 187, ¶ 30; 224.) This option guarantees the beneficiary the greater of either: 1) the "amount equal to your total premiums accumulated at 5% annually [on a compounding basis] (less adjusted partial surrenders);" or 2) "an amount equal to the largest policy value on any

5

annual anniversary, plus premiums and less any adjusted partial surrenders that occur after the highest anniversary." (App. 38, ¶ 20; 65; 186, ¶ 31; 214.)  By exploiting the terminally ill, with short lifespans, and including the Double Enhanced Death Benefit, the policy became a hedge and a vehicle for a short-term investment in the equity markets.  When the annuitant dies, the owner/beneficiary locks in any market gains during that period.  Should the markets yield losses, the Double Enhanced Death Benefit guarantees, at a minimum, a return of the investment premium.  (App. 37, ¶ 17; 184-85, ¶ 18.)

The death benefit component was integral to the scheme, along with short life spans for the annuitants.  Under the structure of the policy, if the annuitant survives past the point when underlying annuity payments begin to be paid out, then the available death benefit is reduced.  (*See* App. 105, 257.)  And if the annuitant is fortunate to live long enough for all of the annuity payments to be disbursed during his or her lifetime, then no death benefit is payable.  (*See id.*; App. 65, 96, 214, 247.)  This would result in policy owner's inability to recover the guaranteed minimum return available only through the Double Enhanced Death Benefit rider that it purchased.  Moreover, as long as the annuitant is alive, the owner cannot receive a lump sum distribution of its entire investment without incurring a financial penalty.  (*See* App. 87, 238.)  Regardless of market performance or the amount of the death benefit, the entire corpus of the investment

6

is unavailable as long as the annuitant is living.  Hence, Caramadre and his associates targeted the terminally ill – their gains and hedge were dependent upon the combination of the death benefit riders and the imminent deaths of the annuitants.

### A.    The DK transaction:  Defendants find terminally ill Jason Veveiros, with whom they have no relationship, and, unbeknownst to him, have him sign a Policy application.

The Defendants' scheme was effected through DK as owner-beneficiary as follows.  Caramadre or his associate, Defendant Radhakrishnan, located Jason Veveiros, terminally ill with cancer, through his hospice.  (App. 186, ¶¶ 24-25.) Radhakrishnan convinced Veveiros to sign an application for a Western Reserve Policy by paying Veveiros $7,000.  Radhakrishnan did not explain to Veveiros, and Veveiros had no knowledge, how the Policy worked, or what Veveiros' involvement would be.  (App. 186-87, ¶¶ 26-27; 220-21.)  He was not told, and did not know what he was signing.  (App. 220, ¶¶ 5-6.)

Because Caramadre and his associates needed an agent to submit the Policy application, they arranged that Defendant Hanrahan of Defendant The Leaders Group, Inc., sign and submit the Policy application to Western Reserve, listing DK as the owner and beneficiary, and accompanied by a $250,000 initial premium payment.  (App. 187, ¶¶ 27, 29-30, 33.)  Consistent with and integral to the scheme, the application sought the Double Enhanced Death Benefit.  (App. 187,

7

¶ 30.)  Veveiros had no relationship with DK, did not know, and had never met Hanrahan.  (App. 187, ¶¶ 32, 35.)

Western Reserve received the DK application with Veveiros' signature in August or September 2008.  (App. 187, ¶ 28.)  It issued the Policy with the date of September 9, 2008.  (App. 188, ¶ 37; 232.)  DK then made an additional premium payment of $750,000 eight days later.  (App. 188, ¶ 38.)

> **B.    The ADM transaction:  Defendants find terminally ill Charles Buckman, with whom they have no relationship, and have him sign a Policy application.**

The scheme played out with respect to the ADM policy similarly. Defendants found Charles Buckman, terminally ill with Chronic Obstructive Pulmonary Disease.  (App. 39, ¶ 23.)  He accepted $5000 to sign an application (*id.* ¶ 24), never meeting the purported agent, Defendant Hanrahan, and having no relationship with ADM.  (App. 40, ¶¶ 30, 33.)

Western Reserve received the application, signed by Buckman as the proposed annuitant, on or about September 2008, together with an initial premium payment of $250,000.  (App. 40, ¶ 27; 79.[4])  The application, submitted by Defendant Hanrahan and/or his brokerage firm, the Defendant Leaders Group (App. 40, ¶ 28), listed ADM as the primary owner and beneficiary.  (*Id.*, ¶ 29; 71.)

---

[4] The Second Amended Complaint alleges that the application was received in March 2008.  (App. 40, ¶ 27.)  The application, however, was not received until September 2008.  (*See* App. 79, 81.)

Consistent with and integral to the scheme, the application requested the Double

Enhanced Death Benefit.  (App. 40, ¶ 29; 73.)

Western Reserve issued the Policy, with the requested death benefits, with

an effective date of September 15, 2008.  (App. 40, ¶ 35; 81.)  Shortly thereafter,

ADM invested an additional $750,000 in the Policy.  (App. 41, ¶ 36.)

## II.     The suits:  Western Reserve took action to declare the Policies void as soon as it discovered the scheme.

Within the months following the issuance of the Policy, Western Reserve

learned of Veveiros and Buckman's previously undisclosed health condition; the

absence of any relationship between Veveiros, Buckman and DK, ADM or

Hanrahan; the payment of money to Veveiros and Buckman to sign the

applications; the circumstances surrounding the applications; and various material

misrepresentations and omissions associated with the applications.  (App. 41, ¶ 38;

41-42, ¶¶ 41-44; 188, ¶¶ 40-41.)

By letter dated September 24, 2009, Western Reserve notified Veveiros,

DK, Buckman and ADM that it was rescinding their Policies.  (App. 41, ¶ 39; 108;

188, ¶ 42; 260.)  A week later, it filed suits to declare the Policies void and/or

rescinded and to recover damages.  (App. 1, 146.)

The grounds asserted voiding the Policies include the requirement,

longstanding under both Rhode Island statutory and common law and consistent

with the law elsewhere, that the owner-beneficiary of a death benefit, here DK and

9

ADM, have insurable interests in the lives upon whom the policies are based,

which, as strangers to Veveiros and Buckman, they lacked.  (App. 42, ¶¶ 46-47;

43, ¶ 51; 190, ¶¶ 49-50.)  Because Veveiros had no idea what he was signing,

Western Reserve additionally sought damages for fraud in the inducement and

factum.  (App. 191-92.)  ADM was included in Western Reserve's common law

fraud count as a member of the fraudulent scheme (App. 43-44).  DK and ADM

were additionally named as Defendants in Western Reserves' claims for civil

liability for crimes and offenses in violation of R.I. Gen. Laws §§ 9-1-2 and

11-41-29 (App. 47-48, 196-197), and for civil conspiracy for their participation in

the scheme.  (App. 48, 197.)[5]

### III.    The appealed rulings:  the District Court dismissed all claims against DK and ADM, concluding that Rhode Island does not require an insurable interest for annuities with death benefits and that the Policies' incontestability clauses precluded any relief.

The District Court rejected Western Reserve's claims for rescission and/or a

declaratory judgment on the ground that, in its view, an insurable interest was not

required for the Policies, because the Court concluded that they were not an

"insurance contract[s] upon the life or body of another" within the meaning of

Rhode Island Gen. Laws § 27-4-27.  (Add. 1, *Western Reserve Life Assurance Co.*

---

[5] Veveiros and Buckman are named as Defendants only for the counts of the complaints seeking to void the Policies, and not the counts seeking damages. (App. 41-43; 189-91; *see* App. 190, ¶¶ 48, 51 (noting that the fraud was perpetrated on Veveiros).)

*of Ohio v. Conreal LLC*, 715 F. Supp. 270, 276 (D.R.I. 2010) (hereinafter

*Conreal I*).)  In so ruling, the District Court stated, *inter alia*, that the Policies'

death benefits were insufficient to make them fall within Rhode Island's

longstanding prohibition of speculative contracts on the life of another.  (*See id.* at

278, concluding that the death benefits "merely sweeten [the] deal; they do not

define it.")

The District Court additionally dismissed the claims against DK and ADM

based on the Policies' incontestability clauses, which provide that the Policies

"shall be incontestable from the Policy Date."  (Add. 1, *Conreal I*, 715 F. Supp. at

279, 280; *see* App. 84, 235.)  In so ruling, the District Court tacitly rejected, *inter*

*alia*, Western Reserve's argument and authority, reflecting the majority view, that

incontestability clauses do not apply when a policy is void *ab initio*, such as when

the policy lacks an insurable interest.  (*See id.*, 715 F. Supp. at 279-80.)

Thereafter, the District Court confirmed this ruling, as well as rejected the

fraud in the factum claim against DK.  (Add. 20, *Western Reserve Life Assurance*

*Co. of Ohio v. Conreal LLC*, 847 F. Supp. 329, 333, 343-44 (D.R.I. 2010).)

11

## SUMMARY OF THE ARGUMENT

*Insurable Interest.*  The question presented is whether stranger-originated annuity transactions (STATs), like stranger-originated life insurance (STOLI), are void as against public policy for lacking an insurable interest, when the STAT includes death benefits such as those included in the Policies at issue here.  The District Court's decision is "the lone case to hold that insurable interest requirements are not applicable to STATs."  *Stranger-Initiated Annuity Transactions and the Case for Insurable Interest* (hereinafter *STATs*), 19 Conn. Ins. L.J 113, 113 (Fall 2012).  For all the reasons STOLI is prohibited, so also are STATs:  to prevent wagering on human lives, which creates perverse economic incentives to curtail those lives.  *See Warnock v. Davis*, 104 U.S. 775, 779 (1881) (a policy lacking an insurable interest "would constitute what is termed a wager policy, or a mere speculative contract upon the life of the assured, with a direct interest in its early termination.")

Nothing in Rhode Island law undermines this conclusion.  To the contrary, Rhode Island has long required an insurable interest both under the common law, *e.g. Cronin v. Vermont Life Ins. Co.*, 40 A. 497, 497 (R.I. 1898) (citing *Warnock*), and statute, Rhode Island General Laws § 27-4-27(c).  The District Court's view that Section 27-4-27(c) does not apply was incorrect.  The statute requires an insurable interest for "**any** insurance contract upon the life or body of another

12

individual" (emphasis applied), and the Policies, with their death benefits, fall comfortably within this definition. These death benefits were not a mere "sweeten[er]," but an integral part of the transactions and scheme, implicating the risks for which the public policy requiring insurable interests was adopted. Even if the statute did not apply, moreover, Rhode Island common law still voids the contracts on public policy grounds. In enacting Section 27-4-27(c), the General Assembly expressed no intent to limit the common law insurable interest requirement, which applies to speculative "contract[s] on the life of another," whether labeled "insurance" or otherwise. *See Cronin*, 40 A. at 497.

*Incontestability Clause*. Because the lack of an insurable interest is against public policy, the Policy was void *ab initio*, rendering the incontestability clause inapplicable, as almost all courts have held. *See*, *e.g.*, *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490, 492 (9th Cir. 1997) (applying California law; a "policy which is void *ab initio* may be contested at any time, even after the incontestability period has expired …. An insurance policy is void *ab initio* where the insured lacks an insurable interest."); *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1065 (Del. 2011) (answering affirmatively certified question whether lack of insurable interest could be asserted after expiration of statutory incontestability period, noting that this "answer is consistent with that reached by the majority of courts.")

Here, moreover, the clause applies from the Policy's inception, rendering the provision contrary to public policy for this additional reason. *See*, *e.g.*, *Reagan v. Union Mutual Life Ins. Co.*, 76 N.E. 217, 218 (Mass. 1905) (incontestability clause that precludes insurer from raising fraud as a defense, effective at the inception of the policy, "is against the policy of our law, and therefore void.")

Again, nothing in Rhode Island law suggests that it deviates from these principles. *See Mohr v. Prudential Ins. Co. of America*, 78 A. 554, 557-58 (R.I. 1911) (finding no error in trial court's instruction on the lack of an insurable interest as a defense to payment where a one-year incontestability clause period had lapsed); *Murray v. State Mut. Life Ins. Co*., 48 A. 800, 801 (R.I. 1901) (a party loses the ability to assert voidable fraud as a defense based on a contractual provision stipulating that the party liable to be defrauded has a specified time to make inquiry "if the time fixed is such that the information would show that the fraud had been perpetrated could have been, bar the exercise of ordinary diligence, obtained") (citation omitted).

Because the District Court erred as a matter of law, the claims against DK and ADM should be reinstated for trial.

# ARGUMENT

**I.     Standard of review:  the Court reviews the allegations de novo, with no deference to the District Court's interpretation of Rhode Island law.**

The Court "review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6), 'accepting as true all well-pleaded facts, analyzing those facts in the light most hospitable to the plaintiff's theory, and drawing all reasonable inferences for the plaintiff.'"  *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 532 (1st Cir. 2011) (citations omitted).

In so reviewing, the Court gives no deference to the District Court's interpretation of Rhode Island law.  *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc*., 215 F.3d 182, 191 (1st Cir. 2000) ("Regardless of the district court's knowledge of Rhode Island law, its legal rulings on local law deserve no more appellate deference than any other legal ruling") (citing *Salve Regina College v. Russell*, 499 U.S. 225, 234 (1991)).

**II.     The Policies are void *ab initio* for lack of an insurable interest.**

    **A.     Rhode Island law requires an insurable interest in contracts with benefits dependent upon the death of another.**

        **1.     Under Rhode Island common law, in the absence of an insurance interest, a contract with benefits dependent upon the death of another is void as a policy wagering against continued life.**

As the Supreme Court's ruling in *Warnock*, *supra*, indicates, the requirement that a policy holder have an insurable interest has long been accepted in Anglo-

15

Saxon jurisprudence. *See also Connecticut Mutual Life Ins. Co. v. Schaefer*, 94 U.S. 457, 460 (1876) (noting that the rule that "policies in which the insured party has no interest whatever in the matter insured, but only an interest in its loss or destruction—are void, as against public policy" predates the English Revolution of 1688.)

Rhode Island has adhered to this longstanding requirement. In *Mowry v. Home Ins. Co.*, 9 R.I. 346 (1869), the Rhode Island Supreme Court rejected a claim seeking recovery on an insurance policy on the plaintiff's uncle on the ground that the trial court erred in re-opening the trial to admit evidence of their relationship, thus tacitly assuming that an insurable interest, *i.e.* such a relationship, was required. In 1877, the Rhode Island Supreme Court upheld the assignment of a life insurance contract against an argument that the assignee lacked an insurable interest, while recognizing the need for an originating insurable interest. *Clark v. Allen*, 11 R.I. 439, 444 (1877) ("it is one thing to say that a man may take insurance upon the life of another for no purpose except as a speculation or bet on his chance of life, and may repeat the act ad libitum, and quite another thing to say that he may purchase the policy, as a matter of business, after it has once been duly issued under the sanction of the law, and is therefore an existing chose in action or right of property").

16

In so ruling, the Court in *Clark* recognized that there was an element of chance upon human life with the assignment, but "so there is when a man takes a transfer of an annuity, or buys a life estate, or an estate in remainder after a life estate." *Id.* But when a contract is legal when made, the transfer or assignment is proper if "not a contrivance to circumvent the law." *Id.* at 445. This, again, was consistent with the view generally. *See Grisby v. Russell*, 222 U.S. 149, 154 (1911) (upholding a policy assignment while noting that "[a] contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end.")

Twenty-two years after the decision in *Clark*, the Rhode Island Supreme Court deemed "settled" since the decision in *Mowry*, *supra*, the question whether an insurable interest was required in Rhode Island. *Cronin*, 40 A. at 497. Acknowledging the references in the *Clark* decision to transfers of annuities and life estates, the Court reaffirmed that "a purely speculative contract on the life of another is … objectionable on the grounds of public policy …. And such a contract may properly be held to be void." *Cronin*, 40 A. at 497.

Finally, in *Mohr*, *supra*, the Rhode Island Supreme Court approved jury instructions that unless the jury found that the policies at issue "were the bona fide contracts of the insured himself, the beneficiary should not be allowed to recover without satisfying the jury that she had such an insurable interest." *Mohr*, 78 A. at

17

557 (citing *Cronin*).  Since the decision in *Mohr*, no Rhode Island authority has

deviated from these principles.

Thus, it is clear that, under Rhode Island common law, a "purely speculative

contract on the life of another" is void as against public policy as a wagering policy

with sinister incentives to shorten that life.  *See Cronin*, 40 A. at 497.  In *Cronin*,

the Court cited as "a reasonable" and "now substantially the excepted rule," the

following statement in *Warnock*, 104 U.S. at 779:

> It is not easy to define with precision what will constitute an
> insurable interest, so as to take the contract out of the class of wager
> policies.  It may be stated generally, however, to be such an interest,
> arising from the relations of the party obtaining the insurance … as
> will justify a reasonable expectation of advantage or benefit from the
> continuance of his life.

*Cronin*, 40 A. at 497.

In sum, under Rhode Island case law, consistent with the law

elsewhere, a contract is void when, at the time it is made, the beneficiary has

no interest in the continuance of the life upon whom the contractual benefits

are based.  Such an agreement is against public policy as a wagering contract

upon the life of another.

     **2.     Rhode Island statutory law also requires an insurable interest for any insurance contract upon the life of another.**

In 1992, the General Assembly enacted Section 27-4-27.  This section, entitled "[i]nsurable interest," echoes *Cronin*'s "on the life of another" language, providing:

> No person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under the contract are payable to the individual insured or his or her personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured.

Rhode Island Gen. Laws § 27-4-27(a).

Section 27-4-27(b) goes on to state that if a beneficiary "under any contract made in violation of this section" receives any benefits from the insurer accruing upon the death of the individual insured, the insured or his or her executor or administrator may maintain an action to recover the benefits from the person receiving them.  Section 27-4-27(c) then defines an insurable interest, requiring, *e.g.*, a substantial interest engendered by love and affection, or a lawful and substantial economic interest in having the insured's life continue.[6]

Notably, in enacting Section 27-4-27, the General Assembly never expressed any intent that the statute supersede or limit the insurable interest requirement as

---

[6] This definition is consistent with the common law, *see supra* at 18.  DK and ADM, total strangers to Veveiros and Buckman, incontestably lack such an interest as defined in the common law and Section 27-4-27(c).  (*See* App. 40 ¶ 30; 41, ¶ 39; 42, ¶ 47; App. 187, ¶ 32; 188, ¶ 42; 189, ¶ 45; 190, ¶ 50.)

demanded in the common law. *See Knowles v. Ponton*, 190 A.2d 4, 6 (R.I. 1963) ("It is a well-settled rule in the construction of statutes that legislative enactments will be construed to alter the common law only to the extent that the legislature has made that purpose clear.")[7]

Indeed, the face of the statute recites only one consequence of a policy lacking an insurable interest – recoupment of any paid benefits from the recipient by the insured. That this statute was meant to vitiate the longstanding rule that such contracts are unenforceable and void would not only be contrary to the principle set forth in *Knowles*, but unlikely on its face. To the contrary, because, under the common law contracts lacking insurable interests are void *ab initio*, it is unclear whether under the common law, an insured could enlist a court to assist in recouping any payments already made under such an illegal contract. *See infra*, § II.A. The statute makes clear that an insured has the ability to do so by statute.

Just as Section 27-4-27(b)'s recitation of one consequence of a lack of insurable interest does not eliminate the other consequences in the common law, so also Section 27-4-27(a)'s identification of policies requiring insurable interests reflects no legislative intent to narrow the types of contracts found void under the

---

[7] The General Assembly is aware of how to override the common law, and has done so elsewhere. *See*, *e.g.*, R.I. Gen. Laws § 5-20.6-1(b) ("This chapter is intended to abrogate the common law of agency relative to relationships in regulated real estate transactions to the extent that they are inconsistent with this chapter.")

20

common law if they lack insurable interests.  Rather, the statute is consistent with and supplements the common law.

### B.  Both the Section 27-4-27 and the common law require DK and ADM to have an insurable interest in the Policies.

#### 1.  Section 27-4-27 applies to the Policies.

Section 27-4-27(a) prohibits "any insurance contract upon the life or body of another individual …."  There is no dispute that the Double Enhanced Death Benefit of the Policies are based "upon the life or body" of Jason Veveiros and Charles Buckman.  Thus, applicability of this statutory prohibition depends upon whether the Policies constitute "any insurance contract" within the meaning of Section 27-4-27.

#### a.  The Policies, with their death benefits, are "insurance contracts" within the meaning of Section 27-4-27.

The phrase "any insurance contract" is not defined in Chapter 4 of Title 27. In the absence of a statutory definition, the term "insurance" has a broad meaning generally and under Rhode Island law.  The Double Enhanced Death Benefit of the Policies commands payment to the beneficiary, for a premium charged, in the event of the death of the annuitant.  (*See* App. 65, 105, 214, 257.)  This Policy characteristic constitutes insurance within the classic understanding of the concept. *See* Black's Law Dictionary at 723 (5th ed. 1979) (definition of life insurance as a contract whereby the insurer agrees, in return for premium payments, to pay a specified sum to the beneficiary upon the death of the insured; the kind of

insurance in which the risk contemplated is the death of a particular person). *See Mutual Dev't Corp. v. Ward Fisher & Co.*, 47 A.3d 319, 328-29 (R.I. 2012) ("When a statute does not define a word it is our practice to employ the common meaning of the word as provided by recognized dictionaries").

Rhode Island case law supports this common sense understanding of an insurance contract. In *Sisson v. Prata Undertaking Co*, 141 A. 76 (R.I. 1928), the defendant (Prata) offered various burial contracts to Rhode Island residents, under which the purchaser would pay a monthly fee for a certain period of time in return for a funeral and burial upon the person's death. If the person died before the final payment was made, Prata would provide the funeral and burial without additional charge to the decedent's heirs. The State brought enforcement proceedings against Prata for operating an unlicensed insurance business in Rhode Island. The issue before the court was whether Prata's burial contracts constituted insurance. In answering the question, the court noted that Prata's burial contracts provided for benefits upon the death of a person, in return for monetary payments. Thus, the burial contracts were a form of "insurance." *Id.* at 76-77.

This logical test for an insurance contract is consistent with other jurisdictions' treatment of the issue. *See*, *e.g.*, *Atty. Gen. v. C. E. Osgood Co.*, 144 N. E. 371, 371-72 (Mass. 1924) (holding that contract for the sale of furniture pursuant to a "lease" containing a discharge of outstanding balance due upon the

death of lessor constitutes insurance) (cited in *Sisson*, 141 A. at 77); *Lerner v. Lerner*, 508 N.Y.S.2d 191, 194-96 (N.Y. App. Div. 1986) (holding that a death benefit available under a retirement investment plan constitutes a form of "life insurance").

      **b.**      **The death benefits cannot be carved out of the Policies in determining the applicability of Section 27-4-27.**

      Contrary to the District Court's view of the death benefits as a legally immaterial "sweeten[er]," as noted *supra* at 6-7, they are integral to the transaction and the fraudulent scheme. The statute's reference to "any" insurance contract upon the life of another further signals a broad intent to cover any agreement with such an insurance component. *See also Lerner*, 508 N.Y.S.2d. at 194 ("'the mere calling of a contract of insurance by any particular appellation that may be adopted for business or conventional uses or classification cannot make a policy containing an agreement to pay another a sum of money upon the happening of an unknown or contingent event, dependent upon the existence of a life, other than one of life insurance, and **that is none the less so because coupled with an investment or bond feature**.") (emphasis added; quoting Couch on Insurance 2D § 1.76, p. 242).

      Perhaps most importantly, this reading of the statute to cover policies with death benefits like those contained in these Policies, regardless of the agreements' other components, comports with legislative objectives, which is the touchstone in

23

any statutory construction. *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I. 1987) ("it is this court's responsibility in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes").

The goal of the statute, plain from its text, is the same as that of the common law from which the statutory insurable interest requirement is derived – to prohibit strangers from profiting from agreements that speculate upon the life of another and to preclude incentives for shortening the lives of such strangers. Such speculation and incentives are precisely what is alleged here, with attempted gaming of the speculation by choosing strangers who are terminally ill. This is exactly the sort of conduct long condemned in Rhode Island and elsewhere as against public policy, and which the text of the statute indicates to be its goal to suppress.

Put simply, the scheme here would not work without the Policies' death benefits. The statute is designed to stop schemes like these. We need go no further. *See STATs*, 19 Conn. Ins. L. J. at 137 (noting that the death benefit "is a fundamental component of a STAT transaction. By placing a wager on whether aggressive investments will turn a profit before a stranger dies, and putting the entire risk of loss on the insurance component, STAT promoters have certainly

24

made the life insurance component of the scam more than a mere 'ancillary perk'")

(*citing* Add. 1, *Conreal I*, 715 F. Supp. 2d at 278).

> **c.    The insurable interest requirement of Section 27-4-27(a) is not limited to "Life Insurance" contracts as that term is defined in Section 27-4-0.1; in any event, the Policies meet this statutory definition, too.**

The District Court found that Section 27-4-27 did not apply because it deemed the statutory scheme to segregate "annuities" from "life insurance," and concluded that the Policies were the former, and, therefore, not the latter.  (*See* Add. at 12-13, citing Rhode Island Gen. Laws § 27-4-0.1(a) & (c) (defining "annuities" and "life insurance.")

But, first, the Section 27-4-27(a) insurable interest requirement is not limited to "life insurance," the term defined in Section 27-4-0.1(a).  Rather, Section 27-4-27 applies to "any insurance contract upon the life or body of another individual …."  The fact that Section 27-4-27 does not use the defined term "life insurance," but rather broader, different language, is read as reflecting a conscious legislative intent not to limit the applicability of the statute to "life insurance" as defined in Section 27-4-0.1(a).  *See Gorman v. Gorman*, 883 A.2d 732, 738 n. 9 (R.I. 2005) (applying the "venerable" and "helpful" maxim expression unius est exclusio alterius).  *Cf. Lawson v. FMR, LLC,* 670 F.3d 61, 71 (1st Cir. 2012) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress

25

acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).

This statutory construction is confirmed in the remaining subparts of Section 27-4-27. For example, Section 27-4-27(b) reflects that the insurable interest requirement applies to every insurance contract that pays "any benefits … upon the **death, disablement or injury** of the insured." (emphasis added). Thus, Section 27-4-27(a) applies to "any insurance contract" related to the life or physical welfare of a person, including traditional life insurance contracts, disability insurance policies and any other form of insurance that provides benefits when a person dies or is injured. Similarly, under Section 27-4-27(c)(2), the insurable interest requirement applies when benefits "would arise only by, **or would be enhanced in value** by the death, disablement, or injury of the individual insured …." (emphasis added). Conventional life insurance policies traditionally provide for fixed death benefits, not enhanced benefits. This reference to enhanced benefits further undermines the position that Section 27-4-27 applies only to typical life insurance contracts.

In any event, even if Section 27-4-27 were limited, contrary to its text and context, to "life insurance" as the term is defined under Section 27-4-0.1, the Policies, with their Double Enhanced Death Benefits, would still satisfy that statutory definition. Section 27-4-0.1(c) defines "life insurance" as

**every insurance** upon the lives of human beings and **every insurance** appertaining to that life, **including** the granting of endowment benefits, **additional benefits** in the event of death by accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit, or a special surrender value upon diagnosis of terminal illness … and optional modes of settlement of proceeds.

(emphasis added).  This statutory definition of "life insurance" is broad and inclusive.  There is no exclusion for contracts that provide death benefits as one component of the agreement.  As long as an insurance contract is predicated "upon the lives of human beings" or relates to a human being, then it constitutes "life insurance" under Section 27-4-0.1.  Again, there is no textual or logical basis to sever the death benefits from the remainder of the Policies and then find the Policies excluded from coverage, and to do so would run counter to the insurable interest objective of the Section 27-4-27.

That Section 27-4-0.1(a) provides a definition of annuities[8] does not undercut this conclusion.  That "payments made in connection with a life insurance policy" (*supra* n. 8) are not deemed annuity payments does not imply that an annuity contract can never have components that constitute life insurance.  An annuity that also provides death benefits as contemplated under Section 27-4-0.1(c)

---

[8] "'Annuities' means all agreements to make periodic payments for a certain period or where the making or continuance of all or some of a series of payments, or the amount of any payment, depends on the continuance of human life, except payments made in connection with a life insurance policy."  Rhode Island Gen. Laws, § 27-4-0.1(a).

is a form of "life insurance."  Indeed, Section 27-4-0.1(a) refers to recipients of

certain annuity benefits as "insured."

Here, the Double Enhanced Death Benefits available under the Policies,

which were specifically and purposefully purchased as an integral component of

the transaction, is based "upon" and "appertain[s] to" Veveiros' and Buckman's

lives.  Rhode Island Gen. Laws, § 27-4-0.1(c).  Thus, the Policy includes "life

insurance."

The District Court's rejection of this view, and its reading that the statutes

impose a strict either-or categorization for any agreement for any purpose, or that

at least this Policy does not meet requirements for a "hybrid" that would be

covered by Section 27-4-27, provides no persuasive authority to support its

conclusion.[9]

_____

[9] In other contexts, separation has been made between certain types annuities and
insurance, *e.g. Nationsbank of N.C., N.A. v. Variable Annuity life Ins. Co*., 513
U.S. 251 (1995); *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 79 (1979);
*American Deposit Corp. v. Schacht*, 84 F.3d 834 (7th Cir. 1996), but none of these
decisions sheds light on the relevant context, the insurable interest requirement for
annuities with death benefits.  For example, in *Nationsbank*, 513 U.S. at 259,
which the District Court found relevant (Add. 1, *Conreal I*, 715 F. Supp. at 278,
n. 5), the Supreme Court found that national banks may serve as agents in the sale
of annuities under a federal statute because "an annuity is like putting money in a
bank account, a debt instrument, or a mutual fund," in which an initial payment is
made in exchange for a future income stream, with the customer deferring
consumption and making a financial investment.  Here, however, the Policies'
death benefits act precisely like the risk-spreading aspect classic to insurance, *see*

28

The District Court opined that, to be covered by Section 27-4-27, an agreement would, at a minimum, "need to have life insurance at its core." (Add. 1, *Conreal I*, 715 F. Supp. at 278.) Because the Court viewed the "basic bargain" in the Policies as a future income streams, with the death benefits as "sweeten[ers]," it found the Policies excluded from coverage. (*Id.*) This reasoning, aside from lacking support in the text or any legislative history, again misses the legislative objective. The purposes supporting the insurable interest requirement are to prevent illegal gambling contracts and to protect human life and welfare. These purposes "must stand at the center of any analysis of the doctrine's application." *Delk v. Markel American Ins. Co.*, 81 P.3d 629, 637 (Okla. 2003). The beneficiary of death benefits associated with an annuity has even more incentive to cause harm to an annuitant than does a beneficiary under a standard life insurance policy. As noted *supra* at 6-7, unlike a traditional life insurance contract, where a set death benefit will be payable upon the inevitable death of an insured, the Double Enhanced Death Benefits provided under the Policies may never be realized if Veveiros or Buckman live too long. And as long as they are alive, DK and ADM cannot receive lump sum distributions of their entire investments without incurring a financial penalty.

---

*SEC*, 359 U.S. at 71, and, even more critically, the concerns behind the insurable interest requirement are directly triggered by the death benefits in the Policies integral to the fraudulent scheme.

29

The District Court's reliance on the references in *Clark* and *Cronin* to annuities (*see* Add. 1, *Conreal I*, 715 F. Supp. at 278) misapprehends that case law. In those decisions, the Rhode Island Supreme Court observed the distinction between assignments and original purchases, and noted that while life estates and transfers of annuities may be measured by life span, they are not deemed to be void wagering policies.  The distinction between contracts and life estates in this regard arises out of the fact that freedom of alienation is an indispensable property right. *See* Edwin W. Patterson, *Insurable Interest in Life*, 18 Colum. L. Rev. 381, 391 (1918).  More to the point, neither a life estate nor a traditional annuity incorporates the death benefit component of these Policies.  It is that death benefit that incents the beneficiary to shorten life.  With a life estate, there is no contractual agreement; the property owner disperses his or her property as he or she chooses.  With a traditional annuity as referenced in this 19th century case law, the annuity was an investment made by and for the annuitant to provide an income stream for the length of that annuitant's life, and the benefits continued only so long as the annuitant was alive.  In contrast, when death benefits are provided to a third party, the incentive is to shorten, not lengthen the annuitant's life – a primary reason why an insurable interest is required.  The other primary reason for the insurable interest requirement – to void gambling or wagering policies – is equally implicated when death benefits are provided to a stranger third-party beneficiary.

30

### d. Rhode Island's Life Settlements Act does not suggest that STATs are countenanced.

Finally, the District Court found that Rhode Island's Life Settlements Act, Rhode Island Gen. Laws, Title 27, Chapter 72 (LSA), indicates a legislative intent not to require insurable interests for STATs. (Add. 1, *Conreal I*, 715 F. Supp. at 277.) This view also misapprehends the statutory language and the interface between the LSA and existing Rhode Island law.

The LSA, effective in 2010, makes clear that STOLI violates Rhode Island law. The relevant provision in the LSA recites:

> "Stranger-originated life insurance" or "STOLI" is a practice or plan to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured.… Trusts that are created to give the appearance of insurable interest, and are used to initiate policies for investors, violate insurable interest laws and the prohibition against wagering on life. STOLI arrangements do not include those practices set forth in this chapter.

Rhode Island Gen. Laws, § 27-72-2(26). The chapter then goes on to permit certain other types of approved life settlement contracts, unrelated to the type of policy at issue here. *See* Rhode Island Gen. Laws, § 27-72-2(13) (defining life settlement contracts); § 27-72-5 (prohibiting life settlement contracts except those approved by and filed with the commissioner.)

The District Court reasoned that because the definition of STOLI in Section 27-72-2(26) did not include "annuities," this means that STATs with death benefits

31

like the Policy are acceptable under Rhode Island law. (*See* Add. 1, *Conreal I,* 715 F. Supp. at 277.) This reading misconstrues the LSA in multiple ways.

First, as noted, *supra*, the Policies at issue here fall within the definition of "life insurance" and thus are expressly covered in Section 27-72-2(26). Second, even if the Policies did not fall within the statutory definition of life insurance, nothing in the text or legislative history of the LSA reflects any intent to bestow approval of STATs by omission. To the contrary, the LSA reinforces the General Assembly's antipathy to attempts by investors to exploit terminally ill strangers. That Section 27-72-2(26) does not expressly allude to STATs simply reflects that STATs constitute more recent attempts to circumvent the longstanding insurable interest requirement contained in other statutory and common law. *See STATs* at 135 ("the General Assembly based the LSA on a model act recommended by the National Conference of Insurance Legislators [and] the model act and the LSA were both drafted well before STATs came to national attention in the past two years.")

This conclusion is confirmed by the language used in the STOLI definition itself. It provides that STOLI is not a type of arrangement allowed under the LSA, and, more broadly, that trusts created to give the appearance of insurable interests violate insurable interest laws and the prohibition on wagering on life. This language reinforces the point that **existing** Rhode Island statutory and common law

32

requires an insurable interest and makes contracts wagering on life void as against public policy, and that establishing a trust of any sort does not evade this other, existing law. Such language supports, rather than undermines, the conclusion that existing Rhode Island law prohibits contracts wagering on life such as the Policies at issue here, whether or not the Policies are STOLI as defined in Section 27-72-2(26).

In sum, the Rhode Island's insurable interest statute, Section 27-4-27, applies to "any insurance contract upon the life or body of another." The Policies, with their death benefits, fall squarely within the common understanding of such a contract, which lacks any further statutory definition, and, most importantly, falls within the category of contracts implicating the moral hazards demanding an insurable interest.

### 2. The Policies violate Rhode Island's common law insurable interest requirement, rendering them void *ab initio*.

Setting aside that the Policies fall within the statutory definition in Section 27-4-27, nothing suggests that Section 27-4-27 was meant to replace the common law and narrow the instruments deemed void for lacking insurable interests. Indeed, were this view correct, as noted, the only remedy provided for in Section 27-4-27 itself is recoupment of benefits to the beneficiary; thus, an insurer would have no ability even to rescind the offending policy – an illogical result. *See State v. Huxford*, 87 A. 171 (R.I. 1913) (avoid construction with absurd results).

33

Under the common law, Rhode Island has proscribed "contract[s]" that constitute wagers on human life. *Cronin*, 40 A. at 497. Regardless of any limitations on the applicability of Section 27-4-27, this common law renders the Policy void. The public policy considerations that support the common law insurable interest requirement compel its application to contracts that provide a financial incentive for a stranger beneficiary prematurely to terminate a person's life. A beneficiary under an annuity policy with a Double Enhanced Death Benefit such as the Policies at issue here is gambling upon, and has a compelling financial interest, in the early demise of the annuitant. This Court should not be the first to endorse such an arrangement, and nothing compels this result under Rhode Island law.

## III.   The incontestability clauses do not bar Western Reserve's claims.

The Policies recite that they are incontestable from the Policy Date. (App. 221, 351.) The Policy Dates are September 9, 2008 and September 15, 2008, approximately thirteen months before Western Reserve commenced this action. (App. 177, ¶ 35; 220; 304, ¶ 37; 348.) The District Court concluded that these clauses barred all of Western Reserve's claims against DK and ADM, citing Rhode Island case law for the proposition that such clauses bar insurers from rescinding

34

policies on grounds of fraud.  (Add. 1, *Conreal I*, 715 F. Supp. at 279, citing, *inter alia*, *Murray*, 48 A. 800.[10])

The District Court's conclusion constituted legal error for two reasons: (A) lack of an insurable interest made the Policies void *ab initio*; and (B) the clauses, if applicable, would further violate public policy by providing no time for Western Reserve to act.

### A.    Incontestability clauses do not apply when the contracts are void *ab initio* because they lack insurable interests.

An incontestability clause presupposes a valid contract.  As noted above, a policy lacking an insurable interest is invalid; it is void *ab initio*.  Contracts void *ab initio* are never in force and their terms cannot be enforced.  Hence, the incontestability clause has no effect.  *See*, *e.g.*, *Obartuch v. Sec. Mut. Life Ins. Co.*, 114 F.2d 873, 878 (7th Cir. 1940) (Illinois law; an incontestability clause presumes a valid contract, not one that is void, and it thus "cannot be used as a vehicle to sanctify that which never existed").  This by far the majority view.  *See PHL Variable*, 28 A.3d at 1065 (noting that the Delaware Court's rejection of the applicability of the clause "is consistent with that reached by the majority of courts; namely, that a life insurance policy lacking an insurable interest is void as

---

[10] While the District Court concluded that the Policy was not insurance for the purposes of determining whether an insurable interest was required, it nevertheless interpreted and applied Rhode Island statutory and common law on insurance to bar these claims based on the Policies' incontestability clauses.

against public policy and thus never comes into force, making the incontestability provision inapplicable."). *See also e.g*., *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490, 492 (9th Cir. 1997) (under California law, "a policy which is void *ab initio* may be contested at any time, even after the incontestability period has expired"); *Carter v. Continental Life Ins. Co*., 115 F.2d 947, 948 (D.C. Cir. 1940) (it is "well settled" an incontestability clause does not prevent the insurer from asserting lack of insurable interest); *Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 19-20 (N.D. Ga. 1984) ("the Court concludes that the policies are void *ab initio* as against public policy …. [T]he incontestability clause in this case is simply not applicable …"); *Amex Life Assur. Co. v. Superior Court*, 930 P.2d 1264, 1271 (Cal. 1997) ("Incontestability does not apply to a policy which is void *ab initio*."); *Wood v. New York Life Ins. Co*., 336 S.E. 2d 806, 811-12 (Ga. 1985) ("The incontestability clauses … presuppose the existence of a contract 'in force.' However, an insurance contract that is void *ab initio* as against public policy is never 'in force,' cannot be ratified or affirmed, and is not subject to being enforced by the courts."); *Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 689 (Md. 1988) ("The invocation of an [i]ncontestability provision presupposes a basically valid contract and thus incontestability does not apply to a contract which is void *ab initio*." (internal citations and quotations omitted)); *Tulipano v. U.S. Life Ins. Co. in the City of New York*, 154 A.2d 645, 650 (N.J. Super. 1959) ("[I]t is generally

36

been held that an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability period has run."); *Kemper v. Equitable Life Ins. Co. of Iowa*, 171 N.E. 2d 536, 537 (Ohio Ct. App. 1960) ("[I]f the policy is invalid in its inception … the Insurance Company is not liable, notwithstanding the incontestability clause."); *Henderson v. Life Ins. Co. of Virginia*, 179 S.E. 680 (S.C. 1935); 44 C.J.S. Insurance § 352 (2007) ("A policy issued to a person who has no insurable interest in the life of the insured is void, from its inception, and is not rendered valid by a clause declaring it incontestable after the lapse of a specified period of time."); 44 Am. Jur. 2d Insurance § 767 (2003) ("An insurance policy which is invalid as being violative of public policy cannot be validated by the agreement of the parties that it shall be incontestable after a stated time.").[11]

---

[11] It appears that only two states – Michigan and New York – have held that a policy lacking an insurable interest is subject to an incontestability provision. *See Bogacki v. Great-West Life Assur. Co*., 234 N.W. 865, 866-67 (Mich. 1931); *New England Mut. Life Ins. Co. v. Caruso*, 535 N.E.2d 270, 273-75 (N.Y. 1989). When *Bogacki* was decided, Michigan, unlike Rhode Island, did not have an insurable interest statute but did have an incontestability statute. *See Beard*, 550 A.2d at 690 (declining to follow *Bogacki* because Maryland, unlike Michigan, has insurable interest statute indicating strong public policy underlying insurable interest requirement). In *Caruso*, the New York Court recognized that New York was not in conformity with the weight of authority in other states, but declined to overrule New York precedent, noting that – unlike in Rhode Island – an insurance policy lacking an insurable interest is not void under New York law. *See id*. at *Caruso*, 535 N.E.2d at 273.

The decision in *Murray, supra,* does not reflect Rhode Island deviation from this nearly universal view.  There, the Rhode Island Supreme Court found that a two-year incontestability clause in an insurance policy barred the insurer from defending against enforcement of its policy based on false answers made by the insured in his application.  *Murray*, 48. A. at 800.  The District Court also cited *Prudential Ins. Co. v. Tanenbaum*, 167 A. 147 (1933), in which an insured similarly made a misstatement in his application and the Court allowed equitable rescission, but in doing so noted that outside the incontestability period, the insured would not have been allowed to assert a defense to an action at law to enforce liability on the policies at issue, citing *Murray*.

A false answer in an application, such as that presented in *Murray* and *Prudential*, makes a policy **voidable**, not **void**.  *See Evora v. Henry*, 559 A.2d 1038, 1040 (R.I. 1989) (material misrepresentation makes insurance contract voidable); *Pelletier v. Phoenix Mut. Life Ins. Co*., 141 A. 79 (R.I. 1928) (release procured by fraud voidable, not void).

This is not jurisprudential hair splitting.  *See Nyonteh v. Peoples Sec. Life Ins. Co*., 958 F.2d 42, 44-45 (4th Cir. 1992) (applying Virginia law; "[i]f the policy, and hence the incontestability clause contained therein, is void, then it should be contestable notwithstanding the incontestability clause.").  A policy without an insurable interest is void because the lack of such an interest transforms

38

the policy into a wagering contract – the contract is illegal, just as if one were

agreeing to sell illegal drugs or to engage in other illicit activity.  Neither party can

enforce such an agreement.  *See State v. Rhode Island Alliance of Social Services*

*Employees, Local 580, SEIU*, 747 A.2d 465, 469 (R.I. 2000) (illegal contracts

unenforceable); *Birkett v. Chatterton*, 13 R.I. 299 (1889) (illegal contract treated as

nullity).  *See generally Restatement (Second) of Contracts* § 7 (1981) (A "void"

contract cannot be enforced because it never had any legal existence or effect and

is incapable of ratification; a "voidable" contract can be ratified and subsequently

enforced.)  *See also Commonwealth Life Ins. Co. v. George*, 28 So. 2d 910, 915

(Ala. 1947) ("[I]f the contract is against public policy the court will not lend its aid

to its enforcement; that the parties to an illegal contract cannot by stipulating that it

shall be incontestable, tie the hands of the court and compel it to enforce contracts

which are illegal and void…"); *Home Life Ins. Co. of N.Y. v. Masterson*,

21 S.W.2d 414, 417 (Ark. 1929) ("The contract being one that was contrary to

public policy, the defense that it was void is allowed, not for the sake of the

defendant, but for the law itself.").

In an incontestability clause, an insurer, the wronged party when an

application contains false answers, is agreeing, as a part of the contract, to give up

its right as the wronged party to void the agreement after the time period contained

in the clause.  The policy is only voidable, and an insurer can contract not to

39

exercise its right to void.  In contrast, when a contract is void *ab initio*, there can be no contractual surrender of a right to enforce because the contract does not exist.[12]

Accordingly, the Rhode Island Supreme Court in *Mohr* found no error in a trial court's instruction on the lack of an insurable interest as a defense to payment in a case where the one-year incontestability clause period contained in a policy had lapsed.  78 A. at 557-58.  Here, similarly, due to the lack of an insurable interest, the Policies, including their incontestability clauses, became illicit wagering contracts, and as such, unenforceable nullities.

**B.    The Policies' incontestability clauses are additionally unenforceable because they make the Policies incontestable at their inception.**

Even with otherwise enforceable insurance policies, courts have split on the enforceability of incontestability clauses, such as the one in the Policies, that purport to render the policy incontestable from its inception.  *See* Couch on Insurance 3D § 240:7 (2000); 16 Williston on Contracts § 49-95 (4th ed. 2000). The split of authorities reflects the tension between opposing polices that, on the one hand, promote freedom of contract and hold the parties to the terms of their

---

[12] The District Court further cited Rhode Island Gen. Laws, § 27-4-6.2(a), which requires individual life insurance policies to contain either two-year contestability periods or approved terms "more favorable to policy holders."  Reasoning that an incontestability clause is designed for the benefit of the insured, the District Court concluded that no public policy barred the parties from agreeing to a term shorter than two years.  (Add. 1, *Conreal I*, 715 F. Supp. at 280.)  This reasoning again fails to recognize that when a contract is void, not voidable, it is not a question of enforcing a contract term – the contract is illegal and none of its terms exist.

agreement and, on the other hand, recognize that the proponent of a fraud should not be rewarded and that insurers must be allowed a reasonable time to detect fraudulent acts.

Recognizing the soundness of the latter policy, several courts have refused to enforce a contract provision that bars an insurer from raising fraud as a defense from the outset.  *See*, *e.g.*, *Fishel v. Union Central Life Ins. Co.*, 270 N.Y.S. 734, 736 (City Ct. 1933) ("[A] stipulation in a contract **providing for a reasonable limitation of time within which it may be contested** for fraud, is not … contrary to public policy.") (emphasis added); *Stratton v. Service Life Ins. Co. of Lincoln*, 222 N.W. 332, 335 (Neb. 1928) ("'The general rule is that a provision in a contract of insurance limiting the time in which the insurer may take advantage of certain facts that might otherwise constitute a good defense to its liability on such contract precludes every defense to the policy other than the defenses excepted in the provision itself, including … even fraud where the time fixed by the contract is not unreasonably short.'" (citation omitted)); *Flanigan v. Federal Life Ins. Co.*, 83 N.E. 178 (Ill. 1907) ("Such stipulations which give to the insurer a limited period for the purpose of testing the validity of the policy and ascertaining the truth of the representations made are valid and binding, provided the period fixed is sufficient to enable the insurer, by the exercise of proper diligence, to ascertain whether fraud has been practiced or not."); *Reagan*, 76 N.E. at 218 (incontestability clause

41

effective at policy inception "is against the policy of our law, and therefore void.");

*Welch v. Union Central Life Ins. Co.*, 78 N.W. 853, 855 (Iowa 1899)

(incontestability clause purporting to bar defenses at inception of coverage did not

preclude insurer from introducing evidence of fraud).

In *Murray*, the only Rhode Island decision to address the issue, the Court

cited with approval the words of the Georgia Supreme Court:

> Where parties enter into a contract which from its nature affords an opportunity to one party to perpetrate a fraud upon another, and it is stipulated therein that the party who is liable to be defrauded shall have a specified time in which to make inquiry as to the acts and conduct of the other party, he is on notice, by the very terms of the contract itself, that fraud may be involved in it, and the duty is upon him to commence at once an investigation into the acts, conduct, and representations of the other party; **and if the time fixed is such that the information which would show that the fraud had been perpetrated could have been, bar the exercise of ordinary diligence, obtained**, then the parties are bound by their contract as to time, and after the lapse of that time fraud is no longer a defense.

48 A. at 801 (quoting *Massachusetts Benefit Life Ass'n v. Robinson*, 30 S.E. 918

(Ga. 1898) (emphasis added).

Thus, a two-year clause, as upheld in *Murray*, is enforceable. Other shorter

terms might also be deemed acceptable. But a term effective at inception is not.

The public policy behind this view only gains in resonance when, as here,

the fraud at issue transforms the agreement from what it purports to be into

something else – an illicit contract wagering on human life. Western Reserve may

have accepted as a matter of contract the risk of not finding a material

misrepresentation in an application, even from the inception of the Policies.  But it never agreed to enter into illegal agreements.

### C.  The incontestability clauses do not bar claims that do not challenge the validity of the Policies.

By their terms, the incontestability clauses only bar those claims in which plaintiff contests the validity of the policy.  (*See* App. 84, 235.)  Even if the incontestability clauses were given effect to the defenses against enforcement, they would have no effect on the claims that presume a valid contract.  *See Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 20-21 (N.D. Ga. 1984); *Love v. Prudential Ins. Co. of America*, 176 S.E. 333 (S.C. 1934).  Accordingly, the incontestability clauses should have no impact on the claims which do not contest the validity of the Policies but rather seek damages flowing from DK's and ADM's participation in the conspiracy.

### CONCLUSION

For the reasons set forth above, this Court should reinstate the claims against DK and ADM.

Dated:  March 8, 2013

/s/ Catherine R. Connors
Catherine R. Connors
First Circuit Bar No. 7451
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as it contains 10,468 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

Dated:  March 8, 2013

*/s/ Catherine R. Connors*
Catherine R. Connors
First Circuit Bar No. 7451
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100

## CERTIFICATE OF SERVICE

I certify that the within brief has been electronically filed with the Clerk of

the Court on March 8, 2013.  All attorneys listed below are ECF filers and will

receive service by electronic means pursuant to Rule 4 of this Court's Rules

Governing Electronic Filing:

> Robert G. Flanders, Jr.
> R. Daniel Prentiss
> Raymond Matthew Ripple
> Deming E. Sherman

Dated:  March 8, 2013

> */s/ Catherine R. Connors*
> Catherine R. Connors
> First Circuit Bar No. 7451
> Pierce Atwood LLP
> Merrill's Wharf
> 254 Commercial Street
> Portland, Maine 04101
> (207) 791-1100

**ADDENDUM**

# TABLE OF CONTENTS OF ADDENDUM

*Western Reserve Life Assurance Co. of Ohio v. Conreal, LLC*,
   715 F.Supp.2d 270 (D. R.I. 2010) ...........................................................Add. 1

*Western Reserve Life Assurance Co. of Ohio v. Caramadre*,
   847 F.Supp.2d 329 (D. R.I. 2012) .........................................................Add. 20

Text Order (09-cv-472), dated July 18, 2012 .................................................Add. 40

Text Order (09-cv-473), dated July 18, 2012 .................................................Add. 41

Judgment (09-cv-472), dated August 2, 2012..................................................Add. 42

Judgment (09-cv-473), dated August 2, 2012..................................................Add. 43

United States District Court,
D. Rhode Island.
WESTERN RESERVE LIFE ASSURANCE CO. OF
OHIO, Plaintiff,
v.
CONREAL LLC, Harrison Condit, Fortune Financial
Services, Inc., and Anthony Pitocco, Defendants;
Transamerica Life Insurance Company, Plaintiff,
v.
Joseph Caramadre, Raymour Radhakrishnan, Estate
Planning Resources, Inc., Estella Rodrigues, Edward
Maggiacomo, Jr., Lifemark Securities Corp., and
Patrick Garvey, Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre, Raymour Radhakrishnan, Estate
Planning Resources, Inc., ADM Associates, LLC,
Edward Hanrahan, The Leaders Group, Inc., and
Charles Buckman, Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre, Raymour Radhakrishnan, Estate
Planning Resources, Inc., DK LLC, Edward Hanra-
han, The Leaders Group, Inc., and Jason Veveiros,
Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre, Raymour Radhakrishnan, Estate
Planning Resources, Inc., Edward Hanrahan, and The
Leaders Group, Inc., Defendants;
Transamerica Life Insurance Company, Plaintiff,
v.
Lifemark Securities Corp., Joseph Caramadre, Ray-
mour Radhakrishnan, Estate Planning Resources, Inc.,
and Edward Maggiacomo, Jr., Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre, Raymour Radhakrishnan, Estate
Planning Resources, Inc., Harrison Condit, And For-
tune Financial Services, Inc., Defendants.

C.A. Nos. 09–470 S, 09–471 S, 09–472 S, 09–473 S,
09–502 S, 09–549 S, 09–564 S.
June 2, 2010.

**Background:** Insurers filed actions allege that de-
fendants engaged in stranger-initiated annuity trans-
actions (STAT) as part of fraudulent scheme to use
variable annuities as vehicle for riskless speculation in
securities. Defendants moved to dismiss.

**Holdings:** The District Court, William E. Smith, J.,
held that:
(1) statutory requirement that owner of insurance
policy on life or body of another have insurable in-
terest in insured did not apply to annuities;
(2) incontestability clauses in annuity contracts barred
insurers' claims against policy owners;
(3) insurers pled fraud with sufficient particularity;
(4) failure of sponsors, agents, and brokers to disclose
that they had no relationship to annuitants was suffi-
ciently material to support insurers' fraud claim; and
(5) economic loss doctrine barred negligence claims
against brokers and agents.

Motions granted in part and denied in part.

West Headnotes

**[1] Annuities 29 ⟜16**

29 Annuities
    29k14 Nature, Creation, Requisites and Validity
        29k16 k. Insurance or other arrangements
distinguished, in general. Most Cited Cases

**Annuities 29 ⟜17**

29 Annuities
    29k14 Nature, Creation, Requisites and Validity
        29k17 k. Particular cases. Most Cited Cases

Under Rhode Island law, annuities did not con-
stitute insurance contracts, and thus statutory re-
quirement that owner of insurance policy on life or
body of another have insurable interest in insured did
not apply to annuities sold by insurance companies.
R.I.Gen.Laws 1956, § 27–4–27.

**[2] Insurance 217 🔑3122**

217 Insurance
    217XXVI Estoppel and Waiver of Insurer's Defenses
        217k3121 Policy Provisions Against Forfeiture; Incontestable Clause
            217k3122 k. In general. Most Cited Cases

Under Rhode Island law, incontestability clauses prevent insurers from rescinding policies even on grounds of fraud.

**[3] Annuities 29 🔑20**

29 Annuities
    29k20 k. Rescission or avoidance for fraud or mistake. Most Cited Cases

Under Rhode Island law, incontestability clauses in annuity contracts barred insurers from seeking to rescind annuities or have them declared void because of fraud.

**[4] Annuities 29 🔑35**

29 Annuities
    29k34 Civil Liabilities
        29k35 k. In general; negligence or bad faith. Most Cited Cases

**Annuities 29 🔑37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

**Conspiracy 91 🔑11**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k11 k. Defenses. Most Cited Cases

Under Rhode Island law, incontestability clauses in annuity contracts effectively barred insurers' claims

for fraud, conspiracy, and civil liability for crimes and offenses against policy owners, where insurers sought damages to cover their obligations under contracts.

**[5] Insurance 217 🔑3122**

217 Insurance
    217XXVI Estoppel and Waiver of Insurer's Defenses
        217k3121 Policy Provisions Against Forfeiture; Incontestable Clause
            217k3122 k. In general. Most Cited Cases

Under Rhode Island law, benefits of incontestable clause can be availed of only by insured or his or her beneficiary, and cannot be invoked by stranger to contract.

**[6] Annuities 29 🔑37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

Under Rhode Island law, incontestability clauses in annuity contracts did not bar insurers' fraud claims against sponsors, agents, and brokers who engaged in stranger-initiated annuity transactions (STAT) as part of scheme to use variable annuities as vehicle for riskless speculation in securities.

**[7] Federal Civil Procedure 170A 🔑636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
        170Ak633 Certainty, Definiteness and Particularity
            170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases

Insurers pled with sufficient particularity claim that sponsors, agents, and brokers engaged in stranger-initiated annuity transactions (STAT) as part of fraudulent scheme to use variable annuities as vehicle for riskless speculation in securities, even though insurers stated that defendants "acted in concert," and did not recite who filled out which portions of applications or who mailed them, where complaint pro-

**Add. 2**

vided detail about alleged conspiracy, and each defendant's role, to explain origin of alleged duty to tell insurers about STATs. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[8]** **Fraud 184** 🗝3

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k2 Elements of Actual Fraud
         184k3 k. In general. Most Cited Cases

To establish prima facie case of common law fraud in Rhode Island, plaintiff must prove that defendant made false representation intending thereby to induce plaintiff to rely thereon, and that plaintiff justifiably relied thereon to his or her damage.

**[9]** **Conspiracy 91** 🗝13

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k12 Persons Liable
            91k13 k. In general. Most Cited Cases

Under Rhode Island law, participants in civil conspiracy need not know everything their coconspirators know, or participate in every wrongful act, to be found liable for ultimate fraud.

**[10]** **Insurance 217** 🗝2964

217 Insurance
   217XXIV Avoidance
      217XXIV(A) In General
         217k2961 Concealment or Failure to Disclose
            217k2964 k. Materiality. Most Cited Cases

Under Rhode Island law, as predicted by the district court, if insured's failure to disclosure information to insurer is such that it amounts to fraud, then it is material, even if insurer did not specifically request information.

**[11]** **Annuities 29** 🗝37

29 Annuities
   29k34 Civil Liabilities
      29k37 k. Fraud or misrepresentation. Most Cited Cases

Under Rhode Island law, failure of sponsors, agents, and brokers engaged in stranger-initiated annuity transactions (STAT) to disclose to insurers that they had no relationship to annuitants was sufficiently material to support insurers' claim that sponsors, agents, and brokers were engaged in fraudulent scheme to use variable annuities as vehicle for riskless speculation in securities, even though applications did not request that information, and there was no statutory requirement that they have insurable interest.

**[12]** **Annuities 29** 🗝30

29 Annuities
   29k30 k. Regulation in general. Most Cited Cases

Rhode Island's anti-kickback statute for insurers does not govern annuities. R.I.Gen.Laws 1956, § 27–8–7.

**[13]** **Annuities 29** 🗝37

29 Annuities
   29k34 Civil Liabilities
      29k37 k. Fraud or misrepresentation. Most Cited Cases

Under Rhode Island law, insurers' allegation that agents and brokers knowingly concealed and misrepresented information on annuity applications was sufficient to plead scienter required to establish fraud claims against agents and brokers, even though complaint alleged that they had no substantive involvement in selling annuities, where agents affirmed on applications that they made annuity recommendation and found investment appropriate.

**[14]** **Conspiracy 91** 🗝1.1

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k1 Nature and Elements in General

91k1.1 k. In general. Most Cited Cases

Under Rhode Island law, conspiracy requires specific intent to do something illegal or tortious.

**[15] Implied and Constructive Contracts 205H 3**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
            205Hk2 Constructive or Quasi Contracts
                205Hk3 k. Unjust enrichment. Most Cited Cases

Under Rhode Island law, unjust enrichment requires circumstances that make it inequitable for defendant to retain benefit gained from plaintiff, such that enrichment to defendant is unjust.

**[16] Federal Civil Procedure 170A 921**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(I) Motions in General
            170Ak921 k. In general. Most Cited Cases

Arguments raised for first time in reply briefs are procedurally barred.

**[17] Contracts 95 326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of action. Most Cited Cases

New York law does not recognize separate cause of action for breach of implied covenant of good faith and fair dealing when breach of contract claim, based upon same facts, is also pled.

**[18] Contracts 95 326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of action. Most Cited Cases

Florida law requires claims based on implied duty of good faith and fair dealing to piggyback on violation of specific contractual provision.

**[19] Torts 379 118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
            379k118 k. Economic loss doctrine. Most Cited Cases

Under Rhode Island law, economic loss doctrine prohibits parties who have contracted to protect against potential economic liability from recovering purely economic damages in tort claims.

**[20] Annuities 29 35**

29 Annuities
    29k34 Civil Liabilities
        29k35 k. In general; negligence or bad faith. Most Cited Cases

Under Rhode Island law, economic loss doctrine barred insurance companies' negligence claims against brokers and agents based on their failure to properly verify information on annuity contracts, where negligence claims were based on brokers' and agents' alleged violations of their duties under their service contracts with companies.

**\*272** Brooks R. Magratten, Michael J. Daly, Pierce Atwood LLP, Providence, RI, David E. Barry, Pierce Atwood LLP, Portland, ME, for Plaintiffs.

Robert G. Flanders, Jr., Matthew H. Parker, Hinckley, Allen & Snyder LLP, Providence, RI, Jeffrey S. Brenner, Nixon Peabody LLP, J. Scott Kilpatrick, Chisholm Chisholm & Kilpatrick LLP, **\*273**Deming E. Sherman, John B. Rosenquest, III, Edwards Angell Palmer & Dodge LLP, R. Daniel Prentiss, R. Daniel Prentiss, P.C., Joseph V. Cavanagh, Jr., Mary C. Dunn, Blish & Cavanagh, LLP, Anthony M. Traini, Providence, RI, Eric S. Giroux, Hinckley, Allen & Snyder LLP, Boston, MA, Douglas J. Friednash, Greenberg Traurig, LLP, Denver, CO, for Defendants.

**OPINION AND ORDER**
WILLIAM E. SMITH, District Judge.

In these cases, Plaintiffs Transamerica Life Insurance Company ("Transamerica") and Western Reserve Life Assurance Company of Ohio ("Western Reserve") claim they have been defrauded in an annuity scam. Plaintiffs allege that Defendants found a way to use variable annuities as a vehicle for riskless speculation in securities. The key to the scheme was recruiting terminally—ill people as annuitants—the individuals whose lives were used as measuring tools for the contracts. Defendants or their clients would buy policies that allowed them to invest the premiums in stocks and bonds. When the annuitants died, the policies' so-called "death benefits" guaranteed the return of those invested premiums, effectively creating a buffer against losses. The Complaints seek to revoke the outstanding annuities on grounds of fraud, and assert a variety of state law claims for damages. Defendants now move to dismiss all of them.

At bottom, beneath the public outcry about the exploitation of the dying, these disputes pivot on a series of state law questions. The answers to these questions unravel many, but not all, of Plaintiffs' claims. Accordingly, for the reasons set forth below, Defendants' motions are granted in part and denied in part.

I. Background

A. Overview of the "STAT" scheme and parties

The genesis of these cases is a scheme for annuity investments that Plaintiffs dub "stranger-initiated annuity transactions," or STATs. Because the Court must accept the alleged facts as true for purposes of Defendants' motions pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it here provides an overview of the STATs drawn from the Complaints.

Defendant Joseph Caramadre is an attorney who specializes in reading the fine print of insurance and annuity products and finding "loopholes." The one he discovered in these actions focused on two components of certain annuities sold by Plaintiffs. One, the annuities were variable, which means that premiums paid to obtain the policy could be invested in securities on behalf of the owner. Two, the annuities allowed the owner to elect a "death benefit." This option guaranteed the return of premiums upon the death of the annuitant, no matter what the market value of the policy was at that time. (See, e.g., Am. Compl., C.A.

No. 09–471, Doc. No. 9, Oct. 16, 2009 (hereinafter "471 Compl.") ¶¶ 14–17; Am. Compl., C.A. No. 09–472, Doc. No. 8, Oct. 16, 2009 (hereinafter "472 Compl.") ¶¶ 14–17; Am. Compl., C.A. No. 09–473, Doc. No. 8, Oct. 16, 2009 (hereinafter "473 Compl.") ¶¶ 14–17; Compl., C.A. No. 09–502, Doc. No. 1, Oct. 16, 2009 (hereinafter "502 Compl.") ¶¶ 13–16; Compl., C.A. No. 09–549, Doc. No. 1, Nov. 16, 2009 (hereinafter "549 Compl.") ¶¶ 12–15; Compl., C.A. No. 09–564, Doc. No. 1, Nov. 24, 2009 (hereinafter "564 Compl.") ¶¶ 12–15.)

Caramadre's insight was that policies with those two features invited riskless securities speculation. The annuitants would of course die at some point. If one could safely bet that would happen quickly, **\*274** the annuities could be used to turn fast profits. Investors could make aggressive short-term trades without worrying about losses. Thus, the key to the strategy was finding terminally ill individuals, with a correspondingly short life expectancy, willing to be annuitants.

To find such individuals, Caramadre and his associates, including Defendant Raymour Radhakrishnan, began publicizing a "Program for the Terminally Ill" to hospice patients and workers. (See 564 Comp. Ex. A.) Flyers bearing the business name "Estate Planning Resources," a company allegedly controlled by Caramadre, promised cash payments to dying patients willing to do business with the company. (See id.) Once either Caramadre or Radhakrishnan identified both a terminally-ill annuitant candidate and an investor, they arranged for a licensed agent of an annuities broker to provide the annuity application. They then paid the sick patient to sign the application as the annuitant. In some instances, Plaintiffs claim, Caramadre, Radhakrishnan, or the agent actually forged the annuitant's signature. The investor would be designated as the owner and beneficiary on the application, and would pony up the cost of the policy.

Once completed, the insurer accepted the application and issued an annuity in which the owner had no relationship to the annuitant, other than through the alleged STAT itself. (See, e.g., 472 Compl. ¶¶ 15–18; 473 Compl. ¶¶ 16–19; 502 Compl. ¶¶ 15–18; 549 Compl. ¶¶ 14–17.) Within this broad framework, all Defendants fit into one of the following categories:

• "*Sponsors*" of the STAT scheme, a term the Court

uses to refer to Caramadre and Radhakrishnan, who solicited the transactions, as well as their alleged company Estate Planning Resources ("EPR"). They are named Defendants in each of the actions except 09–470.[FN1]

> FN1. In that case, Western Reserve claims that the agent of the annuities broker, Harrison Condit of Fortune Financial Services, Inc., put together the deal himself, without Caramadre or Radhakrakrishnan.

• *Annuity brokerage companies,* who sell Plaintiffs' annuities. The broker in case numbers 09–470 and 09–564 is Fortune Financial Services, Inc. ("Fortune"); in 09–471 and 09–549, it is Lifemark Securities Corporation ("Lifemark"); and in 09–472, 09–473, and 09–502, it is The Leaders Group ("Leaders").

• *Agents* of the brokers: the individuals who are licensed to sell annuities and provided the policies at issue at the request of Caramadre and/or Radhakrishnan. Fortune's agent, named as a Defendant in cases 09–470 and 09–564, is Harrison Condit; Lifemark's agent, named in 09–471 and 09–549, is Edward Maggiacomo; Leaders's agent, named in 09–472, 09–473, and 09–502, is Edward Hanrahan.

• *Owners* of annuities in the four actions in which the annuitant is still living, cases 09–470 through 09–473. These are the people or corporations who paid premiums for the policies, and stand to redeem the proceeds because they are also designated as the beneficiaries. In case number 09–470, the owner is Conreal LLC ("Conreal"); in 09–471, it is Estella Rodrigues; in 09–472, it is ADM Associates, LLC ("ADM"); and in 09–473, it is DK LLC ("DK"). In the other three cases, the annuitants are deceased, and the owners are not named as Defendants.

• *Annuitants:* the terminally ill individuals who serve as measuring lives for **275** the annuities in cases 09–470 through 09–473. In 09–470, the annuitant is Anthony Pitocco; in 09–471, it is Patrick Garvey; in 09–472, it is Charles Buckman; and in 09–473, it is Jason Veiveiros.

B. Claims and defenses

The Complaints assert the following claims for relief: (1) rescission of the policies in which the annuitants are still living, or a declaratory judgment that the annuities are void, because they were procured on the basis of fraud, and because the owners lack an "insurable interest" in the annuitants as required by R.I. Gen. Laws 1956 § 27–4–27 (2010); (2) common law fraud against the sponsors, brokers, agents, and some of the owners, because Defendants submitted the annuity applications without telling Plaintiffs that the investments were STATs; (3) civil liability pursuant to R.I. Gen. Laws § 9–1–2 for criminal insurance fraud under R.I. Gen. Laws § 11–41–29, against the sponsors, brokers, agents, and some of the owners; (4) civil conspiracy against the sponsors, brokers, agents, and some of the owners; (5) breach of contract against the brokers, for violating the brokerage service agreements between Plaintiffs and the brokers; (6) breach of the implied covenant of good faith and fair dealing against the brokers; (7) unjust enrichment against the brokers and agents, for taking commissions from Plaintiffs in connection with the annuities; and (8) negligence against the brokers and agents, for allowing the submission of annuity applications pursuant to the STAT.

Defendants move to dismiss the Complaints pursuant to Rule 12(b)(6) for failure to state claims on which relief may be granted. In total, Defendants assert dozens of grounds for dismissal. However, stripped to the essentials, most of their arguments rest on three propositions: (i) the "insurable interest" requirement does not apply to the annuities; (ii) an "incontestability clause" contained in each of the policies prevents Plaintiffs from litigating any claims related to the annuity applications; and (iii) Defendants did not make any material misrepresentations or omissions in connection with the annuity applications.

II. Discussion

A. The Legal Standard

In reviewing a motion to dismiss, the Court must "accept the well-pleaded facts as true, viewing factual allegations in the light most favorable to the plaintiff." *Rederford v. U.S. Airways, Inc.,* 589 F.3d 30, 35 (1st Cir.2009). To meet the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, each Complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ―― U.S. ――, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp.*

**Add. 6**

*v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This means it must present "factual allegations that raise a right to relief above the speculative level." *Simmons v. Galvin,* 575 F.3d 24, 30 (1st Cir.2009) (citation and internal quotation marks omitted). In judging whether this standard is satisfied, the Court may consider not only the Complaints, but "facts extractable from documentation annexed to or incorporated by reference in the [C]omplaint[s] and matters susceptible to judicial notice." *Jorge v. Rumsfeld,* 404 F.3d 556, 559 (1st Cir.2005).

In addition, Plaintiffs' fraud claims must meet the heightened pleading requirements of Rule 9(b), which "applies to state law fraud claims asserted in federal court." *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale,* 567 F.3d 8, 13 (1st Cir.2009). These claims must "specify **\*276** the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 29 (1st Cir.2004). Rule 9(b) also requires "identifying the basis for inferring scienter," which refers to the culpable mental state of knowingly or intentionally committing fraud. *N. Am. Catholic Educ.,* 567 F.3d at 13; *accord Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997).

**B. Claims for rescission and declaratory judgment that the annuities are void *ab initio***

Plaintiffs contend the annuities are void or voidable on two grounds: one, the owners have no insurable interest in the annuitants, in violation of state law; and two, Plaintiffs were defrauded. Because both arguments fail, the rescission and declaratory judgment claims must be dismissed.

*1. The insurable interest requirement*

Section 27–4–27 of Rhode Island's General Laws provides:

No person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under the contract are payable to the individual insured or his or her personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured.

R.I. Gen. Laws § 27–4–27(a)(2010).[FN2] An "insurable interest" generally means that the owner of an insurance policy must have either "a substantial interest engendered by love and affection" in the insured, *id.* § 27–4–27(c)(1), or a "lawful and substantial economic interest in having the life, health, or bodily safety of the individual ... continue," *id.* § 27–4–27(c)(2). From a public policy point of view, the insurable interest rule guards against creating incentives to shorten human life. As the Rhode Island Supreme Court said over 100 years ago, "a purely speculative contract on the life of another is ... objectionable on the grounds of public policy." *See Cronin v. Vt. Life Ins. Co.,* 20 R.I. 570, 40 A. 497, 497 (1898).

> FN2. There is no dispute that Rhode Island law governs most of Plaintiffs' claims, including their requests for equitable relief and their tort claims. However, the contract-based claims (breach of contract and breach of the duty of good faith and fair dealing) are an exception. As noted below, the brokerage contracts between Plaintiffs and the brokers expressly designate either New York or Florida law as controlling.

[1] Defendants correctly contend that the insurable interest requirement does not apply to the contracts at issue in these cases, because they are not "insurance contract[s] upon the life or body of another." R.I. Gen. Laws § 27–4–27(a). The subject contracts are annuities, and nothing in the statute supports Plaintiffs' plea to ignore this fact and treat them as insurance policies.

Plaintiffs' argument that § 27–4–27(a) should be read to embrace annuities first hits a statutorily-created wall between insurance and annuities in Rhode Island. The General Laws place the two instruments in separate categories:

(a) "Annuities" means all agreements to make periodic payments for a certain period or where the making or continuance of all or some of a series of the payments, or the amount of any payment, depends on the continuance of human life, *except payments made in connection with a life insurance policy.*

....

(c) "Life insurance" means every insurance upon the lives of human beings and every insurance appertaining to that life, including the granting of endowment **\*277** benefits, additional benefits in the

**Add. 7**

event of death by accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit....

R.I. Gen. Laws § 27–4–0.1 (emphasis added).[FN3]

> [FN3]. In isolation, the reference to a "death benefit" in subsection (c) could set the reader wondering whether annuities with death benefit features could be "life insurance." But subsection (a) appears to preclude that possibility. It says, paraphrased, that annuities are not life insurance. As discussed below, the Court does not need to decide if a product could be an annuity *and* life insurance simultaneously. The Court simply finds that the contracts in this case are not life insurance contracts.

The General Assembly recently reinforced the statutory distinction between annuities and life insurance by enacting the Life Settlements Act ("LSA"), which takes effect in July, 2010. The LSA prohibits "stranger originated life insurance" or "STOLI" transactions. *See* R.I. Gen. Laws § 27–72–2(9)(i)(A)(X) (defining STOLIs as "fraudulent life settlement act[s]"); *id.* § 27–72–14 (prohibiting "fraudulent life settlement acts"). A STOLI is "a practice or plan to initiate a *life insurance policy* for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured." *Id.* § 27–72–2(26) (emphasis added). Put differently, it is exactly what Plaintiffs complain of in these cases, except with life insurance policies instead of annuities. But the word "annuity," which appears dozens of times in Title 27 of the General Laws, is not used once in the LSA. Had the General Assembly intended to extend the ban on stranger-owned products to annuities, it could easily have said so in the new law. All of this helps to smother Plaintiffs' contention that the words "any insurance contract" in § 27–4–27(a) should refer to annuities. *See id.* § 27–4–27(a).

Plaintiffs contend in the alternative that annuities may operate as " 'hybrid products,' possessing characteristics of both insurance products and investment securities." *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 105 (2d Cir.2001). In this respect, Plaintiffs argue that Rhode Island courts have labored to look beneath the surface to expose life insurance

cloaked under different names. For example, in *Sisson ex rel. Nardolillo v. Prata Undertaking Co.,* 49 R.I. 132, 141 A. 76 (1928), the court determined that burial contracts offered by an undertaker constituted "insurance." The contracts were multi-year agreements providing for pre-paid funeral services. If death occurred before a series of annual payments was completed, the undertaker agreed that he would not levy any additional charge against the decedent's heirs, and would provide the services.[FN4] *See id.* at 76. The death benefits in the policies at issue here, Plaintiffs insist, must be treated the same way as the contracts in *Sisson;* they are also, in substance, "insurance contract[s]." R.I. Gen. Laws. § 27–4–27(a).

> [FN4]. Thus, the bargain replicated the trade-off in a basic life insurance policy: if the owner died early, he won (in a financial sense), because he got the entire benefit without having to pay the full cost of the contract. As explained below, that is not the case with the annuities at issue here.

The proposed analogy to *Sisson* squirms out of Plaintiffs' grip. The contract in that case was a straightforward agreement to provide a service, with a provision that if death interceded, the product purchased would still be provided and further costs waived. Similar contracts are commonplace in modern times for mortgage insurance, life insurance, or auto loans. Here, however, the products at issue are not **\*278** modern-day analogues to the funeral services contract. The annuities in question are specific, well-understood financial instruments, and while they also happen to involve monetary exchange connected to the duration of a life, they are not life insurance. Again, as noted, the distinction between annuities and life insurance is significant enough to warrant separate definitions for the two vehicles in Rhode Island statutes.

So, even if the Court agreed that hybrid annuity / life insurance policies could breach the statutory language barrier, something more than the narrow holding in *Sisson* would be required to find in Plaintiffs' favor. Foreshadowing the statutory demarcation, older decisions from the Rhode Island Supreme Court recognized that there is a fundamental difference between life insurance, which requires an insurable interest in order to prevent gambling on human life because it is against public policy, and annuities,

**Add. 8**

which embrace the gamble as a core component of the contract:

> It is true there is an element of chance and uncertainty in the transaction; but so there is when a man takes a transfer of an annuity, or buys a life estate, or an estate in remainder after a life estate. There is in all these cases a speculation upon the chances of human life. But the transaction has never been held to be void on that account.

*Clark v. Allen,* 11 R.I. 439, 1877 WL 4932, at \*4 (R.I.1877); *see Cronin,* 40 A. at 497 (stating the same conclusion).[FN5] Simply because the court in *Sisson* saw the contract as more closely resembling a life insurance contract does not vitiate the clear statements in *Clark* and *Cronin* about the nature of annuities. The products at issue here, without question, fit within that core concept.

> **FN5.** Surely, Plaintiffs protest, annuities in the nineteenth century were far simpler than the exotic instruments here. But that is not a reason to assume the Rhode Island Supreme Court, if presented with the question, would find that the insurable interest rule governs the policies at issue. The court could instead choose to maintain the distinction between life insurance and annuities, even while acknowledging the more sophisticated investment aspects of modern annuities. *See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 255, 260, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (finding that variable annuities, "though more sophisticated than the standard savings bank deposits of old," are "not insurance" under federal statutes).

To be more precise, even if hybrid policies are theoretically possible under Rhode Island law, the present contracts cannot meet any reasonable definition of what such a policy would have to look like. In the Court's view, in order for an annuity to qualify as a hybrid policy, at a minimum it would need to have life insurance at its core, as the contracts in *Sisson* did. That is not the case here. The basic bargain embodied by the policies in dispute is that, in exchange for premiums, the owners receive a future income stream. (*See, e.g.,* Mot. to Dismiss by Conreal LLC and Harrison Condit, Ex. A–2. at 16, C.A. No. 09–470, Doc.

No. 22 (Nov. 13, 2009) (explaining payment options).) The death benefits merely sweeten that deal; they do not define it. They take away the worry that future payments will dwindle if the market sours. As a Western Reserve brochure states: "Regardless of market performance or how [your funds] are allocated, your legacy is protected [by the death benefit]." (502 Compl. Ex. B at 8.) Of course, the whole point of the STATs was to capitalize on the death benefits. But that is because Defendants figured out how to game a flaw in the product, not because the products are life insurance vehicles. The terms of the policies, and **\*279** Plaintiffs' own marketing materials, present the death benefit not as the core benefit of the product, but rather as an ancillary perk.[FN6]

> **FN6.** In contrast, in *Sisson,* the life insurance feature was built into the central purpose of the policy. Specifically, the value of the contract in that case was a function of when the measuring life ended. Here, no matter when the annuitant dies, the death benefit guarantees the return of premiums, but not more than what the owner paid for the policy. Any gains derive from market increases—not, as in *Sisson,* from the owner's death before he can complete the payments.

Plaintiffs' arguments might be more persuasive if they had treated the contracts as life insurance by taking steps to guard against the "temptation to shorten life." *Cronin,* 40 A. at 497. At oral argument, Plaintiffs agreed that "the law makes it [their] obligation to ensure [that] the insurable interest" requirement is met. (Hr'g Tr. 58:24–59:4, Mar. 15, 2010.) Yet, the annuity applications do not pose any questions about the relationship between the annuitant and either the owner or the beneficiary. (*See, e.g.,* 471 Compl. Ex. D. at 1–2; 502 Compl. Ex. C at 1–2.) Thus, as Plaintiffs acknowledge, the argument that the death benefits are life insurance could land them in a precarious position outside these lawsuits. But more importantly, their application procedures suggest that this argument is a newly-minted reaction to Defendants' scheme, as opposed to a long-held belief about the nature of the contracts.

In short, there is no basis in this case to stretch the Rhode Island insurable interest rule to include the contracts at issue here. Doing so would not only torture the language of § 27–4–27(a), ignore the statutory

division between annuities and life insurance, and break new ground that the Rhode Island Supreme Court has not touched; it also would trample any possible construction of the hybrid concept that is consistent with Rhode Island law. Sitting in diversity jurisdiction, this Court could not take that step, even if it wanted to (which it does not). *See Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir.2007)* (explaining that courts sitting in diversity should "not create new rules" of state law "or significantly expand existing rules"). Accordingly, the Court finds the insurable interest requirement creates no grounds to nullify the annuities.

### 2. The incontestability clauses

[2] Defendants rely on clauses contained in the annuities that state, "This policy shall be incontestable from the Policy Date." *(See, e.g.,* Mot. to Dismiss of Conreal LLC and Harrison Condit, Ex. A2 at 4, C.A. No. 09–470, Doc. No. 22, Nov. 13, 2009.) In Rhode Island, incontestability clauses prevent insurers from rescinding claims even on grounds of fraud.[FN7] *See Murray v. State Mut. Life Ins. Co., 22 R.I. 524, 48 A. 800, 800 (1901)* (rejecting insurer's argument that "fraud vitiates all contracts" and enforcing incontestability clause in the policy issued by the defendant); *see also Prudential Ins. Co. of Am. v. Tanenbaum, 53 R.I. 355, 167 A. 147, 150 (1933)* (explaining that incontestability clauses bar defenses "to any action at law which might be brought ... to enforce liability on the policies.") Hence, if the incontestability clauses are valid and enforceable, Plaintiffs may not justify canceling**\*280** the annuities, or having them declared void, by claiming they were defrauded.

> FN7. With respect to incontestability clauses and several other issues discussed below, the parties (and the Court) recognize that Rhode Island law dealing with insurance provides a useful body of authority. Both Plaintiffs and Defendants cite cases and statutes governing insurance policies as persuasive authority. Thus, the conclusion that the annuities are not life insurance for purposes of § 27–4–27(a) does not require ignoring insurance law where relevant to the analysis of these issues.

Grasping this problem, Plaintiffs ask the Court to erase the incontestability clauses from the contracts. Incontestability clauses that take effect immediately violate public policy, Plaintiffs say, because they tempt fraud. Plaintiffs cite decisions from other states that have found as much. *See, e.g., Reagan v. Union Mut. Life Ins. Co., 189 Mass. 555, 76 N.E. 217, 218 (1905)* ("If we treat [an incontestable clause that takes effect on the policy date] as intended to include fraud ... we are of opinion that this part of the provision is against the policy of our law, and therefore void."); *Welch v. Union Cent. Life Ins. Co., 108 Iowa 224, 78 N.W. 853, 854–55 (1899)* (finding an immediate incontestability provision ineffective against fraud claim).

While the Rhode Island Supreme Court has not spoken directly to this issue, no reasonable reading of that court's decisions, or Rhode Island statutory law, supports Plaintiffs' contention. In this state, incontestability provisions are "for the benefit of the insured." *Columbian Nat'l Life Ins. Co. v. Indus. Trust Co., 53 R.I. 334, 166 A. 809, 812 (1933)*. Accordingly, section 27–4–6.2(a) of the General Laws requires all policies to contain either two-year contestability periods or terms that the Rhode Island Department of Business Regulation ("DBR") considers "more favorable to policyholders." *See R.I. Gen. Laws § 27–4–6.2(a)*. From the consumer's perspective, a "more favorable" period during which the insurer could challenge the policy based on fraud or other grounds would be shorter, rather than longer. *See R.I. Gen. Laws § 27–4–6.2(a)*. Thus, it is reasonable to conclude that the DBR may authorize shorter lengths of time than the two-year default. In fact, other provisions of the General Laws allow the agency to review policies on a case-by-case basis. *See id.* § 27–4–24 (providing for filing of policy forms). This suggests that parties themselves may "stipulate for a shorter period of limitation than that provided by law"—subject to DBR approval—because it is more favorable to the insured. *Murray, 48 A. at 800.* As *Murray* demonstrates, this was acceptable before the passage of *§ 27–4–6.2(a)*.

Similarly, omitting the challenge period altogether would clearly be "more favorable" to the insured than the two-year default period. Both the statutory and decisional law discussed above support the conclusion that parties can agree on their own to do just that. At a minimum, there is no basis to assume the opposite: that the law contains an unstated public policy ban on making contracts incontestable from the date of issue.

**Add. 10**

[3] For these reasons, the Court cannot strike the incontestability clauses from the annuities, and these clauses therefore serve to deflect claims to rescind the annuities or have them declared void because of fraud.

C. Fraud and derivative claims

1. *Claims against the policy owners*

[4] The incontestability clauses also effectively knock out Plaintiffs' claims for fraud, conspiracy, and civil liability for crimes and offenses against the policy owners, who are the beneficiaries of the policies, in cases 09–472 and 09–473. "If a fraud defense to the validity of a policy is barred by incontestability, then a separate fraud action alleging the same grounds is also barred." 17 Lee R. Russ and Thomas F. Segalla, Couch on Insurance § 240:65 (3d ed.2009). Each of Plaintiffs' fraud-based tort claims relies upon the same underlying allegations. Since Plaintiffs seek damages to cover their obligations under the policies, allowing these fraud-based claims to proceed against the owners**281 would essentially permit an end-run around the incontestability clauses. Each of the claims against the policy owners must therefore be dismissed. *See* Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1048 (11th Cir.2007) (noting that incontestability clauses "may apply ... to bar ... fraud-based claims (request for declaratory judgment, aiding and abetting fraud, conspiracy to commit fraud, and even RICO claims)"); Maslin v. Columbian Nat'l Life Ins. Co., 3 F.Supp. 368, 369 (S.D.N.Y.1932) ("[I]n so far as the defendant relies upon an alleged conspiracy between one of its agents and Samuel Maslin [to commit fraud] ..., there is no defense to the policies. The fraud, abhorrent as it is if the facts pleaded are true, has no legal significance once the period set by the incontestability clause has expired.").

An argument could be made that the incontestability clauses are special to insurance contracts, and should not be extended to the owners of annuities who are part and parcel, Plaintiffs say, of a fraudulent scheme. This argument would suggest that because annuities such as the ones in this case are really investments, the owners should not, as a policy matter, be allowed to slink beneath the cloak of incontestability. Plaintiffs do not make this argument, no doubt because they argue in the first instance that the products here are contracts for insurance (an argument the Court has rejected). The position has some obvious appeal, but cannot overcome the fact that the incontestability clauses appear in the contracts, and state no

fraud exception. *Cf.* First Interstate Bank of Billings v. United States, 61 F.3d 876, 877–78 (Fed.Cir.1995) (allowing claim for fraud despite incontestability clause in a loan guarantee agreement, because the clause stated the guarantee was incontestable "except for fraud" under certain circumstances). And while the annuities are not life insurance, the two are cousins, and the familial similarity makes the insurance authority cited above quite persuasive. In fact, the only case the Court has found to confront the question of why annuities contain incontestability clauses, Newton v. N.Y. Life Ins. Co., 325 F.2d 498 (9th Cir.1963), supports this view. The answer, the court in Newton found, is that the clauses were designed to "reassure prospective policy holders" that the annuity would not be "disputed by the insurer many years after the contract had been issued." Id. at 502 (citation omitted).

Thus, according to Newton, the policy rationale underlying incontestability clauses is the same for both insurance and annuities. In either case, the provision protects the policy holder, not the insurer.[FN8] *See id.* This strengthens the conclusion that incontestability clauses in annuities have the same effect as those contained in insurance contracts and, based on the holdings discussed above, must shield the owners from any fraud-based claims.

> FN8. The court in Newton stated that incontestability clauses in annuities are "for the benefit of the annuitant," but it is reasonable to assume it did not contemplate the possibility that the owner would be different from the annuitant. Newton v. N.Y. Life Ins. Co., 325 F.2d 498, 502 (9th Cir.1963) (citation omitted). The thrust of the court's holding was that incontestability clauses benefit the consumer as opposed to the insurer, in either annuities or insurance policies. *See id.*

2. *Fraud claims against the sponsors, agents, and brokers*

[5][6] Defendants initially seek blanket immunity beneath the cover of the incontestability clauses. But unlike Harry Potter's "Invisibility Cloak," which could conceal not only Harry, but anyone who wore it,[FN9] "[t]he benefits of an incontestable **282 clause can be availed of only by an insured or his or her beneficiary, and cannot be invoked by a stranger to the contract." 17 Russ & Segalla, supra, § 240:10. The clauses thus have no effect on the fraud claims against the spon-

sors, agents, and brokers, each of which are discussed below. Defendants have cited no persuasive authority in which a court has extended the coverage of an incontestability clause to anyone but the insured or the owner of a policy, and the Court has found none.

FN9. Moreover, as Dumbledore observed: "[T]he true magic of [the Invisibility Cloak], of course, is that it can be used to protect and shield others as well as its owner." J.K. Rowling, *Harry Potter and the Deathly Hallows* 716 (Scholastic 2007).

Defendants, in the alternative, assert various other grounds on which the fraud claims should be dismissed; all of these argument fail to carry the day.

a. Rule 9(b) requirements

[7] Defendants fault Plaintiffs for failing to specify the "who" and "what" of the alleged fraudulent scheme in their Complaints, as required by Rule 9(b). *Alternative Sys.,* 374 F.3d at 29. This argument fails, because the Complaints do satisfy the heightened pleading requirements for fraud.

[8] "To establish a prima facie case of common law fraud in Rhode Island the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." *Zaino v. Zaino,* 818 A.2d 630, 638 (R.I.2003) (internal quotation marks and citation omitted). Defendants attack the Complaints for lumping all of them together when describing the alleged "false representations" and omissions. *See* 2 Jeffrey A. Parness & Jerry E. Smith, *Moore's Federal Practice* § 9.03[1][f] (2010) ("If a claim involves multiple defending parties, a claimant may usually not group all claimed wrongdoers together in a single set of allegations."). The Complaint in case number 09–549 provides a characteristic example:

Caramadre, Radhakrishnan, Estate Planning Resources, [and] Maggiacomo ... acted in concert to submit the applications identified herein, containing intentionally omitted ... information concerning the respective annuitants' health conditions, the limited life expectancies of the annuitants, the payments to the annuitants, and the absence of a relationship between the annuitants and the owners and beneficiaries of the annuities with Maggiacomo....

(549 Compl. ¶ 119.)

[9] Reading the Complaints in full, the fact that they state Defendants "acted in concert" is not a fatal flaw. *(See, e.g.,* 549 Compl. ¶ 119.) The Complaints assert that the STAT scheme is a way to fleece the insurers for death benefits by hiding the annuitants' imminent demise. Together, the Counts for fraud and civil conspiracy *(see, e.g.,* 549 Compl. Counts I, V), along with the factual allegations supporting those Counts, go into enough detail about the alleged conspiracy, and each Defendant's role, to explain the origin of the alleged duty to tell Plaintiffs about the STATs.[FN10] As in a criminal conspiracy, participants**283** in a civil conspiracy need not know everything their coconspirators know, or participate in every wrongful act, to be found liable for the ultimate fraud. *See Miller v. Holzmann,* 563 F.Supp.2d 54, 80 n. 13 (D.D.C.2008) (discussing liability under the False Claims Act, and stating "once [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable ....") (quoting *Halberstam v. Welch,* 705 F.2d 472, 481 (D.C.Cir.1983) (discussing similarities between civil and criminal conspiracies)). Accordingly, at this point in the litigation, it does not matter that Plaintiffs cannot recite, for instance, who filled out which portions of the applications, or who mailed them. *See Airport Boulevard Apartments, Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners, Ltd.),* 411 B.R. 352, 366 (Bankr.S.D.Tex.2009) ("Rule 9(b) does not work to penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who allegedly acted in concert to defraud him.") (citation omitted); *accord Deere & Co. v. Zahm,* 837 F.Supp. 346, 350 (D.Kan.1993) (finding a complaint for fraud and civil conspiracy sufficiently pleaded). The point is that the applications were misleading, and all Defendants allegedly knew how the scheme operated and each played a specified role in it; therefore, it is alleged, each should have spoken up, and committed fraud by not doing so.

FN10. For instance, Caramadre "orchestrated" the STAT scheme, and brought in investors. *(See, e.g.,* 472 Compl. ¶¶ 14–17; 502 Compl. ¶¶ 14–17; 549 Compl. ¶¶ 13–16;

**Add. 12**

564 Compl. ¶¶ 13–16.) Estate Planning Resources is allegedly Caramadre's business, which he used in connection with the flyers advertising "Program[s] for the Terminally Ill." *(See, e.g.,* 472 Compl. ¶ 18; 502 Compl. ¶ 18; 549 Compl. ¶ 17; 564 Compl. ¶ 17.) The Complaints state that Radhakrishnan either "identified" terminally ill annuitants *(see, e.g.,* 472 Compl. ¶ 24; 502 Compl. ¶ 24), or "recruited" them *(see, e.g.,* 549 Compl. ¶ 22; 564 Compl. ¶ 22). The agents, allegedly acting in an agency capacity on behalf of the brokers, then furnished the annuity applications, which they "would sign and submit" to Plaintiffs. *(See, e.g.,* 472 Compl. ¶ 26; 502 Compl. ¶ 26; 549 Compl. ¶¶ 25, 42, 59; 564 Compl. ¶¶ 25, 42, 57.)

In addition, with respect to the agents, Plaintiffs go a step further. They claim that, by signing the annuity applications, the agents affirmed they were "the agent[s] who sold the [a]nnuit[ies]," but that this was false. *(See, e.g.,* 472 Compl. ¶ 43; 502 Compl. ¶ 44; 549 Compl. ¶ 122; 564 Compl. ¶ 77.) This allegation is sufficiently specific when read in conjunction with the applications themselves, which are attached to the Complaints as exhibits. Above the signature line for agents, each application form declares that the agent has investigated the appropriateness of the investment for the consumer, and on that basis has certified the policy as reasonable for the consumer's needs. (*See, e.g.,* 472 Compl. Ex. C at 10.) But, in fact, according to the Complaints, the agents did no such thing, and had they performed any investigation, could never have so certified.

In the aggregate, all the allegations discussed above serve the goals of Rule 9(b) to "provide a defendant with fair notice" of the claim and discourage baseless actions. *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997).

### b. Materiality

Defendants next attack the more fundamental question of whether any of the alleged omissions and misrepresentations was material. Yet, even without any extant insurable interest requirement, Plaintiffs nevertheless allege a series of omissions that, if proven, could be found material by a jury.

### i. The insurers' duty of inquiry

Defendants' first strategy is to emphasize the absence of any questions about the owner's relationship to the annuitant, or the annuitant's health status, on Plaintiffs' application forms. Anything Plaintiffs did not ask about cannot be material, according to Defendants. This, they say, is because the insured "has no duty [to disclose information] where the application makes **\*284** no specific inquiries." 6 Russ & Segalla, *supra,* § 84:2.

It is true that the general rule "appears to assume that the insured or applicant does not have reason to know of the information's materiality apart from whether the insurer makes an inquiry. Such knowledge, combined with knowledge that the insurer is ignorant of the information, generally would impose a duty to disclose." 6 Russ & Segalla, *supra,* § 84:2. The general rule, however, is not without exception. As at least one decision in this District has recognized, many state courts allow claims for "[f]raudulent concealment ... even without inquiry concerning the concealed material facts by the insurer." *Putnam Res. v. Pateman,* 757 F.Supp. 157, 162 n. 1 (D.R.I.1991); *see Lighton v. Madison–Onondaga Mut. Fire Ins. Co.,* 106 A.D.2d 892, 892–93, 483 N.Y.S.2d 515 (N.Y.App.Div.1984) (allowing a claim for fraudulent concealment based on omitting the fact that fires had occurred in the plaintiffs' basement several months before applying for insurance, even though "plaintiffs were asked no question with relation to prior fires"); *Sun Ins. Co. of N.Y. v. Hercules Sec. Unlimited, Inc.,* 195 A.D.2d 24, 30, 605 N.Y.S.2d 767 (N.Y.App.Div.1993) (affirming judgment on claim for fraudulent concealment even though "the insured ha[d] not been asked" about the concealed fact that the insured planned to steal the insured assets); *see also Harrison State Bank v. U.S. Fid. & Guar. Co.,* 94 Mont. 100, 22 P.2d 1061, 1064 (1933) (stating that "any concealment of a material fact known to a party, increasing the ordinary risk, would be deemed ... fraudulent," and explaining that the applicant for bank insurance knew of a planned robbery that law enforcement intended to allow in an attempt to catch the criminals).

[10] While the Rhode Island Supreme Court has not addressed the issue directly, it has, as Defendants concede, recognized fraud claims based on concealment. *See Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 269 (D.R.I.2000) (citing *Home Loan & Inv. Ass'n. v. Paterra,* 105 R.I. 763, 255 A.2d 165,

168 (1969)). That recognition, combined with the decisions cited above finding insurance fraud where applicants hid information the insurer did not request, indicates that the Rhode Island Supreme Court would recognize a very narrow exception to the general rule that the insurance company must ask about facts to make them material. The exception, in its most limited form, can be simply stated as follows: if the non-disclosure is such that it amounts to fraud, then it surely must be material.[FN11] That is, the rule that assumes (for the benefit of the insured) that insurers must ask in order for the information to be material cannot be used to facilitate or promote common law fraud. This would doubtless violate public policy, because it would cause a policy-based rule designed to protect insured parties to swallow the general rule of law that forbids fraud. The Court therefore rejects the argument that any information Plaintiffs did not demand on the annuity applications is immaterial as a matter of law.[FN12]

> FN11. The exception cannot, however, be so narrow as to require Defendants to be convicted of the crime of fraud for their omissions to be considered material. Yet, at this time, the Court need not define the precise contours of the exception that a jury might eventually have to consider. For now, it is sufficient to conclude that the lack of inquiry on Plaintiffs' part does not preclude materiality.

> FN12. Defendants argue that *Testa v. Norfolk & Dedham Mut. Fire Ins. Co.,* 764 A.2d 119, 121 (R.I.2001) confirms their position that the insurer must ask about a fact to make it material. They over-read the case. In rejecting an insurer's fraud claim, the court in *Testa* noted that no "inquiry was made" of the insured about an allegedly concealed fact. *Testa,* 764 A.2d at 121. Yet, the defendant's policy had been transferred from one carrier to another without any requirement to re-apply for coverage. The court stressed that the original representations made to the transferor "did not constitute an application" to the plaintiff-transferee. *Id.* Thus, unlike in this case, it was questionable whether the defendant made any representations at all to the plaintiff (instead of only to the transferor).

**\*285** ii. Alleged omissions and misrepresentations

Rhode Island courts allow actions for fraudulent concealment in circumstances where the defendant bears "a duty to speak." *Home Loan,* 255 A.2d at 168. Whether or not the duty arises—in other words, whether a fact is material, such that it must be disclosed—depends on the "circumstances of [the] case." *Id.* at 168. The duty generally obligates a party to divulge facts that, if withheld, render other affirmative representations misleading. See *Nisenzon v. Sadowski,* 689 A.2d 1037, 1046 (R.I.1997) (finding a letter from an attorney that "not only ... fail[ed] to disclose [the attorney's] ownership" of disputed property, but also "affirmatively sought to induce" the recipients to take no action against his client, supported a fraud claim).

[11][12] Under this standard, Plaintiffs' fraud claims clear the hurdle of Defendants' motions to dismiss. True, in the absence of any insurable interest requirement, the theory that Defendants concealed a statutory violation holds no water.[FN13] Yet, there are more than enough fragments of allegedly withheld information that remain to meet or exceed the materiality threshold. Specifically, Plaintiffs assert that Defendants hid: (i) the recruitment of annuitants who faced imminent death (*see, e.g.,* 471 Compl. ¶¶ 24–25; 472 Compl. ¶ 23; 564 Compl. ¶¶ 22, 39, 56); (ii) in some cases, the annuitants' ignorance of the terms of the policies (*see,* e.g., Am. Compl., C.A. no. 09–470, Doc. No. 9, Oct. 16, 2009 (hereinafter "470 Compl.") ¶ 21; 471 Compl. ¶ 39; 473 Compl. ¶ 56); (iii) the payments to some annuitants to sign the applications (*see,* e.g., 472 Compl. ¶ 44; 471 Compl. ¶ 39; 502 Compl. ¶ 45); (iv) in some cases, the forgery or possible forgery of annuitants' signatures (*see,* e.g., 470 Compl. ¶ 21–24; 564 Compl. ¶ 24); and (iv) with respect to the agents, the fact that they were not the agents who sold the policies, in contradiction of representations on the applications that they brokered the annuity sales and deemed them appropriate (*see,* e.g., 472 Compl. ¶ 43; 502 Compl. ¶ 44; 564 Compl. ¶ 77).

> FN13. Plaintiffs also allege that the payments to the annuitants violate the anti-kickback rules established by R.I. Gen. Laws § 27–8–7 (2010). However, as with the insurable interest provision in § 27–4–27, the anti-kickback statute is not written to govern annuities. By its terms, it only prohibits

payments in connection with "contract[s] for insurance" of various types, not annuities. R.I. Gen. Laws § 27–8–7. In the Court's view, this language does not include annuities, particularly in light of the consistent statutory distinction between annuities and insurance in Rhode Island, discussed above. Nevertheless, as explained in this section, the fact that the payments to the annuitants could not have violated § 27–8–7 does not spoil Plaintiffs' fraud claims.

This last point bears a further comment: Plaintiffs' pleadings focus in part on the agents as the source of what could be considered either omissions or affirmative misrepresentations. Each annuity contains a signature section for the agent with the following text printed immediately above it:

> I HAVE MADE REASONABLE EFFORTS TO OBTAIN INFORMATION CONCERNING THE CONSUMER'S FINANCIAL STATUS, TAX STATUS, INVESTMENT OBJECTIVES AND **\*286** SUCH OTHER INFORMATION USED OR CONSIDERED TO BE REASONABLE IN MAKING THE ANNUITY RECOMMENDATION AND FIND THE ANNUITY BEING APPLIED FOR APPROPRIATE FOR HIS/HER NEEDS.

(564 Compl. Ex. G at 10.) Plaintiffs, however, contend the agents did not have "any substantive involvement in selling the annuities," but were merely go-betweens for the sponsors. The sponsors needed these particular annuity applications, which could only be sold by licensed brokers, for their pre-arranged investors. (*Id.*) A jury could reasonably find that those facts, if proven, were material, because shrouding them rendered the statements printed above misleading.[FN14]

> **FN14.** The agents try to duck the effect of those statements by uncorking, in the middle of their fraud argument, the issue of whether they owed any duty to Plaintiffs as a matter of agency law. That issue could be relevant for negligence claims, *see Gen. Acc. Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.,* 716 A.2d 751, 756–57 (R.I.1998) (finding that insurance brokers owed duties both to the insurer and the insured), but for fraud, the

relevant duty is the duty to disclose, which turns only on the materiality of the omissions identified above. It thus arises independently from any agency relationship.

Simply put, according to Plaintiffs, Defendants collectively did not tell them they were conspiring to exploit a loophole in Plaintiffs' annuity products. As explained above, Plaintiffs' theory in this case is that each of the parties understood the nature of the fraudulent scheme, and each had his or her part to play and played it. Thus, much like a criminal enterprise, the fraud was the product of a group effort. *See Miller,* 563 F.Supp.2d at 81. Under these circumstances, evidence substantiating the allegations would be sufficient to create a jury question as to whether the information Defendants withheld was material. *Cf. Affleck v. Potomac Ins. Co.,* 49 R.I. 112, 140 A. 469, 470 (1928) (explaining that "[s]ometimes questions of materiality are for the jury," although the court may find misrepresentations on an insurance application to be material as a matter of law); *Smith v. Beaumier,* 703 A.2d 1104, 1107 (R.I.1997) (finding sufficient evidence in the record from which a jury could reasonably have concluded that the defendant "made material misrepresentations"); *In re Cabletron Sys., Inc.,* 311 F.3d 11, 36 (1st Cir.2002) (reversing dismissal of fraud claims and noting that materiality would "present a question of fact for a jury").

### c. Scienter

Defendants submit that, even accepting Plaintiffs' allegations as true, they cannot prove the scienter element of fraud: that Defendants "inten[ded]" to deceive Plaintiffs. *Zaino,* 818 A.2d at 638. The sponsors' argument on this point again rests on their objection that none of the alleged omissions was material. They do not dispute that the Complaints all allege they knowingly withheld the facts discussed above. Rather, they assert it was not inappropriate to stay silent about those facts, because the facts were immaterial as a matter of law. For the reasons discussed at length above, this argument must be rejected.

[13] The agents and brokers, for their part, argue that the Complaints fail to allege they knowingly concealed information or lied. The agents fasten on the fact that Plaintiffs say they had no "substantive involvement" in selling the policies (*see, e.g.,* 564 Compl. ¶ 77), and that, in some cases, the annuitants

**Add. 15**

"had never met" the agents before signing the applications *(see, e.g.,* 472 Compl. ¶ 34). However, the Complaints declare that the agents "knew the ... omissions in the applications" described above were "misleading." (*See, *287 e.g.,* 472 Compl. ¶ 54; 502 Compl. ¶ 47; 549 Compl. ¶ 125; 564 Compl. ¶ 80.) Plus, Plaintiffs allege that it was the sponsors, not the agents, who identified the buyers, and who solicited the annuitants to sign the applications. *See supra* n. 10. At a minimum, these facts, if proven, would make it unlikely that the agents had actually brokered the sales; this, in turn, would provide a "basis for inferring" that each agent knew it was misleading to proclaim on the application that he had made the annuity recommendation and found the investment appropriate. *N. Am. Catholic Educ.,* 567 F.3d at 13.

Because the Complaints properly allege scienter on the part of the agents, the brokers cannot escape liability by pleading ignorance. They may be vicariously liable for fraud if Plaintiffs prove the allegations that the agents acted in an agency capacity for the brokers when delivering the applications. *See In re Atl. Fin. Mgmt., Inc.,* 784 F.2d 29, 32 (1st Cir.1986) (explaining the basis for vicarious liability for fraud).[FN15]

> [FN15.] Defendants also argue Plaintiffs cannot prove the justifiable reliance element of fraud. They argue big insurance companies are too sophisticated to justifiably rely on the absence of information they did not ask for. However, as noted, the insurers' lack of inquiry does not rule out fraud. Furthermore, sophistication does not preclude reliance. *See Kenda Corp. v. Pot O'Gold Money Leagues, Inc.,* 329 F.3d 216, 227 (1st Cir.2003) (rejecting an argument that the principal of a corporation was "sophisticated" and therefore could not have reasonably relied on misrepresentations by a potential business partner).

*3. Claims for conspiracy, civil liability for crimes, and unjust enrichment against the sponsors, agents, and brokers*

[14][15] According to Defendants, the conspiracy and unjust enrichment claims cannot prevail, because each springs from Plaintiffs' deficient fraud claims. A conspiracy requires "specific intent to do something illegal or tortious." *Guilbeault,* 84 F.Supp.2d at 268.

Unjust enrichment requires circumstances that make it "inequitable for a defendant to retain [a] benefit" gained from a plaintiff, *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997) (internal citation omitted), such that "the enrichment to the defendant [is] unjust," *R & B Elec. Co. v. Amco Constr. Co.,* 471 A.2d 1351, 1356 (R.I.1984). There are no cognizable allegations that Defendants have done anything wrongful or tortious, they insist, because Plaintiffs have failed to plead fraud adequately. However, since the fraud claims against the sponsors, agents and brokers may proceed for the reasons already discussed, the conspiracy and unjust enrichment Counts may follow against those parties.

Plaintiffs' claims for civil liability for crimes and offenses, on the other hand, trip over a statutory barrier similar to the one that obstructs their insurable interest argument. The insurance fraud statute on which the claims depend only criminalizes deceit in connection with "any application for the issuance of an insurance policy." *R.I. Gen. Laws § 11–41–29(b)(1); see R.I. Gen. Laws § 9–1–2* (providing civil liability for victims of crimes). The words "insurance policy" are even less susceptible to the interpretation that they include annuities than the words "insurance contract" in *§ 27–4–27(a)*. Again, given the statutory division between insurance and annuities in Rhode Island law, the Court declines to transpose the rules for insurance policies onto annuities. Defendants may have defrauded Plaintiffs, and thereby violated some other part of the state criminal code; but *§ 11–41–29* cannot serve as a basis for civil liability in these cases.[FN16]

> [FN16.] In their opposition to Defendants' motions, Plaintiffs coin two new theories as to why the contracts are void: forgery and fraud in the factum. The latter occurs when someone is "tricked into signing an instrument without knowledge of its true nature or contents." *Vasapolli v. Rostoff,* 39 F.3d 27, 35 (1st Cir.1994). It renders a contract "void and not merely voidable." *R.I. Depositors Econ. Protection Corp. v. Bowen Court Assoc.,* 763 A.2d 1005, 1009 (R.I.2001). Forgery may have the same result, if for no other reason than that it is one instance in which fraud in the factum may occur. *See Giannone v. Ayne Inst.,* 290 F.Supp.2d 553, 563 (E.D.Pa.2003). The twist here is that, if either

**Add. 16**

claim were successful, this could rope the owners back into the lawsuits in cases 09–472 and 09–473: they could no longer rely on the incontestability clauses, which never would have come into effect. However, none of the Complaints articulates any separate claims for relief based on forgery or fraud in the factum—which, as species of fraud, are subject to Rule 9(b). Instead, the only reasonable reading of the Complaints is that they plead garden-variety claims of fraud in the inducement: concealing the annuitants' ignorance of the policies, and the possible forgery of their signatures, allegedly induced Plaintiffs to issue the annuities. *See R.I. Depositors Econ. Prot. Corp. v. Duguay,* 715 A.2d 1278, 1280 (R.I.1998) (distinguishing fraud in the inducement from fraud in the factum). The Court's decision here is without prejudice to any motion for leave to amend the Complaints to add fraud in the factum or rescission on grounds of forgery as separate causes of action. The Court takes no position at this time on the merits of such a motion, or on the question of whether such claims would in fact allow re-joining the owners to these cases by effectively negating the incontestability clause defense. This issue, if it arises, would need to be fully briefed and argued.

**\*288** D. Contract claims

    1. *Breach of contract*

    A necessary consequence of the Court's preservation of the fraud claims against the agents is that the breach of contract claims against the brokers also cannot be dismissed. Plaintiffs entered agreements with each of the brokers setting conditions for selling their insurance and annuity products. If proven, the fraud could create liability under at least two contract provisions cited in the Complaints. First, Western Reserve alleges that its agreements obligate the brokers to indemnify Western Reserve for "fraudulent ... acts" of the brokers' "employees ... or agents" when selling Western Reserve products. (564 Compl. ¶ 88; *see* 470 Compl. ¶ 46; 472 Compl. ¶ 61; 473 Compl. ¶ 64; 502 Compl. ¶ 54.) Second, both Transamerica's and Western Reserve's contracts require the brokers to "supervise" their agents in selling Plaintiffs' products. (471 Compl. ¶ 62; *see* 549 Compl. ¶ 132.) If the agents engaged in fraud, this may allow Plaintiffs to establish that the brokers failed to supervise the agents.[FN17]

FN17. Given that the breach of contract claims must be allowed to go forward on the basis of the indemnification for fraud and supervision clauses, the Court need not decide whether any other provisions might ultimately create liability.

    The brokers make no headway with objections to Plaintiffs' lack of specificity in pleading breach of contract, or failure to attach the relevant contracts to the Complaints. Plaintiffs have satisfied the relaxed pleading standards of Rule 8, which apply to claims for breach of contract. *See* 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice & Procedure § 1235* (3d ed.2010) ("In pleading the existence of an express written contract, the plaintiff, at her election, may set it forth verbatim in the complaint, attach a copy as an exhibit, or plead it according to its legal effect.").

    [16] Leaders also falls short in asserting, for the first time in its reply memoranda, that the Complaints in cases 09–473 and 09–502 rely on an outdated agreement. Arguments "raised for the first time in reply briefs are procedurally barred." **\*289***Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council,* 589 F.3d 458, 474 n. 14 (1st Cir.2009). Regardless, the Complaints say the agreement remains valid, and Western Reserve stated at oral argument that it stands by that assertion. Whatever the facts may eventually reveal about the status of the contract, the Court must accept Western Reserve's allegations as true for purposes of Defendants' motions.

    2. *Breach of the duty of good faith and fair dealing*

    [17] The Transamerica contracts include an express choice-of-law clause designating New York law as governing the terms of the agreement. *(See* Pl.'s Obj. to Mot. to Dismiss Ex. A at 3, ¶ 11(a), C.A. No. 09–549, Doc. No. 17 (Feb. 1, 2010).) New York law thus controls Transamerica's contract claims. *See DeCesare v. Lincoln Benefit Life Co.,* 852 A.2d 474, 481 (R.I.2004) ( "[C]hoice-of-law provisions are enforceable if the intention of the parties to stipulate to the jurisdiction is made clear by express language ...."); *see also Baker v. St. Paul Travelers Ins. Co.,* 595 F.3d 391, 392 (1st Cir.2010) ("Because this court is sitting in diversity, we apply the choice of law rules of the forum state ..."). New York law "does not recognize a separate cause of action for breach of the im-

**Add. 17**

plied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002). Thus, Transamerica can only rely on its contract claims.

[18] Florida law governs the Western Reserve contracts, also pursuant to an express choice-of-law clause. *(See* Pl.'s Obj. to Mot. to Dismiss Ex. A ¶ 15, C.A. No. 09–472, Doc. No. 37 (Feb. 1, 2010).) Florida law requires claims based on the implied duty of good faith and fair dealing to piggyback on the violation of a specific contractual provision. *See Burger King Corp. v. Weaver,* 169 F.3d 1310, 1318 (11th Cir.1999) (explaining that under Florida law, an "action for breach of the implied covenant cannot be maintained ... in the absence of breach of an express term of the underlying contract"). Since Western Reserve has viable claims for the breach of express contractual terms, as a matter of law it may proceed with its claims for violation of the implied covenant of good faith. *See Nautica Int'l, Inc. v. Intermarine USA, L.P.,* 5 F.Supp.2d 1333, 1340–41 (S.D.Fla.1998) ("That action constituted an express breach of a term of an agreement between [plaintiff and defendant], and, therefore, plaintiff, as a matter law, may bring a claim for breach of implied covenant of good faith.").

E. Negligence

[19] Finally, Rhode Island law forbids Plaintiffs' negligence claims, because they do not assert any physical or emotional damages. The economic loss doctrine in this state prohibits parties who "have contracted to protect against potential economic liability" from recovering "purely economic damages" in tort claims. *Franklin Grove Corp. v. Drexel,* 936 A.2d 1272, 1275 (R.I.2007) (quotation marks and citation omitted). Plaintiffs are correct that the Rhode Island Supreme Court has not applied the economic loss rule to service contracts, such as the broker agreements at issue. However, in this case, the rationales for the rule apply, and the exception to it does not.

Some courts have recognized that the economic loss doctrine preserves the distinction between tort and contract law, allows sophisticated parties freedom to allocate economic risk by contract, and enables the party best positioned to assess economic risk to allocate it. *See* **\*290***Ins. Co. of N. Am. v. Cease Elec. Inc.,* 276 Wis.2d 361, 688 N.W.2d 462, 470 (2004). Here, as a general matter, permitting the contract claims and

not the negligence claims to move forward is consistent with these ends. This result enforces the allocations of risk Plaintiffs bargained for in the agreements. Indeed, Western Reserve's contracts allegedly create an express remedy for negligence on the part of the agents, which requires the brokers to indemnify Western Reserve for any resulting losses. *(See, e.g.,* 564 Compl. ¶ 88.) In addition, there is no dispute that Plaintiffs are sophisticated corporations. Therefore, the exception to the economic loss rule for ordinary "consumers [who] deal with commercial entities" in Rhode Island does not apply. *See Rousseau v. K.N. Constr., Inc.,* 727 A.2d 190, 193 (R.I.1999).

[20] Accordingly, judging by the purposes of the economic loss doctrine, the Court has little trouble concluding that the rule prevents Plaintiff's negligence claims, notwithstanding the fact that the state's high court has not yet had occasion to apply the rule to service contracts. *Cf. Maine Rubber Int'l v. Envtl. Mgmt. Group, Inc.,* 298 F.Supp.2d 133, 137–38 (D.Me.2004) (discussing various approaches to the economic loss doctrine, and concluding that it would reach a contract for services under Maine law). They must therefore be dismissed.[FN18]

FN18. Plaintiffs contend that the "close economic relationship" between the parties allows bypassing the economic loss rule. However, in the case cited as authority for that argument, there was no privity of contract between the plaintiff and the defendant, unlike in these disputes. *See Forte Bros., Inc. v. Nat'l Amusement, Inc.,* 525 A.2d 1301, 1303 (R.I.1987) (finding an architect owed a duty of care to a third-party general contractor and that there is "no requirement of privity ... to maintain an action in tort"). *Forte Brothers* also does not announce any general exception to the economic loss doctrine. Rather, its holding was merely that an architect owed a duty of care to a general contractor working on the same project even in the absence of a contract between the two. *See id.* at 1303.

III. Conclusion

For the reasons stated above, Defendants' motions are GRANTED in part and DENIED in part. All Counts for rescission, declaratory judgment that the contracts are void, civil liability for crimes and of-

fenses, and negligence are dismissed. The Counts for fraud and civil conspiracy are dismissed as against ADM in case 09–472 and DK in case 09–473. Finally, the Counts for breach of the duty of good faith and fair dealing in cases 09–471 and 09–549 are both dismissed. The remaining Counts may proceed.

IT IS SO ORDERED.

D.R.I.,2010.
Western Reserve Life Assur. Co. of Ohio v. Conreal LLC
715 F.Supp.2d 270

END OF DOCUMENT

H

United States District Court,
D. Rhode Island.
WESTERN RESERVE LIFE ASSURANCE CO. OF
OHIO, Plaintiff,
v.
Joseph CARAMADRE; Raymour Radhakrishnan;
Estate Planning Resources, Inc.; Harrison Condit; And
Fortune Financial Services, Inc., Defendants;
Transamerica Life Insurance Company, Plaintiff,
v.
Joseph Caramadre; Raymour Radhakrishnan; Estate
Planning Resources, Inc.; Estella Rodrigues; Edward
Maggiacomo, Jr.; Lifemark Securities Corp.; and
Patrick Garvey, Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre; Raymour Radhakrishnan; Estate
Planning Resources, Inc.; ADM Associates, LLC;
Edward Hanrahan; The Leaders Group, Inc.; and
Charles Buckman, Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre; Raymour Radhakrishnan; Estate
Planning Resources, Inc.; DK LLC; Edward Hanra-
han; The Leaders Group, Inc.; and Jason Veveiros,
Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre; Raymour Radhakrishnan; Estate
Planning Resources, Inc.; Natco Products Corp.; Ed-
ward Hanrahan; and The Leaders Group, Inc., De-
fendants;
Transamerica Life Insurance Company, Plaintiff,
v.
Lifemark Securities Corp.; Joseph Caramadre; Ray-
mour Radhakrishnan; Estate Planning Resources, Inc.;
and Edward Maggiacomo, Jr., Defendants;
Western Reserve Life Assurance Co. of Ohio, Plain-
tiff,
v.
Joseph Caramadre; Raymour Radhakrishnan; Estate
Planning Resources, Inc.; Harrison Condit; and For-
tune Financial Services, Inc., Defendants.

C.A. Nos. 09– 470 S, 09–471 S, 09–472 S, 09–473 S,
09–502 S, 09–549 S, 09–564 S.
Feb. 7, 2012.

**Background:** Insurers filed actions allege that de-
fendants engaged in stranger-initiated annuity trans-
actions (STAT) as part of fraudulent scheme to use
variable annuities as vehicle for riskless speculation in
securities. Defendants moved to dismiss. The District
Court, William E. Smith, J., granted motions in part
and denied motions in part. Defendants moved to
dismiss and for reconsideration.

**Holdings:** The District Court, William E. Smith, J.,
held that:

(1) allegations that annuitants' signatures were forged
or procured by fraud were sufficient to establish ob-
jective circumstances giving rise to a duty to disclose;

(2) sponsors had no duty to disclose;

(3) insurers failed to state fraud in the factum claims
against defendants;

(4) allegations that agent violated state forgery law
were sufficient to state a claim of breach of contract;

(5) allegations that annuity applications were forged,
were sufficient to state claims of civil liability for
crimes and offenses; and

(6) unjust enrichment claims were not derivative of
fraud claims.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** ⚲636

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Par-
ticularity
                170Ak636 k. Fraud, mistake and condi-
tion of mind. Most Cited Cases

    State law fraud claims asserted in federal court
must meet the heightened pleading requirements of
the federal rule requiring fraud be pled with particu-

larity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
        170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases

    To satisfy the federal rule requiring fraud be pled with particularity, fraud claims must specify the who, what, where, and when of the allegedly false or fraudulent representation. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
        170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases

    Federal rule requiring fraud be pled with particularity requires identifying the basis for inferring scienter, which refers to the culpable mental state of knowingly or intentionally committing fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** 🔑928

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(I) Motions in General
      170Ak928 k. Determination. Most Cited Cases

    A motion for reconsideration is properly granted where the moving party demonstrates a manifest error of law, there exists newly discovered evidence, or a court has misunderstood a party's argument.

**[5] Courts 106** 🔑99(3)

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k99 Previous Decisions in Same Case as Law of the Case
        106k99(3) k. Jurisdiction, dismissal, nonsuit, and summary judgment, rulings relating to. Most Cited Cases

    Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case.

**[6] Fraud 184** 🔑3

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k2 Elements of Actual Fraud
      184k3 k. In general. Most Cited Cases

    To establish a claim for fraudulent inducement, under Rhode Island law, a plaintiff must demonstrate that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage.

**[7] Fraud 184** 🔑16

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k15 Fraudulent Concealment
      184k16 k. In general. Most Cited Cases

**Fraud 184** 🔑24

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k24 k. Acts induced by fraud. Most Cited Cases

    Under Rhode Island law, fraudulent inducement can be grounded on either affirmative acts or concealment.

**[8] Fraud 184** 🔑17

**Add. 21**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to disclose facts. Most Cited Cases

    Under Rhode Island law, a claim of fraudulent inducement grounded on concealment, as opposed to an affirmative misrepresentation, will not lie absent a duty to speak.

**[9] Fraud 184 🔑17**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to disclose facts. Most Cited Cases

    Whether a person has a duty to disclose under Rhode Island law, turns on the specific circumstances of the case.

**[10] Annuities 29 🔑37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

**Fraud 184 🔑17**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to disclose facts. Most Cited Cases

    Even if they were independent contractors, defendants involved in annuity transactions may still have owed a duty, under Rhode Island law, to disclose material information when submitting an application for a financial instrument, where a reasonable representative/independent contractor would have known that an insurer armed with the information would have rejected the application.

**[11] Annuities 29 🔑37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

    Allegations that agents had knowledge of stranger-initiated annuity transactions (STAT) scheme, including knowledge that the annuitants were paid for their participation, and in some cases, that the annuitants' signatures were forged or procured by fraud were sufficient, under Rhode Island law, to establish objective circumstances that gave rise to a duty to disclose, as required to state fraudulent inducement claims against agents.

**[12] Annuities 29 🔑37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

    Under Rhode Island law, sponsors engaged in stranger-initiated annuity transactions (STAT) had no duty to disclose to insurers that they had no relationship to annuitants, as required to state fraudulent inducement claims against sponsors, absent any relationship, dealings, or communications between sponsors and insurers.

**[13] Fraud 184 🔑17**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k15 Fraudulent Concealment
            184k17 k. Duty to disclose facts. Most Cited Cases

    In order to state a claim for fraudulent concealment, plaintiffs must plead each element of the tort, including a duty to disclose; pleading conspiracy is not a substitute for this requirement.

**[14] Annuities 29 🔑20**

**Add. 22**

29 Annuities
    29k20 k. Rescission or avoidance for fraud or mistake. Most Cited Cases

**Annuities 29 &#128273;37**

29 Annuities
    29k34 Civil Liabilities
        29k37 k. Fraud or misrepresentation. Most Cited Cases

Under Rhode Island law, insurers, who did not pose any questions on annuity applications directed to elicit information they later contended should have been disclosed, did not waive their opportunity to complain of nondisclosure.

**[15] Contracts 95 &#128273;94(1)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k94 Fraud and Misrepresentation
                95k94(1) k. In general. Most Cited Cases

Under Rhode Island law, fraud in the factum concerns misrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms.

**[16] Fraud 184 &#128273;24**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k24 k. Acts induced by fraud. Most Cited Cases

Under Rhode Island law, fraudulent inducement is a misrepresentation as to the terms, quality or other aspects of a contractual relation that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken.

**[17] Annuities 29 &#128273;20**

29 Annuities
    29k20 k. Rescission or avoidance for fraud or mistake. Most Cited Cases

To state fraud in the factum claims, under Rhode Island law, insurers were required to allege that they believed they were entering into contracts of a different nature or that they did not have an opportunity to learn the essential terms of the contracts; insurers' allegations that they were essentially tricked into agreeing to annuity contracts were nothing more than fraudulent inducement claims dressed up as fraud in the factum claims.

**[18] Annuities 29 &#128273;20**

29 Annuities
    29k20 k. Rescission or avoidance for fraud or mistake. Most Cited Cases

Under Rhode Island law, insurers could not raise fraud in the factum claims on behalf of annuitants who were not parties to any contract involving insurers.

**[19] Federal Civil Procedure 170A &#128273;636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
        170Ak633 Certainty, Definiteness and Particularity
            170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases

Allegations of wholesale forgery by sponsors, agents, and brokers engaged in stranger-initiated annuity transactions (STAT), without more particularized allegations of each defendant's role, including which one of the defendants put pen to paper and executed the forgeries, were insufficient to plead Rhode Island law fraud in the factum claims grounded in forgery with particularity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[20] Annuities 29 &#128273;32**

29 Annuities
    29k32 k. Agents and agency, in general. Most Cited Cases

**Add. 23**

Under Iowa law, allegations that agent violated state forgery law with respect to annuity transactions were sufficient to state a claim of breach of contract.

**[21] Annuities 29 ⟞32**

29 Annuities
    29k32 k. Agents and agency, in general. Most Cited Cases

Allegations that agents violated insurer's compliance bulletin by submitting stranger-initiated annuity transactions (STAT) applications, were insufficient to state a breach of contract claim under Iowa law, where the bulletin did not specifically direct agents to refrain from submitting such applications.

**[22] Annuities 29 ⟞32**

29 Annuities
    29k32 k. Agents and agency, in general. Most Cited Cases

Under Iowa law, precatory language in insurance agents' ethics code, which was not intended to be binding on agents, did not give rise to a specific contractual duty with regard to annuity transactions.

**[23] Contracts 95 ⟞176(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k176 Questions for Jury
                95k176(1) k. In general. Most Cited Cases

Under Iowa law, contract interpretation and construction are questions of law to be decided by the Court.

**[24] Contracts 95 ⟞168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms implied as part of contract. Most Cited Cases

Under Iowa law, the duty of good faith and fair dealing does not give rise to new substantive terms that do not otherwise exist in the contract, but rather the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and expresses terms of the contract.

**[25] Contracts 95 ⟞312(1)**

95 Contracts
    95V Performance or Breach
        95k312 Acts or Omissions Constituting Breach in General
            95k312(1) k. In general. Most Cited Cases

Under Iowa law, covenant of good faith is breached when a party to a contract acts in a manner that is offensive to community standards of decency, fairness and reasonableness.

**[26] Annuities 29 ⟞35**

29 Annuities
    29k34 Civil Liabilities
        29k35 k. In general; negligence or bad faith. Most Cited Cases

To the extent insurers adequately pleaded a breach of contract claim against agent, under Iowa law, based on the express terms of the agreement between agent and insurers, insurers adequately stated a claim for breach of the duty of good faith and fair dealing against agent with regard to annuity transactions.

**[27] Conspiracy 91 ⟞1.1**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k1 Nature and Elements in General
                91k1.1 k. In general. Most Cited Cases

To adequately plead civil conspiracy under Rhode Island law, a plaintiff must allege that (1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means.

**Add. 24**

[28] Annuities 29 ☞35

29 Annuities
  29k34 Civil Liabilities
    29k35 k. In general; negligence or bad faith.
Most Cited Cases

## Torts 379 ☞430

379 Torts
  379V Other Miscellaneous Torts
    379k430 k. Forgery. Most Cited Cases

Under Rhode Island law, allegations against agents, brokers, and sponsors engaged in stranger-initiated annuity transactions (STAT), that annuity applications were forged, were sufficient to state claims of civil liability for crimes and offenses. R.I.Gen.Laws 1956, § 9–1–2.

[29] Implied and Constructive Contracts 205H ☞3

205H Implied and Constructive Contracts
  205HI Nature and Grounds of Obligation
    205HI(A) In General
      205Hk2 Constructive or Quasi Contracts
        205Hk3 k. Unjust enrichment. Most Cited Cases

Under Rhode Island law, insurers' unjust enrichment claims against agents, brokers, and sponsors engaged in stranger-initiated annuity transactions (STAT) were not derivative of their fraud claims, since claims for unjust enrichment did not require the existence of an underlying tort.

[30] Implied and Constructive Contracts 205H ☞3

205H Implied and Constructive Contracts
  205HI Nature and Grounds of Obligation
    205HI(A) In General
      205Hk2 Constructive or Quasi Contracts
        205Hk3 k. Unjust enrichment. Most Cited Cases

To make out a claim for unjust enrichment, under Rhode Island law, a plaintiff must prove that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant appreciated the benefit; and (3) it would be inequitable, under the circumstances, for the defendant to retain the benefit without paying for its value.

**\*332** Brooks R. Magratten, Michael J. Daly, Providence, RI, David E. Barry, Portland, ME, for Plaintiff.

Robert G. Flanders, Jr., Adam M. Ramos, Jeffrey S. Brenner, Providence, RI, for Defendants.

### *333 OPINION AND ORDER

WILLIAM E. SMITH, District Judge.

Plaintiffs Western Reserve Life Assurance Co. of Ohio ("Western Reserve") and Transamerica Life Insurance Company ("Transamerica") (collectively, "Plaintiffs") [FN1] filed these seven suits against various defendants, who are identified below, alleging that the defendants improperly engaged in "stranger-initiated annuity transactions" or STAT schemes. [FN2] Before the Court are Defendants Joseph Caramadre, Raymour Radhakrishnan, Estella Rodrigues, Harrison Condit, Estate Planning Resources, Inc., and ADM Associates, LLC's Motion to Dismiss the Newly Amended Complaints and Request for Reconsideration, filed in cases 09– 470, 09–471, 09–472, 09–473, 09–502, 09–549, and 09–564; Defendant Edward Hanrahan's Motion to Dismiss and Request for Reconsideration, or, in the Alternative, for a More Definite Statement, filed in cases 09–472, 09–473, and 09–502; DK LLC's Motion for Dismissal of Third Amended Complaint, filed in case 09–473; and Fortune Financial's Motion to Dismiss Plaintiff's Second Amended Complaint, filed in cases 09– 470 and 09–564. [FN3]

FN1. While there is only a single plaintiff in each action, Western Reserve or Transamerica, the Court refers to Plaintiffs (plural) except where it is necessary to distinguish between the two. Plaintiffs are represented by the same counsel and have filed consolidated briefs. The Court also understands that they are both part of the "Aegon Americas" companies.

FN2. On February 18, 2011, the Court "linked" these cases for purposes of pretrial electronic filing only. (See Consolidation Order, C.A. No. 09– 470, ECF No. 86.) As a

result, all filings made after February 18, 2011 in each of the seven cases, with the exception of amended complaints, can be found on the electronic docket of case 09–470. The cases are not otherwise consolidated.

FN3. Plaintiffs note that Fortune Financial's motion to dismiss the second amended complaint is moot in light of Plaintiffs' third round of amendments, but, in the interest of efficiency, Plaintiffs do not object to the Court taking up the arguments presented in the context of the Third Amended Complaint. The Court, therefore, considers the arguments presented therein.

Moreover, by stipulation, Edward Maggiacomo joined his codefendants' memoranda in support of their motions to dismiss. (*See* Stipulation, Apr. 18, 2011, C.A. No. 09– 470, ECF No. 101.) The Court also considers the arguments set forth in Maggiacomo's motion to dismiss and request for reconsideration, which was filed after the Court's June 2, 2010 Opinion and Order and Plaintiffs' subsequent amendments. (*See* Mot. to Dismiss and Request for Recons. of Def. Edward L. Maggiacomo, Jr., C.A. No. 09–471, ECF No. 62.)

The movant-Defendants move to dismiss the newly amended complaints and for reconsideration of the Court's June 2, 2010 Opinion and Order (hereinafter "June 2 Order"), in which the Court granted in part and denied in part Defendants' previously-filed motions to dismiss. For the reasons set forth below, DK LLC's motion to dismiss is granted, and the other movant-Defendants' motions are granted in part and denied in part.

## I. Background[FN4]

FN4. On November 17, 2011, a grand jury returned a sixty-six count indictment against two of the defendants in this case, Joseph Caramadre and Raymour Radhakrishnan. (*See generally* Indictment, filed Nov. 17, 2011, D.R.I., Cr. No. 11–186 S.) The Indictment charges Caramadre and Radhakrishnan with wire fraud, mail fraud, con-

spiracy, identity fraud, aggravated identity theft, and money laundering. Caramadre is also charged with one count of witness tampering. While the Indictment and instant civil cases do share some overlap in the facts and scheme alleged, the Indictment is much broader and paints a picture of a scheme that, over a number of years, defrauded many insurance companies, as well as many terminally ill individuals and their families, and employed death-put bonds, corporate bonds, and variable annuities to do so. Of course, at this stage, these are only allegations, and for the Court's purposes, the criminal allegations have no bearing on the allegations set forth in these Complaints.

The following background information is reprised from the Court's June 2 Order **334 (with updates and alterations indicated by brackets):

The genesis of these cases is a scheme for annuity investments that Plaintiffs dub "stranger-initiated annuity transactions," or STATs. Because the Court must accept the alleged facts as true for purposes of Defendants' motions pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it here provides an overview of the STATs drawn from the Complaints.

Defendant Joseph Caramadre is an attorney who specializes in reading the fine print of insurance and annuity products and finding "loopholes." The one he discovered in these actions focused on two components of certain annuities sold by Plaintiffs. One, the annuities were variable, which means that premiums paid to obtain the policy could be invested in securities on behalf of the owner. Two, the annuities allowed the owner to elect a "death benefit." This option guaranteed the return of premiums upon the death of the annuitant, no matter what the market value of the policy was at that time.

Caramadre's insight was that policies with those two features invited riskless securities speculation. The annuitants would of course die at some point. If one could safely bet that would happen quickly, the annuities could be used to turn fast profits. Investors could make aggressive short-term trades without worrying about losses. Thus, the key to the strategy was finding terminally ill individuals, with a correspondingly short life expectancy, willing to be annui-

**Add. 26**

tants.

To find such individuals, Caramadre and his associates, including Defendant Raymour Radhakrishnan, began publicizing a "Program for the Terminally Ill" to hospice patients and workers. Flyers bearing the business name "Estate Planning Resources," a company allegedly controlled by Caramadre, promised cash payments to dying patients willing to do business with the company. Once either Caramadre or Radhakrishnan identified both a terminally-ill annuitant candidate and an investor, they arranged for a licensed agent of an annuities broker to provide the annuity application. They then paid the sick patient to sign the application as the annuitant. In some instances, Plaintiffs claim, Caramadre, Radhakrishnan, or the agent actually forged the annuitant's signature. The investor would be designated as the owner and beneficiary on the application, and would pony up the cost of the policy.

Once completed, the insurer accepted the application and issued an annuity in which the owner had no relationship to the annuitant, other than through the alleged STAT itself. Within this broad framework, all Defendants fit into one of the following categories:

• "*Sponsors*" of the STAT scheme, a term the Court uses to refer to Caramadre and Radhakrishnan, who solicited the transactions, as well as their alleged company Estate Planning Resources ("EPR"). [They are named Defendants in each of the actions.[FN5]]

> FN5. [Caramadre and Radhakrishnan were not named defendants in the Complaint initially filed in C.A. No. 09– 470; however, Plaintiff Western Reserve added Caramadre and Radhakrishnan as defendants in that case in the Second Amended Complaint, filed on September 7, 2010.]

• *Annuity brokerage companies[*, or the "Brokers"], who sell Plaintiffs' annuities. The broker in case numbers 09– 470 and **335** 09–564 is Fortune Financial Services, Inc. ("Fortune"); in 09–471 and 09–549, it is Lifemark Securities Corporation ("Lifemark"); and in 09–472, 09–473, and 09–502, it is The Leaders Group ("Leaders").

• *Agents* of the brokers: the individuals who are li-

censed to sell annuities and provided the policies at issue at the request of Caramadre and/or Radhakrishnan. Fortune's agent, named as a Defendant in cases 09– 470 and 09–564, is Harrison Condit; Lifemark's agent, named in 09–471 and 09–549, is Edward Maggiacomo; Leaders's agent, named in 09–472, 09–473, and 09–502, is Edward Hanrahan.

• *Owners* of annuities in the four actions in which the annuitant is still living, cases 09– 470 through 09–473.[FN6] These are the people or corporations who paid premiums for the policies, and stand to redeem the proceeds because they are also designated as the beneficiaries. In case number 09– 470, the owner is Conreal LLC ("Conreal"); in 09–471, it is Estella Rodrigues; in 09–472, it is ADM Associates, LLC ("ADM"); and in 09–473, it is DK LLC ("DK"). In the other three cases, the annuitants are deceased, and the owners are not named as Defendants. [Since the June 2 Order, Owners Conreal and DK have both agreed to the rescission of their contracts, Conreal is no longer listed as a defendant in 09–471, and Natco Service Corp., the owner of the annuity at issue in 09–502, has been named as a defendant in that case. Western Reserve does not assert any claims or seek damages against Natco Service Corp.]

> FN6. [This statement is current through the June 2 Order, but the Court cannot say with certainty whether these annuitants are still living as of the date of this Opinion and Order.]

• *Annuitants:* the terminally ill individuals who serve as measuring lives for the annuities in cases 09– 470 through 09–473. In 09– 470, the annuitant is Anthony Pitocco; in 09–471, it is Patrick Garvey; in 09–472, it is Charles Buckman; and in 09–473, it is Jason Veveiros. [Plaintiffs no longer bring claims against any of the Annuitants, but they remain named in the captions of cases 09–471, 09–472, and 09–473.]
>
> *W. Reserve Life Assur. Co. of Ohio v. Conreal LLC,* 715 F.Supp.2d 270, 273–75 (D.R.I.2010) (internal citations to the record omitted).

In the June 2 Order, the Court dismissed the following counts for failure to state a claim: all counts for rescission, declaratory judgment that the contracts are void, civil liability for insurance fraud, and negli-

**Add. 27**

gence; the fraud and civil conspiracy counts against owners ADM and DK in cases 09–472 and 09–473, respectively; and the counts against Lifemark for breach of the duty of good faith and fair dealing in cases 09–471 and 09–549. *Id.* at 290.

Since the June 2 Order, Plaintiffs have filed at least one round of amended complaints in each case, adding claims of: civil liability for forgery (in cases 09– 470, 09–549, 09–564); fraud in the factum (in all cases except 09–472 and 09–502 [FN7]); and claims of breach of contract and breach of the duty of good faith and fair dealing against Agents Condit and Hanrahan (in cases 09– 470, 09–472, 09–473, 09–502, and 09–564).[FN8] The operative Complaints are **336** now the Amended Complaint in 09–502 ("502 Complaint"); the Second Amended Complaints in cases 09–472 ("472 Complaint"), 09–549 ("549 Complaint"), and 09–564 ("564 Complaint"); and the Third Amended Complaints in cases 09– 470 ("470 Complaint"), 09–471 ("471 Complaint"), and 09–473 ("473 Complaint"). Combined, the Complaints assert against some or all Defendants the following claims for relief: (1) fraud in the factum; (2) fraudulent inducement; (3) declaratory judgment; (4) rescission; (5) breach of contract; (6) breach of the duty of good faith and fair dealing; (7) civil liability for crimes and offenses; (8) unjust enrichment; and (9) civil conspiracy.[FN9]

FN7. According to Plaintiffs, they did not add a fraud in the factum count to the Complaints in 09–472 and 09–502 because the Annuitants in those cases appear to have known about the circumstances surrounding their participation in the STAT scheme.

FN8. Plaintiffs note that similar claims were not brought against Maggiacomo in cases 09–471 and 09–549 because Transamerica has not established that it had a direct contractual relationship with Maggiacomo. Plaintiffs do allege, however, that Maggiacomo worked for a broker (Lifemark) who had a contractual relationship with Plaintiffs.

FN9. The Court lists here only claims that survived the June 2 Order, newly pleaded claims, and claims that Plaintiffs attempt to revive in the amended complaints. Plaintiffs re-allege in their amended complaints the

dismissed counts in order to preserve them for appellate review, but they are not discussed in this decision, except where Plaintiffs argue that they have been revived.

Defendants [FN10] move for reconsideration of the June 2 Order as to the claims of fraudulent inducement, unjust enrichment, and civil conspiracy, and they move for dismissal of the Complaints pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted as to the claims of fraud in the factum; declaratory judgment; rescission; breach of contract; breach of the duty of good faith and fair dealing; and civil liability for crimes and offenses.

FN10. For purposes of this discussion, the Court does not differentiate between the arguments of the various factions of Defendants, except where relevant.

## II. Discussion

### A. The Legal Standard

In reviewing a motion to dismiss, the Court must "accept the well-pleaded facts as true, viewing factual allegations in the light most favorable to the plaintiff." *Rederford v. U.S. Airways, Inc.,* 589 F.3d 30, 35 (1st Cir.2009). To meet the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, each Complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This means it must present "factual allegations that raise a right to relief above the speculative level." *Simmons v. Galvin,* 575 F.3d 24, 30 (1st Cir.2009) (citation and internal quotation marks omitted). In judging whether this standard is satisfied, the Court may consider not only the Complaints, but "facts extractable from documentation annexed to or incorporated by reference in the [C]omplaint[s] and matters susceptible to judicial notice." *Jorge v. Rumsfeld,* 404 F.3d 556, 559 (1st Cir.2005).

[1][2][3] In addition, Plaintiffs' fraud claims must meet the heightened pleading requirements of Rule 9(b), which "applies to state law fraud claims asserted in federal court." *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale,* 567 F.3d 8, 13 (1st

Cir.2009). These claims must "specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 29 (1st Cir.2004). Rule 9(b) also requires "identifying the basis for inferring scienter," which refers to the culpable mental state of knowingly or intentionally committing**\*337** fraud. *N. Am. Catholic Educ.,* 567 F.3d at 13.

[4][5] A motion for reconsideration is properly granted where the moving party demonstrates "a manifest error of law," there exists newly discovered evidence, or a court has misunderstood a party's argument. *Ruiz Rivera v. Pfizer Pharm., LLC,* 521 F.3d 76, 81–82 (1st Cir.2008). Moreover, "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994) (quoting *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 15 (1st Cir.1986)).

**B. Fraudulent Inducement**

In their motions for reconsideration, Defendants ask the Court to revisit the June 2 Order with respect to the viability of the fraudulent inducement claims against the Agents and the Sponsors. Defendants argue that, even assuming that the undisclosed information (namely, that the Annuitants were terminally ill individuals with no relationship to the Owners or the Agents and the Annuitants were paid to sign the applications) was material, the Agents and the Sponsors had no duty to disclose the information in the absence of Plaintiffs' inquiry, and therefore, according to Defendants, the fraudulent inducement claims must fail. In the June 2 Order, the Court did not explicitly address the Agents' and the Sponsors' duty to disclose *vel non,* apart from the issue of materiality, but rather, the Court determined that the duty to disclose turned exclusively on materiality. *See W. Reserve,* 715 F.Supp.2d at 285 ("Whether or not the duty arises—in other words, whether a fact is material, such that it must be disclosed—depends on the 'circumstances of [the] case.' " (quoting *Home Loan & Inv. Ass'n v. Paterra,* 105 R.I. 763, 255 A.2d 165, 168 (1969))); *see also id.* at 286 n. 14 ("[B]ut for fraud, the relevant duty is the duty to disclose, which turns only on the materiality of the omissions identified above."). Moreover, the Court held that an owner/applicant's duty to disclose material information may arise even where the insurer has not requested the information. *Id.* at 284.

The Court has carefully examined and considered the parties' arguments and will use the opportunity to clarify the June 2 Order.

**1. The Agents**

[6][7][8][9] To establish a claim for fraudulent inducement, under Rhode Island law, a plaintiff must demonstrate "that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." *Zaino v. Zaino,* 818 A.2d 630, 638 (R.I.2003) (quoting *Women's Dev. Corp. v. City of Central Falls,* 764 A.2d 151, 160 (R.I.2001)) (internal quotation marks omitted). Fraudulent inducement can "be grounded on either affirmative acts or concealment." *Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 268–69 (D.R.I.2000). But a claim of fraudulent inducement grounded on concealment, as opposed to an affirmative misrepresentation, "will not lie absent a duty to speak." *Id.* (citing *Home Loan,* 255 A.2d at 168); *see also McGinn v. McGinn,* 50 R.I. 236, 240, 146 A. 636 (1929) ("[M]ere silence in the absence of a duty to speak is not fraudulent.") (internal citations omitted). Whether a person has a duty to disclose turns on the specific circumstances of the case. *Home Loan,* 255 A.2d at 168. This is a flexible inquiry; one that examines the facts of each case to determine whether they give rise to a duty to disclose. *See id.; see also Nisenzon v. Sadowski,* 689 A.2d 1037, 1045–47 (R.I.1997) (examining **\*338** facts to determine whether there was duty to disclose). The Restatement articulates the inquiry this way: one party to a business transaction has a duty to disclose to another party, among other things,

> facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Restatement (Second) of Torts* § 551(2)(e). As noted in the June 2 Order, the Complaints adequately plead the materiality of the undisclosed information, *see W. Reserve,* 715 F.Supp.2d at 283, and thus, that information may be considered "basic to the transaction."

[10] More difficult is the second prong of the inquiry, whether Plaintiffs could reasonably expect

the Agents to disclose the pertinent information in light of their relationship with Plaintiffs and "the customs of the trade or other objective circumstances," even in the absence of any inquiry for the information on the application. The parties make much of whether the Agents were "soliciting agents," as Plaintiffs would have it, or "independent contractors," as Defendants would have it. But the Court need not determine the exact nature of the agency relationship between the Agents and Plaintiffs on these motions to dismiss. It is enough that the Agents signed the annuity applications as "Registered Representative[s]/Licensed Agent[s]" and held direct or indirect contractual relationships with Plaintiffs. Thus, even if they were independent contractors,[FN11] they may still arguably owe a duty to disclose material information when submitting an application for a financial instrument, where a reasonable representative/ independent contractor would have known that an insurer armed with the information would have rejected the application. *See Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F.Supp.2d 45, 49 (D.D.C.2004) (holding that broker may be held liable to insurer where broker submits application bearing misrepresentations); *Century Sur. Co. v. Crosby Ins., Inc.*, 124 Cal.App.4th 116, 21 Cal.Rptr.3d 115, 120 (Cal.Ct.App.2004) (holding broker liable to insurer where he submitted application with false information on it and he knew or should have known that disclosure would have resulted in rejection of application); **\*339** *Liberty Surplus Ins. Corp. v. First Indem. Ins. Servs., Inc.*, 31 So.3d 852, 857 (Fla.Dist.Ct.App.2010) (holding insurance broker liable for negligent misrepresentation where broker submitted application on which it listed three of fourteen pending claims against applicant and failed to disclose others); *St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 693 N.E.2d 669, 672 (1998) (holding broker liable for negligent misrepresentation for submitting insurance application containing false statement).

FN11. According to the Complaints, Condit submitted a "Producer Appointment Application" and Hanrahan submitted a "Representative Licensing Application" to Western Reserve (collectively, "Appointment Applications") "to sell certain investment products offered by Western Reserve, including the type of annuity at issue in th[ese] case[s], through [their] affiliation[s] with" their brokerage companies, and Western Reserve accepted those Appointment Applications. (*See* 470 Compl. ¶¶ 81–82; 472 Compl. ¶¶ 87–88; 473 Compl. ¶¶ 98–99; 502 Compl. ¶¶ 78–79; 564 Compl. ¶¶ 121–22.) While the Complaints in cases 09–471 and 09–549 also allege that Maggiacomo submitted a "Producer Appointment Application" to Transamerica, Plaintiffs concede that Maggiacomo, in fact, never had a direct contractual relationship with Transamerica. In addition to the direct contractual privity that Agents Condit and Hanrahan maintained with Plaintiffs, Western Reserve had agreements with both Leaders (Condit's brokerage company) and Fortune (Hanrahan's brokerage company), stating that the Agents acted as "independent contractors, and not as agents or employees" of Western Reserve. (*See* Ex. 2 to Mot. to Dismiss and Request for Recons., or, in the Alternative, For a More Definite Statement ¶ 10, C.A. No. 09– 470, ECF No. 96–2; Ex. C to Defs.' Mot. to Dismiss ¶ 10, C.A. No. 09–470, ECF No. 22–4.) Maggiacomo also had a relationship with Transamerica by way of the contract between Lifemark (his brokerage company) and Transamerica. (*See* Ex A to Pl.'s Obj. to Defs.' Mots. to Dismiss, C.A. No. 09–471, ECF No. 37–1.)

Defendants urge that these cases involve affirmative misstatements not concealment; in each, the representative or broker-dealer, in response to an inquiry, either made a false statement, an incomplete statement, or a disclosure that was misleading when viewed in context. Defendants argue that, if no false or misleading information was provided, there is no fraud; rather the representative or broker-dealer simply out-smarted the insurers. Put another way, if an insurer does not ask the question on the application in an arms-length transaction, failure to provide the answer cannot be the basis for a fraud claim.

[11] But as the Court noted in the June 2 Order, there are circumstances in which courts have held that an insured or applicant must disclose information, even in the absence of an inquiry by the insurer. *See W. Reserve*, 715 F.Supp.2d at 284 ("[f]raudulent concealment [can make an insurance policy voidable] even without inquiry concerning the concealed material facts by the insurer" (quoting *Putnam Res. v. Pateman*, 757 F.Supp. 157, 162 n. 1 (D.R.I.1991)));

*Harrison State Bank v. U.S. Fid. & Guar. Co.,* 94 Mont. 100, 22 P.2d 1061, 1064 (1933) (stating that "any concealment of a material fact known to a party, increasing the ordinary risk, would be deemed ... fraudulent," and explaining that applicant for bank insurance knew of planned robbery that law enforcement intended to allow in an attempt to catch the criminals); *Sun Ins. Co. of N.Y. v. Hercules Sec. Unlimited, Inc.,* 195 A.D.2d 24, 30, 605 N.Y.S.2d 767 (N.Y.App.Div.1993) (affirming judgment on claim for fraudulent concealment where insured did not disclose that he returned to steal insured assets, where insurer had not inquired); *Lighton v. Madison–Onondaga Mut. Fire Ins. Co.,* 106 A.D.2d 892, 892–93, 483 N.Y.S.2d 515 (N.Y.App.Div.1984) (allowing claim for fraudulent concealment based on omission of fact that fires had occurred in plaintiffs' basement several months before applying for insurance, even though plaintiffs were not asked about prior fires). Although these cases involve nondisclosure by insureds and applicants for insurance, there is no reason why the same rule should not hold true for independent contractors of the insurer, who are in contractual relationships with the insurer, are knowledgeable of the material, undisclosed facts, and submit an application on behalf of an applicant. Here, the Complaints charge the Agents with knowledge of the STAT scheme, including knowledge that the Annuitants were paid for their participation, and in some cases, that the Annuitants' signatures were forged or procured by fraud. These facts, as alleged, are sufficient to establish objective circumstances that give rise to a duty to disclose.

Accordingly, Defendants' motions to dismiss and for reconsideration are denied with respect to the fraudulent inducement claims against the Agents.[FN12]

FN12. In addition to pleading fraudulent inducement based on concealment, some of the Complaints also succeed in setting forth a claim for fraudulent inducement based on the affirmations appearing on the annuity applications. Each application contains the following affirmation, under which the respective Agent placed his signature:

I HAVE MADE REASONABLE EFFORTS TO OBTAIN INFORMATION CONCERNING THE CONSUMER'S FINANCIAL STATUS, TAX STATUS, INVESTMENT OBJECTIVES AND SUCH OTHER INFORMATION USED OR CONSIDERED TO BE REASONABLE IN MAKING THE ANNUITY RECOMMENDATION AND FIND THE ANNUITY BEING APPLIED FOR APPROPRIATE FOR HIS/HER NEEDS.

(*E.g.,* Ex. G to Compl. 8, C.A. No. 09–549, ECF No. 1–7; Ex. C to Compl. 10, C.A. No. 09–502, ECF No. 1–4.) The Complaints in cases 09–471, 09–472, 09–502, 09–549, and 09–564, each adequately plead a cause of action against the respective agent for fraudulent inducement based on these attestations and the allegations that the Agents either failed to have any substantive involvement in selling the annuities or that they failed to review or verify any of the information on the applications. (*See* 471 Compl. ¶ 45; 472 Compl. ¶ 43; 502 Compl. ¶ 44; 549 Compl. ¶¶ 31–32, 41, 47, 63; 564 Compl. ¶ 32.)

Because similar allegations were not made against the Agents in cases 09– 470 and 09–473, Plaintiffs fail to make out a claim of fraudulent inducement grounded in affirmative statements against the Agents in those cases. However, regardless of these inadequacies, all counts of fraudulent inducement against the Agents survive because Plaintiffs have pleaded a cause of action for fraudulent *concealment,* as discussed above.

The Court retracts the language in the June 2 Order suggesting that the affirmations state that the Agents *sold* the annuities. *See W. Reserve,* 715 F.Supp.2d at 285. While this is alleged in some of the Complaints, the applications themselves reflect that the Agents made no express representation to that effect. On a motion to dismiss, the Court may consider documents beyond, but integral to, the Complaint. *Trans–Spec Truck Serv., Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir.2008); *see also Diva's Inc. v. City of Bangor,* 411 F.3d 30, 38 (1st Cir.2005). And where the allegations set forth in the Complaint are incon-

**Add. 31**

sistent with a writing attached as an exhibit, "the terms of the latter, fairly construed, must prevail over any averments differing therefrom." 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1235 (citing *Ott v. Home Savs. & Loan Ass'n,* 265 F.2d 643, 646 (9th Cir.1958)).

### *340 2. The Sponsors

[12] With respect to the Sponsors' duty to disclose, the thrust of Defendants' argument is that the Sponsors cannot be held liable for fraudulent nondisclosure because, in the absence of any relationship, dealings, or communications with Plaintiffs, they had no duty to disclose information to them. For their part, Plaintiffs rest the duty to disclose squarely on the Sponsors' "active role in the conspiracy to defraud Plaintiff[s]," as alleged in the Complaints. (Omnibus Obj. to Defs.' Mots. to Dismiss and for Recon. 24, C.A. No. 09– 470, ECF No. 67.)

While it may be possible for circumstances to give rise to a duty to disclose where parties do not have an underlying contractual or business relationship, the circumstances pleaded in these cases as to the Sponsors—where the Sponsors and Plaintiffs had no contractual relationship, no communications, no business dealings, and no direct dealings—do not give rise to such a duty. *See Moore v. Fenex, Inc.,* 809 F.2d 297, 303 n. 2 (6th Cir.1987) (stating that fraudulent nondisclosure "applies between parties to a business transaction. We are aware of no case, nor has any been cited, where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff"); *see also Magna Bank of Madison County v. Jameson,* 237 Ill.App.3d 614, 178 Ill.Dec. 285, 604 N.E.2d 541, 544 (Ill.App.Ct.1992) ("There is no duty to speak absent a fiduciary or other legal relationship between the parties."); *cf. Chiarella v. United States,* 445 U.S. 222, 227–28, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("At common law, ... one who fails to disclose material information prior to the consummation of a transaction commits fraud *341 only when he is under a duty to do so. And the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.") (alteration in original) (internal quotation marks and citation omitted); *Cardiovascular & Thoracic Assoc., Inc. v. Fingleton,* C.A. No. 95–1322, 1995 WL

941470, at *3 (R.I.Super.Ct. Aug. 23, 1995) ("[F]raud can be established by silence where the business relationship of the parties is such as to create a duty to disclose certain facts." (citing *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 n. 4 (5th Cir.1980))).

[13] Plaintiffs are correct that the Sponsors' orchestration of the fraudulent scheme may support a claim for civil conspiracy. However, in order to state a claim for fraudulent concealment against the Sponsors, Plaintiffs must plead each element of the tort, including a duty to disclose; pleading conspiracy is not a substitute for this requirement. *See Beck v. Prupis,* 529 U.S. 494, 502, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) ("[The plaintiff] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy." (quoting *J. & C. Ornamental Iron Co. v. Watkins,* 114 Ga.App. 688, 152 S.E.2d 613, 615 (Ga.1966))). Accordingly, the fraudulent inducement counts are dismissed with respect to the Sponsors.[FN13]

> FN13. Though the fraudulent inducement counts against the Sponsors do not go forward in the absence of a duty to disclose, this result may have no practical effect in most of the instant cases. As discussed below, the civil conspiracy counts against the Sponsors survive these motions, and if proven, the Sponsors may be held jointly liable for the Agents' fraud. *See Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 268 (D.R.I.2000) (noting that civil conspiracy imposes joint liability on co-conspirators). Case 09– 470, however, does not allege civil conspiracy against any Defendants.

### 3. Waiver

[14] Relying on a decision out of this Court decided shortly after the Court's June 2 Order, *Nationwide Life Ins. Co. v. Steiner,* 722 F.Supp.2d 179 (D.R.I.2010), Defendants argue that Plaintiffs, by failing to ask questions designed to elicit the information at issue, have waived their opportunity to complain of nondisclosure.

In *Steiner,* the insurer, on its annuity application, inquired as to the relationship between the beneficiary and the annuitant. *Id.* at 180. The applicants left the question blank, but the company accepted the application and premium and issued the annuity, never

**Add. 32**

following up on the blank answer. *Id.* Thereafter, the annuitant died and the applicants sought payment under the annuity. *Id.* The company learned that the annuitant had been terminally ill when the application was submitted, and with this knowledge in hand, it tried to back out of the contract. *Id.* at 181. On those facts, the Court held that Nationwide "waived the right to rely on the blank application question as a basis" to terminate the annuity contract under the applicable contractual termination provision, because in Rhode Island, "an insurer waives the right to deny coverage by accepting a premium payment 'with full knowledge' of grounds for not fulfilling its obligations under the policy." *Id.* at 185 (quoting *Imperial Cas. & Indem. Co. v. Bellini*, 888 A.2d 957, 963–64 (R.I.2005)). The Court further noted that the First Circuit has recognized that "an insurer may lose its right to rescind the coverage of an insurance contract if it knows of the facts that may warrant rescission and fails to disclaim within a reasonable time, or if it acts in any way inconsistent with an intention to disclaim." *Id.* (quoting **\*342**\*Gen. Star Indem. Co. v. Duffy*, 191 F.3d 55, 59 (1st Cir.1999)).

The instant cases, however, are distinguishable from *Steiner.* Plaintiffs here did not pose any questions on the applications directed to elicit the information they now contend should have been disclosed; therefore, they did not accept incomplete applications. The answer left blank on the application was critical to the Court's reasoning in *Steiner,* because it placed the insurer on notice of omitted information, thereby giving the insurer the opportunity to follow up. Here, there were unanswered questions on the applications, and so, there was no signal to Plaintiffs to investigate. Accordingly, Defendants get no traction with their waiver argument.

Apart from what has been reconsidered and clarified above, the Court reaffirms the June 2 Order with respect to the fraudulent inducement claims.

## C. Fraud in the Factum and Related Counts

Plaintiffs have pleaded claims of fraud in the factum in cases 09– 470, 09–471, 09–473, 09–549, and 09–564, against the Sponsors, Brokers, and Agents in each case, and the Owner, DK, in 09–473. In cases 09– 470, 09–549, and 09–564, the Complaints allege that "[a]ll Defendants committed fraud in the factum by either forging [the Annuitant's] signature to the annuity application and submitting it to [Plain-

tiffs], or by concealing the existence, nature and essential terms of the annuity from [the Annuitant] in order to get him to sign the application under which he purportedly agreed to serve as an annuitant." (470 Compl. ¶ 41; *accord* 549 Compl. ¶ 130; 564 Compl. ¶ 85.) In cases 09–471 and 09–473, the Complaints do not allege forgery, but only that Defendants committed fraud in the factum by "concealing the existence, nature and essential terms of the annuity from [the Annuitant]." (471 Compl. ¶ 50; 473 Compl. ¶ 51.) The Complaints allege that Defendants thereafter submitted the applications to Plaintiffs, giving Plaintiffs "the false or misleading impression that [the Annuitant] knowingly and voluntarily signed the application." (*E.g.,* 470 Compl. ¶ 43.) Because of this, Plaintiffs claim they "entered the annuity contract without knowledge of the true nature or character of the terms of the agreement" and without a reasonable opportunity to discover its true nature. (*See, e.g.,* 470 Compl. ¶¶ 44–45.) Defendants move to dismiss all of the fraud in the factum counts against the Sponsors, the Agents, DK, and Fortune.

[15][16] Under Rhode Island law, fraud in the factum "concerns '[m] is representation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms.' " *Rhode Island Depositors Econ. Prot. Corp. v. Duguay*, 715 A.2d 1278, 1280 (R.I.1998) (quoting *Black's Law Dictionary* 661 (6th ed.1990)); *see also Bennion Ins. Co. v. 1st OK Corp.*, 571 P.2d 1339, 1341 (Utah 1977) ("[F]raud in factum is found only where forgery is proved, or where the fraud is tantamount to forgery, such as where an incompetent person is induced to sign a deed, or where the deed is surreptitiously substituted for another instrument the grantor believes he is signing ...."). In contrast to fraud in the factum, fraudulent inducement is a "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation ... that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." *Duguay*, 715 A.2d at 1280 (quoting *Bourdon's, Inc. v. Ecin Indus., Inc.*, 704 A.2d 747, 753 (R.I.1997)).

**\*343** [17] All of Plaintiffs' fraud in the factum claims fail because, in actuality, they are nothing more than fraudulent inducement claims dressed up as fraud in the factum allegations. The crux of Plaintiffs' claims is that the Defendants, either by forging signatures on

the applications or concealing the nature of the applications from the Annuitants, fraudulently induced Plaintiffs into issuing the annuity contracts. Essentially, Plaintiffs say they were tricked into agreeing to the annuity contracts, but not that they believed they were entering into contracts of a different nature or that they did not have an opportunity to learn the essential terms of the contracts. *See Duguay*, 715 A.2d at 1280 (stating that to establish fraud in the factum, a party must demonstrate that he had "neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms") (internal quotation marks and citation omitted). Indeed, it is a bit ironic for Plaintiffs to suggest that they did not know the true nature of contracts that they themselves drafted. The fact is, Plaintiffs intended to sell variable life annuities, they believed they sold variable life annuities, and they did, in fact, sell variable life annuities. Therefore, they cannot seriously argue that they have misapprehended the nature of their own contracts.

[18] Plaintiffs' claims of fraud in the factum on behalf of the Annuitants likewise fail. The doctrine of fraud in the factum renders a contract void *ab initio* only where a *contracting party* does not understand the nature of the contract. Here, the Annuitants were not parties to any contract; they were not bound in any way by the annuity applications, let alone the annuity contracts. (*See, e.g.,* Ex. B–1 to Compl., C.A. No. 09– 470, ECF No. 1–4; Ex. D–1 to Compl., C.A. No. 09–502, ECF No. 1–5 (stating that, the annuity contract "is a legal contract between the policyowner and the Company [Plaintiffs]").) Plaintiffs cannot evade their contractual obligations under the annuity contracts by alleging forgery or concealment of essential terms with respect to the Annuitants vis-à-vis the annuity applications.

[19] Plaintiffs' forgery allegations also run afoul of Rule 9(b). While state law governs the elements necessary to establish a fraud claim, "the procedure for pleading fraud in federal court in a diversity suit is governed by the requirements of Rule 9(b)." *Guilbeault*, 84 F.Supp.2d at 268–69. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). In this Circuit, a plaintiff is required to specify in his pleadings "the time, place, and content of the alleged false or fraudulent representations." *Powers v. Boston Cooper*

*Corp.*, 926 F.2d 109, 111 (1st Cir.1991). Moreover, it is well established that "[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)." *Loan v. Fed. Deposit Ins. Corp.*, 717 F.Supp. 964, 968 (D.Mass.1989) (citing *Margaret Hall Found. v. Atl. Fin. Mgmt., Inc.*, 572 F.Supp. 1475, 1481 (D.Mass.1983)); *accord DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 456 F.Supp.2d 131, 151 n. 27 (D.Me.2006); *In re Maroun*, 427 B.R. 200, 206 (Bankr.D.N.H.2010). Therefore, to adequately plead fraud in the factum grounded in forgery, Plaintiffs may not allege wholesale (or "group") forgery by Defendants without more particularized allegations of each Defendant's role, including which one of the Defendants put pen to paper and executed the forgeries.

**\*344** Accordingly, the fraud in the factum counts in each of the cases in which it is alleged (cases 09– 470, 09–471, 09–473, 09–549, and 09–564), against the Agents, the Sponsors, DK, and Fortune are dismissed.[FN14] Insofar as Plaintiffs have attempted to revive their counts for rescission and declaratory judgment in case 09–471 on the basis that the annuities were void *ab initio* due to fraud in the factum, those counts also are dismissed.[FN15]

> FN14. In addition to the infirmities addressed here, Defendants advance other arguments for dismissal of the fraud in the factum counts. While the Court does not reach those arguments, they may also be fatal to Plaintiffs' claims.

> FN15. Plaintiffs also included fraud in the factum as a basis for rescinding the annuity contract or declaring it void in case 09–473. However, DK and Plaintiffs have agreed that the annuity is rescinded and so, those counts are moot. (*See* Omnibus Obj. to Defs.' Mots. to Dismiss and for Recon. 9, C.A. No. 09– 470, ECF No. 67.)

**D. Breach of Contract against the Agents**

Agents Condit and Hanrahan move to dismiss the breach of contract claims against them in cases 09– 470, 09–472, 09–473, 09–502, and 09–564.[FN16] The Complaints allege that Western Reserve accepted

**Add. 34**

Condit's and Hanrahan's Appointment Applications. The Appointment Applications, which are appended to the Agents' filings, reflect that Condit and Hanrahan signed a declaration stating:

> FN16. Plaintiffs do not assert breach of contract claims against Maggiacomo, who is the Agent named in the other two Complaints, presumably because he is not alleged to have had a direct contractual relationship with Transamerica.

> I shall comply with the rules and regulations of the Company as they may be established from time to time, and the laws of the states in which I am licensed and the regulations of the Department of Insurance of each such state, including, but not limited to, keeping in force all licenses and permits for the solicitation of insurance.
> (Ex. B to Consolidated Mot. to Dismiss the Newly Am. Compls. and Req. for Recons. 2, C.A. No. 09–470, ECF No. 94–3; Ex. 1 to Mot. to Dismiss and Req. for Recons. Or, in the Alternative, For a More Definite Statement 2, C.A. No. 09– 470, ECF No. 96–1.) They further affirmed that they "shall comply with the concepts in the Company's Code of Professional Conduct...." (*Id.*)

The Complaints also allege the following: on the Appointment Applications, Condit and Hanrahan "agreed that if Western Reserve consented to the appointment, then [they] would comply with Western Reserve's rules and regulations, applicable state laws and the Ethics Code identified herein." (*E.g.,* 470 Compl. ¶ 81; 472 Compl. ¶ 87.) Condit's and Hanrahan's participation in the STAT scheme "was contrary to [their] obligation under the Ethics Code to conduct [themselves] 'according to the high standards of honesty and fairness,' to use 'appropriate fact finding tools' to assist customers [in] determin[ing] their '*insurable* needs and financial objectives,' and to sell products that meet customers' 'insurable needs or financial objectives' and constituted a breach of [their] contractual obligations owed to Western Reserve." (E.g., 470 Compl. ¶ 83; 472 Compl. ¶ 89 (emphasis in original)). Moreover, the Complaints allege that their participation was "contrary to state law and Western Reserve's rules and regulations," and therefore, constituted a breach of their contractual obligations. (*E.g.,* 470 Compl. ¶ 84; 472 Compl. ¶ 90.)

In sum, Plaintiffs allege that the Agents breached their contracts with Western Reserve**345** by (1) violating the Ethics Code; (2) failing to comply with Western Reserve's rules and regulations; and (3) violating state law. The Court concludes that, in cases 09– 470 and 09–564, Plaintiffs plead a cognizable breach of contract claim based on the alleged state law violations.

[20] In cases 09– 470 and 09–564, the forgery allegations are sufficient to serve as the underpinning for a breach of contract claim grounded in the violation of state law. Although the wholesale forgery allegations were not sufficiently particularized to plead a cause of action for fraud in the factum, the relaxed pleading standard of Rule 8 governs breach of contract claims, *see* 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1235 (3d ed.2011), and Plaintiffs' allegations satisfy this standard. [FN17] Taking the allegations in the Complaints as true, it is plausible that Agent Condit forged the signatures on the annuity applications in cases 09– 470 and 09–564, thereby violating the state law criminalizing forgery. [FN18]

> FN17. For purposes of this claim, the Court also disregards all allegations in the Complaint inconsistent with forgery. Plaintiffs were free to plead alternative factual predicates (*viz.,* forging the Annuitants' signatures and misleading the Annuitants to procure their signatures) to support their claims. *See BMC–The Benchmark Mgmt. Co. v. Ceebraid–Signal Corp.,* No. 1:05–cv–1149–WSD, 2007 WL 4200198, at *6 (N.D.Ga. Nov. 23, 2007) (noting that generally, a plaintiff "is not always required to elect a single theory of the factual situation where fraud is claimed, and, at least, where each of two alternative statements independently satisfies the particularity requirement of Rule 9(b), the pleading does not violate that rule solely because the alternatives are stated" (quoting *Hirshfield v. Briskin,* 447 F.2d 694, 697 (7th Cir.1971))), *aff'd BMC–The Benchmark Mgmt. Co. v. Ceebraid–Signal Corp.,* 292 Fed.Appx. 784 (11th Cir.2008); *Holveck v. Ameriquest Mortg. Co.,* No. 02 C 1154, 2003 WL 21149085, at *2 (N.D.Ill. May 19, 2003) (denying a motion to dismiss where the

**Add. 35**

complaint pleaded "incomplete, alternative factual scenarios"). *But see Vladimir v. Deloitte & Touche LLP,* No. 95 CIV 10319(RPP), 1997 WL 151330, at *7 (S.D.N.Y. Mar. 31, 1997) (holding that "[a]lternative fact pleading is insufficient to satisfy the requirements of Fed.R.Civ.P. 9(b)" where "plaintiffs' counsel [had] been in possession of defendant's work papers for three years and [had] conducted extensive discovery").

FN18. Of course, it is doubtful that a contract can be read to impose upon the Agents a contractual obligation to comply with *all* state laws, regardless of how unrelated they may be to the contract; rather, the sensible reading of this language is that it is intended to require agents to comply with those state laws governing insurance brokers or otherwise related to selling financial instruments, such as the prohibition on forgery.

[21] With respect to the allegations concerning violations of Western Reserve's rules and regulations, Plaintiffs point to a document entitled "Insurance Compliance Bulletin," which appears to originate from its Florida office and states that Western Reserve "will not accept annuity applications where the contract owner/applicant does not have an appropriate insurable interest in the life of the annuitant." (Ex. D to Omnibus Obj., C.A. No. 09– 470, ECF No. 67–4.) On closer inspection, this flyer places the onus on Western Reserve to scrutinize incoming applications for potential deficiencies related to insurable interests and to reject non-complying applications. (*See id.*) Nowhere does the bulletin state that agents may not submit such applications; and, while this may be a reasonable implication of the document, the bulletin does not specifically direct agents to refrain from submitting such applications. Therefore, even if the Court, viewing the facts pleaded in the light most favorable to Plaintiffs, assumes that the instant Agents received this flyer and that the flyer is a "rule or regulation," the allegations set forth in the Complaints do not state a breach of contract claim **346** based on the Agents' failure to comply with Western Reserve's rules and regulations.

As for the alleged breach grounded in the Agents' violation of the Ethics Code, while the Agents' con-

tractual duties arise from their signed applications, the Ethics Code referenced therein consists only of aspirational and precatory language about how agents should act in relation to their customers.

[22][23] Under Iowa law,FN19 contract interpretation and construction are questions of law to be decided by the Court. *Pillsbury Co. v. Wells Dairy, Inc.,* 752 N.W.2d 430, 435–36 (Iowa 2008). Looking to the Ethics Code, there can be no question that it dictates how Western Reserve would like its agents to treat its customers. For example, the second paragraph states, in part, "Together, let us strive to always put the interests of the customer first. This Code formally states in one place many of the values to which we have been committed throughout our history. We ask you, as the true professional you are, to commit yourself to these ethical concepts." (Ex. C to Defs.' Mot to Dismiss 1, C.A. No. 09– 470, ECF No. 94–4.) While Plaintiffs ask the Court to focus not on the actual words of the Ethics Code, but rather to look to the broader "concepts" behind it, the Court concludes that the language set forth in the Ethics Code is clearly precatory and not intended to be binding on the Agents, *see Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 699 (8th Cir.2003) (stating that precatory language "gives rise to no specific contractual duty"), and therefore, Plaintiffs have not pleaded a claim for breach of contract in this respect.

FN19. Plaintiffs contend that Iowa law controls the Appointment Applications because they were submitted to and accepted by Western Reserve in Iowa. *See DeCesare v. Lincoln Benefit Life Co.,* 852 A.2d 474, 484 (R.I.2004) (noting that under Rhode Island's conflict of laws doctrine, in the absence of a controlling contractual provision, the law of the state where the contract was executed governs). While these facts are not alleged in the Complaints and Plaintiffs do not attach any supporting documentation, Defendants do not provide any conflicting evidence, and so the Court assumes Iowa law controls the Appointment Applications for purposes of this decision.

Accordingly, cases 09– 470 and 09–564, plead a viable claim for breach of contract against Agent Condit based upon his alleged violations of state law, and his motion to dismiss is denied with respect to

these counts. Because Plaintiffs do not plead forgery in cases 09–472, 09–473, and 09–502, in which Hanrahan is the named agent, and Plaintiffs fail to state a viable breach of contract claim predicated on other grounds, Hanrahan's motion to dismiss is granted as to the breach of contract counts against him.[FN20]

FN20. In light of the Court's conclusion, Defendant Hanrahan's request for a more definite statement is denied as moot.

**E. Breach of the Duty of Good Faith and Fair Dealing**

Defendants Condit and Hanrahan ask the Court to dismiss the counts against them alleging breach of the duty of good faith and fair dealing because, they contend, Plaintiffs have failed to allege the breach of an express contractual provision.

[24][25][26] Under Iowa law, the duty of good faith and fair dealing "does not give rise to new substantive terms that do not otherwise exist in the contract," *Mattes*, 323 F.3d at 700, but rather "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Mid–America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir.2005) (quoting **\*347** *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710, 727 (1992)). The "covenant is breached when a party to a contract acts in a manner that is offensive to 'community standards of decency, fairness and reasonableness.' " *Kopple v. Schick Farms, Ltd.*, 447 F.Supp.2d 965, 982 (N.D.Iowa 2006) (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982)). Because Plaintiffs have adequately pleaded breach of contract based on the express terms of the agreement between Condit and Plaintiffs, so too, Plaintiffs' claim for breach of the duty of good faith and fair dealing against Condit survives his motion to dismiss.[FN21] Agent Hanrahan's motion to dismiss with respect to this count, in cases 09–472, 09–473, and 09–502, is granted because, as stated above, Plaintiffs do not plead a viable breach of contract claim against him and "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Mid–America,* 406 F.3d at 974 (quoting *Carma Developers,* 6 Cal.Rptr.2d 467, 826 P.2d at 727).

FN21. Defendants also argue that Plaintiffs'

claims fail because the Iowa Supreme Court does not recognize a cause of action for a breach of the duty of good faith and fair dealing "in employment situations." *See NCMIC Fin. Corp. v. Artino,* 638 F.Supp.2d 1042, 1074 (S.D.Iowa 2009) (quoting *Nelson v. Long Lines Ltd.,* 335 F.Supp.2d 944, 968 (N.D.Iowa 2004)). However, while it is clear that Iowa law does not recognize the cause of action in employment *termination* situations, *see Fogel v. Trs. of Iowa Coll.,* 446 N.W.2d 451, 456–57 (Iowa 1989), there is no reason to believe that it would not be recognized under these circumstances.

**F. Civil Conspiracy**

[27] To adequately plead civil conspiracy, a plaintiff must allege that "(1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means." *Smith v. O'Connell,* 997 F.Supp. 226, 241 (D.R.I.1998) (quoting *Stubbs v. Taft,* 88 R.I. 462, 149 A.2d 706, 708–09 (1959)). "Civil conspiracy is not an independent basis of liability, but merely a means of establishing joint liability for tortious conduct. Thus, a civil conspiracy claim requires a valid underlying intentional tort theory." *Guilbeault,* 84 F.Supp.2d at 268 (citing *ERI Max Entm't, Inc. v. Streisand,* 690 A.2d 1351, 1354 (R.I.1997)). Here, Plaintiffs have pleaded a valid theory of fraudulent inducement against the Agents, and accordingly, their civil conspiracy counts survive.

**G. Civil Liability for Forgery**

[28] Defendants seek dismissal of the new claims for civil liability for crimes and offenses, pursuant to R.I. Gen. Laws § 9–1–2,[FN22] based on forgery of the annuity applications, which are alleged in cases 09–470 (against the Agent and Broker), 09–549 (against the Sponsors, Agent, and Broker), and 09–564 (against the Sponsors, Agent, and Broker). (*See* 470 Compl. ¶¶ 66–72; 549 Compl. ¶¶ 151–57; 564 Compl. ¶¶ 103–09.)

FN22. R.I. Gen. Laws § 9–1–2 provides in pertinent part:

Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any

crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made....

In the June 2 Order, the Court dismissed the counts of civil liability for crimes and offenses grounded in the **\*348** Rhode Island insurance fraud statute, R.I. Gen. Laws § 11–41–29, because that statute criminalizes deceit in connection with insurance policy applications, not applications for the issuance of annuities, such as the ones involved here. *W. Reserve,* 715 F.Supp.2d at 287. In their amendments, Plaintiffs attempt to revive this cause of action by alleging civil liability for forgery.

R.I. Gen. Laws § 11–17–1 makes it a crime to

falsely make, alter, forge, or counterfeit, or procure to be falsely made, altered, forged or counterfeited ... policy of insurance, ... or any writing whatsoever purporting to contain evidence of any debt, contract, or promise, or of the discharge, payment of satisfaction of any debt, contract, or promise, with intent to defraud.

Defendants say that because annuity contracts are not enumerated within the statute, Rhode Island does not criminalize the forging of annuity applications. However, the catchall phrase "any writing whatsoever purporting to contain evidence of any debt, contract, or promise" arguably encompasses these annuity applications, which contain evidence of a promise.

Moreover, the relaxed pleading standard of Rule 8 governs the pleading of this count, and therefore, as noted previously, Plaintiffs are free to allege in the alternative, and factual allegations inconsistent with the crime of forgery are disregarded for purposes of considering this count on a motion to dismiss. *See* Fed.R.Civ.P. 8(d)(2) & (3). Similarly, the wholesale forgery allegations implicating "all Defendants" are not fatal to this count.

Accordingly, the counts alleging civil liability for crimes and offenses in cases 09– 470, 09–549, and 09–564 survive Defendants' motions to dismiss.

## H. Unjust Enrichment

[29][30] Defendants argue that Plaintiffs' unjust enrichment claims should be dismissed because they are derivative of the fraud claims which they seek to have dismissed. To make out a claim for unjust enrichment, under Rhode Island law, a plaintiff must prove that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant appreciated the benefit; and (3) it would be inequitable, under the circumstances, for the defendant to retain the benefit without paying for its value. *Narragansett Elec. Co. v. Carbone,* 898 A.2d 87, 99 (R.I.2006). In contrast to a claim for civil conspiracy, a claim for unjust enrichment does not require the existence of an underlying tort, and so, strictly speaking, Plaintiffs' unjust enrichment claims are not derivative of their fraud claims. Defendants present no other arguments on this point, and accordingly, the unjust enrichment claims survive their motions.

## I. Negligence Claims Against Agent Maggiacomo

In their briefing, Plaintiffs stated that they "do[ ] not seek to resurrect negligence counts against any of the defendants at this time." (Omnibus Obj. 32, C.A. No. 09– 470, ECF No. 67.) After the hearing on the instant motions, counsel for Plaintiffs wrote a letter informing the Court that Plaintiffs now take the position that "the Economic Loss Doctrine does not bar the pending negligence count against Defendant/Agent Edward Maggiacomo. He is not alleged to have been in a direct contractual relationship with Plaintiff Transamerica. It is therefore Transamerica's position that the most recent pleadings raise valid and pending negligence counts against Defendant Maggiacomo." (Letter from Brooks R. Magratten to Hon. William E. Smith (Aug. 9, 2011).)

**\*349** First, the Court considers Plaintiffs' argument waived. Their argument was submitted by letter to the Court (not by the Electronic Case Filing (ECF) system) after briefing and argument on the pending motions had closed. Second, the argument lacks merit. The reasoning in the June 2 Order with respect to the dismissal of the negligence claims against the Agents and the Brokers turned on the contracts between Plaintiffs and the Brokers; therefore, the confirmed absence of a direct contractual relationship between Maggiacomo and Transamerica does not alter the Court's prior economic loss doctrine analysis. *See W. Reserve,* 715 F.Supp.2d at 289–90. Accordingly, in cases 09–471 and 09–549, the Court reaffirms its

**Add. 38**

dismissal of the derivative negligence counts against Maggiacomo and dismisses the negligence claims against Estate Planning Resources based on vicarious liability for Maggiacomo's actions.

### III. Conclusion

Defendants Caramadre, Radhakrishnan, Rodrigues, Condit, EPR, and ADM's motion to dismiss and for reconsideration, filed in cases 09– 470, 09–471, 09–472, 09–473, 09–502, 09–549, and 09–564 is hereby GRANTED in part and DENIED in part; Defendants Hanrahan's and Maggiacomo's motions to dismiss and for reconsideration are hereby GRANTED in part and DENIED in part; DK's motion to dismiss, filed in case 09–473, is hereby GRANTED; and Fortune's motion to dismiss, filed in cases 09– 470 and 09–564, is hereby GRANTED in part and DENIED in part.

The fraudulent inducement counts against Defendants Caramadre, Radhakrishnan, and EPR in all above-captioned cases are hereby DISMISSED. The fraudulent inducement counts against Defendants Condit, Hanrahan, and Maggiacomo will proceed. The fraud in the factum counts (pleaded in cases 09– 470, 09–471, 09–473, 09–549, and 09–564) against Defendants Caramadre, Radhakrishnan, EPR, Condit, Hanrahan, Maggiacomo, DK, and Fortune are hereby DISMISSED. Likewise, the rescission and declaratory judgment counts in case 09–471, insofar as they are based on allegations of fraud in the factum, are DISMISSED. The counts alleging breach of contract and breach of the duty of good faith and fair dealing against Defendant Hanrahan, in cases 09–472, 09–473, and 09–502, are hereby DISMISSED. The counts alleging breach of contract and breach of the duty of good faith and fair dealing against Defendant Condit, in cases 09– 470 and 09–564, will go forward. The counts alleging civil conspiracy (all cases except 09– 470), unjust enrichment (all cases), civil liability for crimes and offenses grounded in forgery (in cases 09– 470, 09–549, and 09–564) will proceed, except those counts dismissed as to certain Defendants in the June 2 Order. The negligence claims against Defendants Maggiacomo and EPR in cases 09–471 and 09–549 are hereby DISMISSED.

By stipulation, Leaders and Plaintiffs have also agreed that Leaders' motion for partial dismissal of the Second Amended Complaint (Counts VII and XI) in case 09–473 may be denied as moot because Plaintiffs are not pursuing those counts against Leaders. (*See* Dismissal Stipulation, C.A. No. 09–473, ECF No. 71.) Therefore, that motion is denied as moot. In addition, DK and Plaintiffs agree that DK's earlier motion for judgment on the pleadings (*see* Mot. of DK, LLC for J. on the Pleadings, C.A. No. 09–473, ECF No. 61) is moot based on the third round of pleadings. Accordingly, DK's motion for judgment on the pleadings is also denied as moot.

The Court further reaffirms the dismissal of all claims previously dismissed but **\*350** not discussed in the instant Opinion and Order.

IT IS SO ORDERED.

D.R.I.,2012.
Western Reserve Life Assur. Co. of Ohio v. Caramadre
847 F.Supp.2d 329

END OF DOCUMENT

| | | DK, LLC for Entry of Final Judgment : **Motion Hearing** *scheduled for 7/18/2012 at 2:00 PM in Courtroom 2* before Judge William E Smith. Associated Cases: 1:09–cv–00470–S–DLM et al.(Jackson, Ryan) (Entered: 06/14/2012) |
|---|---|---|
| 07/18/2012 | | TEXT ORDER granting (136) Motion for Reconsideration ; denying (140) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00470–S–DLM; granting (138) Motion for Final Judgment; granting (139) Motion for Reconsideration ; denying (143) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00472–S–DLM; granting (136) Motion for Final Judgment; granting (137) Motion for Reconsideration ; denying (141) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00471–S–DLM; granting (162) Motion for Final Judgment; granting (165) Motion for Reconsideration ; denying (169) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00473–S–DLM; granting (124) Motion for Reconsideration ; denying (128) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00502–S–DLM; granting (111) Motion for Reconsideration ; denying (115) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00549–S–DLM; granting (104) Motion for Reconsideration ; denying (108) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00564–S–DLM. So Ordered by Judge William E. Smith on 7/18/2012. Associated Cases: 1:09–cv–00470–S–DLM et al.(Urizandi, Nisshy) (Entered: 07/20/2012) |
| 07/20/2012 | | Minute Entry for proceedings held before Judge William E. Smith: Motion Hearing held on 7/18/2012 re (163 in 1:09–cv–00473–S–DLM, 110 in 1:09–cv–00549–S–DLM, 103 in 1:09–cv–00564–S–DLM, 137 in 1:09–cv–00472–S–DLM, 123 in 1:09–cv–00502–S–DLM, 135 in 1:09–cv–00470–S–DLM, 135 in 1:09–cv–00471–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)* filed by Estate Planning Resources, Inc., Raymour Radhakrishnan, Joseph A. Caramadre, (137 in 1:09–cv–00471–S–DLM, 124 in 1:09–cv–00502–S–DLM, 111 in 1:09–cv–00549–S–DLM, 136 in 1:09–cv–00470–S–DLM, 165 in 1:09–cv–00473–S–DLM, 139 in 1:09–cv–00472–S–DLM, 104 in 1:09–cv–00564–S–DLM) MOTION for Reconsideration re (121 in 1:09–cv–00471–S–DLM, 124 in 1:09–cv–00472–S–DLM, 149 in 1:09–cv–00473–S–DLM, 122 in 1:09–cv–00470–S–DLM, 110 in 1:09–cv–00502–S–DLM, 90 in 1:09–cv–00564–S–DLM, 97 in 1:09–cv–00549–S–DLM) Order on Motion to Compe filed by Estate Planning Resources, Inc., (144 in 1:09–cv–00472–S–DLM, 109 in 1:09–cv–00564–S–DLM, 141 in 1:09–cv–00470–S–DLM, 116 in 1:09–cv–00549–S–DLM, 129 in 1:09–cv–00502–S–DLM, 170 in 1:09–cv–00473–S–DLM, 142 in 1:09–cv–00471–S–DLM) MOTION to Amend/Correct filed by Western Reserve Life Assurance Co. of Ohio, (143 in 1:09–cv–00472–S–DLM, 141 in 1:09–cv–00471–S–DLM, 128 in 1:09–cv–00502–S–DLM, 115 in 1:09–cv–00549–S–DLM, 169 in 1:09–cv–00473–S–DLM, 140 in 1:09–cv–00470–S–DLM, 108 in 1:09–cv–00564–S–DLM) MOTION for Entry of Judgment under Rule 54(b) *(Separate Final)* filed by Fortune Financial Services, Inc., (136 in 1:09–cv–00471–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)* filed by Estella Rodrigues, (138 in 1:09–cv–00472–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)* filed by ADM Associates, LLC.(Daly, Ramos, Prentiss, Brenner, MacFadyen) Court addresses. Arguments heard on motion to amend/correct the complaint (filed by plaintiffs in CA 09–470 and CA 09–473; ECF #141). Court questions. Each side responds. Court allows Caramadre, Radhakrishnan, and EPR to file supplemental briefing on the matter and will issue an order after it considers such briefing. The ruling on this motion will affect the ruling on defts' motion for entry of final judgment pursuant to Rule 54(b) as to Caramadre, Radhakrishnan, and EPR (filed in CA 09–470; ECF #135), and therefore this matter is also taken under advisement. Next, Court hears argument on defts motion for reconsideration (filed by defendant EPR in all related cases; ECF #136). Court questions. Each side responds. Court grants motion. Finally, Court hears argument on the individual motions for entry of final judgment pursuant to Rule 54(b) as to defendants: Estella Rodrigues, DK LLC, ADM Associates, and Fortune Financial Services. Court grants motion as to Estella Rodrigues (filed in CA 09–471; ECF #136), DK LLC (filed in CA 09–473; ECF #162), and ADM Associates (filed in CA 09–472; ECF #138). Court denies motion as to Fortune Financial Services (filed in 09–470; ECF #140; CA 09–564; ECF #108, and CA |

Case: 1:09-cv-00473-S-PAS   As of: 03/04/2013 04:38 PM EST   34 of 36

| | | 05/29/2012) |
|---|---|---|
| 06/04/2012 | 176 | RESPONSE in Support re (141 in 1:09–cv–00470–S–DLM, 170 in 1:09–cv–00473–S–DLM) MOTION to Amend/Correct *Complaints* filed by Western Reserve Life Assurance Co. of Ohio. (Attachments: # 1 Exhibit Proposed Stay Orders)Associated Cases: 1:09–cv–00470–S–DLM et al.(Daly, Michael) (Entered: 06/04/2012) |
| 06/14/2012 | | NOTICE of Hearing on Motions: (140 in 1:09–cv–00470–S–DLM, 141 in 1:09–cv–00471–S–DLM, 143 in 1:09–cv–00472–S–DLM, 169 in 1:09–cv–00473–S–DLM, 128 in 1:09–cv–00502–S–DLM, 115 in 1:09–cv–00549–S–DLM, 108 in 1:09–cv–00564–S–DLM) MOTION for Entry of Judgment under Rule 54(b) *(Separate Final)*, (136 in 1:09–cv–00470–S–DLM, 137 in 1:09–cv–00471–S–DLM, 139 in 1:09–cv–00472–S–DLM, 165 in 1:09–cv–00473–S–DLM, 124 in 1:09–cv–00502–S–DLM, 111 in 1:09–cv–00549–S–DLM, 104 in 1:09–cv–00564–S–DLM) MOTION for Reconsideration re (121 in 1:09–cv–00471–S–DLM, 124 in 1:09–cv–00472–S–DLM, 149 in 1:09–cv–00473–S–DLM, 122 in 1:09–cv–00470–S–DLM, 110 in 1:09–cv–00502–S–DLM, 90 in 1:09–cv–00564–S–DLM, 97 in 1:09–cv–00549–S–DLM) Order on Motion to Compe, (135 in 1:09–cv–00470–S–DLM, 135 in 1:09–cv–00471–S–DLM, 137 in 1:09–cv–00472–S–DLM, 163 in 1:09–cv–00473–S–DLM, 123 in 1:09–cv–00502–S–DLM, 110 in 1:09–cv–00549–S–DLM, 103 in 1:09–cv–00564–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)*, (141 in 1:09–cv–00470–S–DLM, 142 in 1:09–cv–00471–S–DLM, 144 in 1:09–cv–00472–S–DLM, 170 in 1:09–cv–00473–S–DLM, 129 in 1:09–cv–00502–S–DLM, 116 in 1:09–cv–00549–S–DLM, 109 in 1:09–cv–00564–S–DLM) MOTION to Amend/Correct , (136 in 1:09–cv–00471–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)*, (138 in 1:09–cv–00472–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)*, (162 in 1:09–cv–00473–S–DLM) MOTION for Final Judgment *Motion of DK, LLC for Entry of Final Judgment* : **Motion Hearing *scheduled for 7/18/2012 at 2:00 PM in Courtroom 2* before** Judge William E Smith. Associated Cases: 1:09–cv–00470–S–DLM et al.(Jackson, Ryan) (Entered: 06/14/2012) |
| 07/18/2012 | | TEXT ORDER granting (136) Motion for Reconsideration ; denying (140) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00470–S–DLM; granting (138) Motion for Final Judgment; granting (139) Motion for Reconsideration ; denying (143) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00472–S–DLM; granting (136) Motion for Final Judgment; granting (137) Motion for Reconsideration ; denying (141) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00471–S–DLM; granting (162) Motion for Final Judgment; granting (165) Motion for Reconsideration ; denying (169) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00473–S–DLM; granting (124) Motion for Reconsideration ; denying (128) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00502–S–DLM; granting (111) Motion for Reconsideration ; denying (115) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00549–S–DLM; granting (104) Motion for Reconsideration ; denying (108) Motion for Entry of Judgment under Rule 54(b) in case 1:09–cv–00564–S–DLM. So Ordered by Judge William E. Smith on 7/18/2012. Associated Cases: 1:09–cv–00470–S–DLM et al.(Urizandi, Nisshy) (Entered: 07/20/2012) |
| 07/20/2012 | | Minute Entry for proceedings held before Judge William E. Smith: Motion Hearing held on 7/18/2012 re (163 in 1:09–cv–00473–S–DLM, 110 in 1:09–cv–00549–S–DLM, 103 in 1:09–cv–00564–S–DLM, 137 in 1:09–cv–00472–S–DLM, 123 in 1:09–cv–00502–S–DLM, 135 in 1:09–cv–00470–S–DLM, 135 in 1:09–cv–00471–S–DLM) MOTION for Final Judgment *Pursuant to Rule 54(b)* filed by Estate Planning Resources, Inc., Raymour Radhakrishnan, Joseph A. Caramadre, (137 in 1:09–cv–00471–S–DLM, 124 in 1:09–cv–00502–S–DLM, 111 in 1:09–cv–00549–S–DLM, 136 in 1:09–cv–00470–S–DLM, 165 in 1:09–cv–00473–S–DLM, 139 in 1:09–cv–00472–S–DLM, 104 in 1:09–cv–00564–S–DLM) MOTION for Reconsideration re (121 in 1:09–cv–00471–S–DLM, 124 in 1:09–cv–00472–S–DLM, 149 in 1:09–cv–00473–S–DLM, 122 in |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

```
WESTERN RESERVE LIFE
ASSURANCE CO. OF OHIO,
          Plaintiff,


          v.                              C.A. No. 09-472 S


JOSEPH CARAMADRE, et al.,
          Defendants.
```

### JUDGMENT

[   ] Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ **X** ] Decision by the Court.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.


IT IS ORDERED AND ADJUDGED:

```
    Pursuant to the Text Order entered by this Court on July
    18th, 2012 judgment hereby enters for the Defendant ADM
    Associates, LLC and against the Plaintiff Western Reserve
    Life Assurance Co. of Ohio.
```

```
                              Enter:


                              /s/ Ryan H. Jackson
                              _____
                              Deputy Clerk
```

```
Dated: August 2nd, 2012
```

**Add. 42**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

```
WESTERN RESERVE LIFE
ASSURANCE CO. OF OHIO,
          Plaintiff,


     v.                              C.A. No. 09-473 S


JOSEPH CARAMADRE, et al.,
          Defendants.
```

## **JUDGMENT**

**[   ]** Jury Verdict.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[ **X** ] Decision by the Court.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.


IT IS ORDERED AND ADJUDGED:

```
     Pursuant to the Text Order entered by this Court on July
     18th, 2012 judgment hereby enters for the Defendant DK LLC
     and against the Plaintiff Western Reserve Life Assurance Co.
     of Ohio.


                              Enter:


                              /s/ Ryan H. Jackson
                              _____
                              Deputy Clerk



Dated: August 2nd, 2012
```

**Add. 43**